## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| SIEMENS INDUSTRY, INC.,<br><br>               Plaintiff,<br><br>   v.<br><br>WESTINGHOUSE AIR BRAKE<br>TECHNOLOGIES CORPORATION<br>(d/b/a WABTEC CORPORATION) and<br>WABTEC RAILWAY ELECTRONICS, INC.,<br><br>               Defendants. | C.A. No. 16-284 (LPS) (CJB) |

## WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION (d/b/a WABTEC CORPORATION) AND WABTEC RAILWAY ELECTRONICS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO THE FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

Defendants Westinghouse Air Brake Technologies Corporation (d/b/a Wabtec Corporation) and Wabtec Railway Electronics, Inc. (collectively "Wabtec"), answer the First Amended Complaint ("Complaint") of Plaintiff Siemens Industry, Inc. ("Siemens") as follows:

### NATURE OF THE ACTION

1.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, specifically including 35 U.S.C. § 271.

**ANSWER:**     Wabtec admits that Siemens' Complaint purports to include patent infringement claims that arise under the patent laws of the United States set forth in Title 35 of the United States Code.

## PARTIES

2.      Siemens Industry, Inc. ("Siemens") is a corporation organized under the laws of the State of Delaware, with a principal place of business at 3333 Old Milton Parkway in Alpharetta, Georgia.

**ANSWER:**  Wabtec lacks knowledge or information sufficient to either admit or deny the allegations of Paragraph 2 of the Complaint, and Wabtec therefore denies the allegations in Paragraph 2.

3.      Westinghouse Air Brake Technologies Corporation ("Wabtec") is a corporation organized under the laws of the State of Delaware, with a principal place of business at 1001 Air Brake Avenue in Wilmerding, Pennsylvania.  Wabtec does business under the name "Wabtec Corporation."

**ANSWER:**  Wabtec admits the allegations in Paragraph 3 of the Complaint.

4.      Wabtec Railway Electronics, Inc. ("WRE") is a corporation organized under the laws of the State of Delaware, with a principal place of business at 21200 Dorsey Mill Road in Germantown, Maryland.

**ANSWER:**  Wabtec admits the allegations in Paragraph 4 of the Complaint.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:**  Wabtec admits that the Complaint purportedly makes allegations for claims under the patent laws of the United States, but Wabtec denies that there is a claim under the patent laws.  Wabtec admits that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  Wabtec denies the remaining allegations in Paragraph 5 of the Complaint.

6.     Defendants are each deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware. In addition, on information and belief, Defendants regularly transact business in Delaware, including but not necessarily limited to offering to sell and/or selling products that infringe one or more of Siemens' asserted patents to customers located in Delaware and/or for use in Delaware. Accordingly, this Court may properly exercise personal jurisdiction over Defendants.

**ANSWER:**  Wabtec admits that it is subject to personal jurisdiction in the State of Delaware because it is incorporated in the State of Delaware.  Wabtec denies the remaining allegations in Paragraph 6 of the Complaint.

7.     Venue may lie in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and/or 1400(b) at least because Defendants are each deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware. In addition, on information and belief, Defendants have committed acts of infringement in the State of Delaware, including but not necessarily limited to offering to sell and/or selling products that infringe one or more of Siemens' asserted patents to customers located in Delaware and/or for use in Delaware.

**ANSWER:**  Wabtec admits that venue is proper in this district and that Wabtec is subject to personal jurisdiction in this district because Wabtec is incorporated in the State of Delaware. Wabtec denies the remaining allegations in Paragraph 7 of the Complaint.

8.     Joinder of Siemens' claims against Wabtec and WRE is permissible under 35 U.S.C. § 299 because (a) Siemens is seeking to hold Defendants jointly and severally liable for infringement of the asserted patents, and the claims against each Defendant arise out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing, offering for sale, or selling of the same accused products, and (b) questions of fact

common to both Defendants will arise in this action.  More particularly, on information and belief, WRE manufactures and Wabtec sells the products accused of infringing Siemens' patents.

**ANSWER:**  Wabtec admits that joinder is permissible under 35 U.S.C. § 299.  Wabtec admits that WRE manufactures and Wabtec sells the products accused of infringing Siemens' patents.  Wabtec denies the remaining allegations in Paragraph 8 of the Complaint.

**THE PATENTS-IN-SUIT**

9.     U.S. Patent No. 6,996,461 ("the '461 Patent"), titled "Method and System for Ensuring that a Train Does Not Pass an Improperly Configured Device," was issued by the United States Patent and Trademark Office ("USPTO") on February 7, 2006. Siemens is the owner by assignment of the entire right, title and interest in and to the '461 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '461 Patent is attached hereto as Exhibit A.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '461 Patent is attached as Exhibit A to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 9 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 9 of the Complaint.

10.     U.S. Patent No. 7,092,801 ("the '801 Patent"), titled "Train Control System and Method of Controlling a Train or Trains," was issued by the USPTO on August 15, 2006. Siemens is the owner by assignment of the entire right, title and interest in and to the '801 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '801 Patent is attached hereto as Exhibit B.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '801 Patent is attached as Exhibit B to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit

or deny the remaining allegations of Paragraph 10 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 10 of the Complaint.

11.     U.S. Patent No. 7,236,860 ("the '860 Patent"), titled "Method and System for Ensuring that a Train Does Not Pass an Improperly Configured Device," was issued by the USPTO on June 26, 2007. Siemens is the owner by assignment of the entire right, title and interest in and to the '860 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '860 Patent is attached hereto as Exhibit C.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '860 Patent is attached as Exhibit C to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 11 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 11 of the Complaint.

12.     U.S. Patent No. 7,467,032 ("the '032 Patent"), titled "Method and System for Automatically Locating End of Train Devices," was issued by the USPTO on December 16, 2008. Siemens is the owner by assignment of the entire right, title and interest in and to the '032 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '032 Patent is attached hereto as Exhibit D.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '032 Patent is attached as Exhibit D to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 12 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 12 of the Complaint.

13.     U.S. Patent No. 7,742,850 ("the '850 Patent"), titled "Method and System for Automatically Locating End of Train Devices," was issued by the USPTO on June 22, 2010. Siemens is the owner by assignment of the entire right, title and interest in and to the '850 Patent,

including the sole and undivided right to sue for infringement. A true and correct copy of the '850 Patent is attached hereto as Exhibit E.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '850 Patent is attached as Exhibit E to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 13 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 13 of the Complaint.

14.     U.S. Patent No. 8,714,494 ("the '494 Patent"), titled "Railway Train Critical Systems Having Control System Redundancy and Asymmetric Communications Capability," was issued by the USPTO on May 6, 2014. Siemens is the owner by assignment of the entire right, title and interest in and to the '494 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '494 Patent is attached hereto as Exhibit F.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '494 Patent is attached as Exhibit F to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 14 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 14 of the Complaint.

15.     U.S. Patent No. 9,233,698 ("the '698 Patent"), titled "Railway Safety Critical Systems with Task Redundancy and Asymmetric Communications Capability," was issued by the USPTO on January 2, 2016. Siemens is the owner by assignment of the entire right, title and interest in and to the '698 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '698 Patent is attached hereto as Exhibit G.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '698 Patent is attached as Exhibit G to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit

or deny the remaining allegations of Paragraph 15 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 15 of the Complaint.

16.     U.S. Patent No. 6,978,195 ("the '195 Patent"), titled "Train Control System and Method of Controlling a Train or Trains," was issued by the USPTO on December 20, 2005. Siemens is the owner by assignment of the entire right, title, and interest in and to the '195 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '195 Patent is attached hereto as Exhibit N.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '195 Patent is attached as Exhibit N to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 16 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 16 of the Complaint.

17.     U.S. Patent No. 7,079,926 ("the '926 Patent"), titled "Train Control System and Method of Controlling a Train or Trains," was issued by the USPTO on July 18, 2006. Siemens is the owner by assignment of the entire right, title, and interest in and to the '926 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '926 Patent is attached hereto as Exhibit O.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '926 Patent is attached as Exhibit O to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 17 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 17 of the Complaint.

18.     U.S. Patent No. 7,200,471 ("the '471 Patent"), titled "Train Control System and Method of Controlling a Train or Trains," was issued by the USPTO on April 3, 2007. Siemens is the owner by assignment of the entire right, title, and interest in and to the '471 Patent,

including the sole and undivided right to sue for infringement. A true and correct copy of the '471 Patent is attached hereto as Exhibit P.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '471 Patent is attached as Exhibit P to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 18 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 18 of the Complaint.

19.     U.S. Patent No. 6,845,953 ("the '953 Patent"), titled "Method and System for Checking Track Integrity," was issued by the USPTO on January 25, 2005. Siemens is the owner by assignment of the entire right, title, and interest in and to the '953 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '953 Patent is attached hereto as Exhibit Q.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '953 Patent is attached as Exhibit Q to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 19 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 19 of the Complaint.

20.     U.S. Patent No. 7,036,774 ("the '774 Patent"), titled "Method and System for Checking Track Authority," was issued by the USPTO on May 2, 2006. Siemens is the owner by assignment of the entire right, title, and interest in and to the '774 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '774 Patent is attached hereto as Exhibit R.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '774 Patent is attached as Exhibit R to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit

or deny the remaining allegations of Paragraph 20 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 20 of the Complaint.

21.     U.S. Patent No. 6,824,110 ("the '110 Patent"), titled "Method and System for Automatically Activating a Warning Device on a Train," was issued by the USPTO on November 30, 2004. Siemens is the owner by assignment of the entire right, title, and interest in and to the '110 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '110 Patent is attached hereto as Exhibit S.

**ANSWER:**  Wabtec admits that what appears to be a copy of the '110 Patent is attached as Exhibit S to the Complaint.  Wabtec lacks knowledge or information sufficient to either admit or deny the remaining allegations of Paragraph 21 of the Complaint, and Wabtec therefore denies the remaining allegations in Paragraph 21 of the Complaint.

## BACKGROUND OF THE DISPUTE

### The Federal Mandate for Implementation of Positive Train Control

22.     Positive Train Control, or "PTC," is a set of advanced technologies designed to make freight and passenger rail transportation safer by automatically stopping a train before certain types of accidents occur. In contrast to previously existing "reactive" train control systems, PTC is a predictive technology that detects upcoming conditions and takes control of the train when needed.

**ANSWER:**  Wabtec admits that Positive Train Control, or "PTC," is a set of technologies designed to make freight and passenger rail transportation safer, for example, by automatically stopping a train before certain types of accidents occur.  Wabtec admits that PTC can be a predictive technology that detects upcoming conditions and takes control of the train when needed.  Wabtec denies the remaining allegations in Paragraph 22 of the Complaint.

23.     The PTC technical architecture comprises four core segments—Back Office, Locomotive, Wayside, and Maintenance of Way (MOW)—with a combination of wireless and wired communications linking components in the different core segments. The Back Office segment in a typical PTC implementation comprises a computer-aided dispatch system, a back office server, and a database storing information about tracks, train consists (i.e., the locomotives and cars that make up a train), work zones, and speed restrictions. The Back Office issues "movement authorities" to Locomotives based on aspect information received from PTC-enabled Wayside signals and switches, location information received from trains, and work status from Maintenance of Way vehicles and personnel. PTC improves upon existing in-track transponder-based train positioning systems through the use of augmented GPS data, which provides more accurate location information.

**ANSWER:**  Wabtec admits that one exemplary PTC technical architecture includes four segments—Back Office, Locomotive, Wayside, and Maintenance of Way (MOW)—with a combination of wireless and wired communications linking components in the different segments.  Wabtec admits that the Back Office segment in one exemplary PTC implementation can include a computer-aided dispatch system, a back office server, and a database storing information about tracks, train consists (i.e., the locomotives and cars that make up a train), work zones, and speed restrictions.  Wabtec denies the remaining allegations in Paragraph 23 of the Complaint.

24.     The diagram below provides a general overview of PTC operation:



Positive Train Control White Paper, 8 (Joint Council on Transit Wireless Communications May 2012) (Ex. H).

**ANSWER:**  Wabtec admits that the diagram below Paragraph 24 appears to provide a general overview of one exemplary PTC architecture.  Wabtec denies the remaining allegations in Paragraph 24 of the Complaint.

25.    The Rail Safety Improvement Act of 2008 ("RSIA"), signed into law on October 16, 2008, required all Class I freight railroads (*i.e*., BNSF, Canadian National, Canadian Pacific, CSX Transportation, Kansas City Southern, Norfolk Southern, and Union Pacific) and all passenger rail operators in the United States to implement PTC-based collision avoidance systems by December 31, 2015 (recently extended to December 31, 2018). Under the law, the PTC technology must be installed on all main-line tracks where intercity passenger trains and commuter trains operate, as well as on all rail lines carrying toxic-by-inhalation hazardous materials.

**ANSWER:**  Wabtec admits the allegations in Paragraph 25 of the Complaint.

26.     Passage of the RSIA was prompted by a major train accident in Chatsworth, California in September of 2008 involving a head-on collision between a freight train and a commuter train that left 25 people dead and more than 130 people injured. The cause of the accident was determined to be human error. Regulatory bodies such as the Federal Railroad Administration ("FRA") and the National Transportation Safety Board generally acknowledged that a PTC-type system would have prevented the collision, as it would have automatically stopped the trains rather than relying on an engineer to physically respond to a stop signal.

**ANSWER:**  Wabtec lacks knowledge or information sufficient to either admit or deny the allegations of Paragraph 26, and Wabtec therefore denies the allegations in Paragraph 26 of the Complaint.

27.     According to the Association of American Railroads ("AAR"), a trade association representing primarily the Class I railroads operating in North America, the federal PTC mandate is the single-largest regulatory cost ever imposed on the rail industry by the FRA. An April 2010 report commissioned by the AAR estimated that installing and maintaining PTC systems would cost Class I railroads up to $13 billion over the next 20 years.  Those costs include equipping 71% of the Class I locomotive fleet (approximately 20,000 locomotives) with PTC devices, installing PTC on 78% of the Class I mainline rail network (an estimated 73,467 route-miles), and installing 125,000 wayside units. Additionally, the total cost of PTC for passenger rail operators was estimated to exceed $2 billion.

**ANSWER:**  Wabtec lacks knowledge or information sufficient to either admit or deny the allegations of Paragraph 27, and Wabtec therefore denies the allegations in Paragraph 27 of the Complaint.

28.     In 2008, in response to the RSIA, a subset of the Class I railroads formed the Interoperable Train Control Committee ("ITC") to develop interoperability standards for various aspects of PTC systems, including messaging format, braking algorithms, hardware platforms, and wireless communications. The ITC eventually standardized on Wabtec's "ETMS" (Electronic Train Management System) platform, as it met the requirements of the RSIA and was already being tested by some of the Class I railroads and other rail operators. Accordingly, the PTC standards ultimately promulgated by the AAR are generally descriptive of the structure and function of Defendants' PTC products.

**ANSWER:** Wabtec admits that the ITC was formed and that it adopted Wabtec's ETMS platform. Wabtec lacks an understanding as to what Siemens is referring to as "PTC products." Wabtec denies the remaining allegations of Paragraph 28 of the Complaint.

### Defendants' Infringing Products

29.     On information and belief, Defendants have been selling PTC products to customers in the United States since at least March of 2011. Generally designated "I-ETMS," for "Interoperable Electronic Train Management System," Defendants' PTC products are grouped into four segments that generally correspond to core segments of the PTC architecture: Office (Train Data, Authorities, Restrictions); Wayside (Signal Status, Switch Status, Radio Frequency Communication); Communications (RF Base Stations, 802.11, Cellular); and Locomotive (Onboard Computer & Display, GPS, RF Communication). The diagram below, taken from a Wabtec product catalog, illustrates the general architecture of the I-ETMS System:

Wabtec Locomotive Catalog Excerpt, 35 (downloaded from www.wabtec.com on February 2, 2016) (Ex. I) (hereinafter, "Wabtec Catalog").

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec admits that it has been selling products relating to PTC to customers in the United States since at least March of 2011.  Wabtec admits that "I-ETMS" is the acronym for "Interoperable Electronic Train Management System," and that Wabtec's I-ETMS product, in some instances, can be grouped into four segments that generally correspond to segments of one exemplary PTC architecture: Office (Train Data, Authorities, Restrictions); Wayside (Signal Status, Switch Status, Radio Frequency Communication); Communications (RF Base Stations, 802.11, Cellular); and Locomotive (Onboard Computer & Display, GPS, RF Communication). Wabtec admits that what appears to be a copy of the Wabtec Locomotive Catalog is attached as Exhibit I to the Complaint.  Wabtec admits that what appears to be a diagram taken from the Wabtec product catalog, illustrates the general architecture of an exemplary I-ETMS system. Wabtec denies the remaining allegations in Paragraph 29 of the Complaint.

30.     Defendants' I-ETMS System is designed to "[p]revent[] track authority violations, speed limit violations, unauthorized entry into work zones, and train movement through a switch left in the wrong position, all of which reduce the potential for train accidents." Wabtec Product Finder, 3 (downloaded from www.wabtec.com on November 5, 2015) (Ex. J). "As the train moves down the track, the I-ETMS® on-board computer, with the aid of an on-board geographic database and global positioning system, continuously calculates warning and braking curves based on all relevant train and track information, including speed, location, movement authority, speed restrictions, work zones, and consist restrictions." *Id.* The system also "communicates with wayside devices checking for broken rails, proper switch alignment and signal aspects." *Id.* "All information is combined and analyzed in real time to provide a 'safety net' for improved train operation." *Id.*

**ANSWER:**  Wabtec admits that what appears to be a copy of the Wabtec Product Finder page of Wabtec's website is attached as Exhibit J to the Complaint.  Wabtec admits that Exhibit J to the Complaint states that its I-ETMS System "prevents track authority violations, speed limit violations, unauthorized entry into work zones, and train movement through a switch left in the wrong position, all of which reduce the potential for train accidents."  Wabtec admits that Exhibit J to the Complaint states that "[a]s the train moves down the track, the I-ETMS® on-board computer, with the aid of an on-board geographic database and global positioning system, continuously calculates warning and braking curves based on all relevant train and track information including speed, location, movement authority, speed restrictions, work zones, and consist restrictions."  Wabtec admits that Exhibit J to the Complaint states that the system also "communicates with wayside devices checking for broken rails, proper switch alignment and signal aspects" and "[a]ll information is combined and analyzed in real time to provide a 'safety

net' for improved train operation."  Wabtec denies the remaining allegations in Paragraph 30 of the Complaint.

31.     The I-ETMS System comprises a variety of different components. For the Locomotive segment, Defendants' PTC product offering includes a Train Management Computer ("TMC"), an I-ETMS Display, a Commlink II Communications Manager, an Asy Cut-Out Switch, and a Navigation Sensor Module. Wabtec Catalog at 36-37. The TMC is the "brain" of the I-ETMS System on any given locomotive, incorporating multiple controllers (*e.g.*, CPUs) to implement the functionality required to comply with governmental regulations for PTC systems. *Id*. at 36. For instance, the TMC is responsible for enforcing movement authorities, speed limits, and hand throw switch alignment, meaning the system will cause a visual and/or audio warning to be given to the train operator if a potentially dangerous situation is encountered, and then will take control of the train, causing the brakes to be applied as appropriate, in the event the operator does not rectify the situation. *See id*.

**ANSWER:**  Wabtec admits that pages 36 and 37 of Exhibit I to the Complaint depict a variety of PTC components for use with an exemplary I-ETMS System including a Train Management Computer ("TMC"), an I-ETMS Display, a Commlink II Communications Manager, an Asy Cut-Out Switch, and a Navigation Sensor Module.  Wabtec admits that page 36 of Exhibit I to the Complaint states that the TMC "Enforces Movement Authorities, Speed Limits, Hand Throw Switch Alignment."  Wabtec denies the remaining allegations in Paragraph 31 of the Complaint.

32.     For the Office segment of the I-ETMS System, Defendants offer a Train Management Dispatch System ("TMDS") and a Back Office Server ("BOS"). *Id*. at 38. The BOS is the storehouse for databases containing speed restriction, track geometry and wayside

signaling configuration data that is communicated to the TMC for use in, for example, calculating safe braking distances. *See id*.

**ANSWER:**  To the extent it is described in Exhibit I to the Complaint as offering a Train Management Dispatch System ("TMDS") and a Back Office Server ("BOS"), Wabtec admits that it offers a TMDS and a BOS.  Wabtec admits that page 38 of Exhibit I to the Complaint states that the TMDS has "[s]tandard train management functions including: Back office systems interface," and that the BOS "[m]aintains downloaded on-board system logs."  Wabtec denies the remaining allegations in Paragraph 32 of the Complaint.

33.    On information and belief, the various components of the I-ETMS System, specifically including the TMC and BOS, are manufactured in the United States by WRE and sold in the United States by Wabtec.

**ANSWER:**  Wabtec admits the allegations in Paragraph 33 of the Complaint.

34.    On information and belief, Wabtec has sold I-ETMS Systems to at least the following customers in the United States since 2011: Alaska Railroad Corporation, Denver Transit Partners, Herzog Technologies (for North County Transit District in Oceanside, California), Northeast Illinois Regional Commuter Railroad, Parsons (for MetroLink in Southern California), Regional Rail Partners, San Diego Rail Line, and Sound Transit (in Seattle, Washington).

**ANSWER:**   Wabtec admits that it has sold I-ETMS Systems to Alaska Railroad Corporation, Denver Transit Partners, Herzog Technologies (for North County Transit District in Oceanside, California), Northeast Illinois Regional Commuter Railroad, Parsons (for MetroLink in Southern California), and Sound Transit (in Seattle, Washington).   Wabtec denies the remaining allegations in Paragraph 34 of the Complaint.

35.     In addition to the I-ETMS System, Defendants manufacture and sell telemetry systems, including but not necessarily limited to TrainLink ATX and TrainLink II 4G-ATX, that monitor essential "last car" conditions, provide rear-of-train emergency braking capability, and provide a high-visibility marker for nighttime use. *See* Wabtec Catalog at 6; TrainLink ATX Brochure (Ex. K). On information and belief, the TMC of the I-ETMS System interfaces with these telemetry systems for enforcement of emergency braking. *See* Wabtec Catalog at 37 (describing Asy Cut-Out Switch). These telemetry systems are comprised of a Head of Train unit ("HOT") located in the locomotive, and an End of Train unit ("EOT") located on the last car. On information and belief, the EOT automatically transmits last car data to the HOT on a periodic basis, including last car brake pipe pressure, motion status, marker light status, and emergency valve status. *Id*. at 6.

**ANSWER:**  To the extent that it is described on page 6 of Exhibit I to the Complaint, Wabtec admits it manufactures and sells "Telemetry Systems," and that "TrainLink™ II End of Train" is such a system.   Wabtec also admits that Exhibit K to the Complaint describes "TrainLink™ ATX."   Wabtec also admits that page 6 of Exhibit I to the Complaint states that "[t]he TrainLink™ II End of Train telemetry system performs three major functions: monitoring many essential last car conditions, providing rear of train emergency braking capability, and providing a high visibility marker for nighttime use."   Wabtec also admits that Exhibit I to the Complaint states that "[t]he TrainLink II system is comprised of a Head of Train Unit, located in the locomotive and an End of Train, located on the last car."   Wabtec also admits that Exhibit I to the Complaint states that "[t]he End of Train sends the Head of Train the following Information (via a unique RF Radio link): Last Car Brake Pipe Pressure, Motion Status, Marker

Light Status (On or Off ), Battery Life, RF Communication Status, Emergency Valve Status." Wabtec denies all remaining allegations in Paragraph 35 of the Complaint.

36.     Defendants' TrainLink ATX and TrainLink II 4G-ATX telemetry systems also include a GPS positioning system and a cellular modem to enable cellular tracking of EOTs. TrainLink ATX Brochure at 2. On information and belief, Defendants maintain an access-controlled website through which customers are able to track the location of their GPS-equipped EOTs. *See* Asset Management Website Users Guide (Ex. L).

**ANSWER:**   Wabtec admits that page 2 of Exhibit K to the Complaint states "TrainLink™ ATX with GPS Tracking."  Wabtec also admits that page 2 of Exhibit K to the Complaint states "we are introducing the option of GPS Cellular Tracking to our proven EOT design.  Although GPS logging has been an option since 2003, we have integrated GPS position technology with the latest in digital cellular communication."  Wabtec also admits that page 7 of Exhibit L to the Complaint states "[t]his website is designed to provide a comprehensive set of tools that can be used to keep track of all of your devices that have GPS tracking ability. With this website, a user can gather the data necessary to keep their GPS capable equipment operating and helping earn revenue."   Wabtec denies all remaining allegations in Paragraph 36 of the Complaint.

**Defendants' Knowledge of Siemens' PTC-Related Patent Portfolio**

37.     On information and belief, Wabtec and WRE have been aware of Siemens' PTC-related patent portfolio since at least November 20, 2014, when Siemens provided Wabtec with express written notice of the '461 and '860 Patents. That same notice also identified U.S. Patent No. 7,096,096, which is the parent of the '032 Patent and grandparent of the '850 Patent. Siemens described the patents as being relevant to Wabtec's business in the areas of positive train control and end of train detection, following up on an earlier discussion in which Siemens

indicated that it would be willing to discuss licensing its PTC patents to Wabtec. Wabtec never responded to Siemens' notice letter.

**ANSWER:**  Wabtec admits that Siemens' November 20, 2014 letter listed two of the asserted patents, the '461 and '860 Patents, among a total of nine patents.  Wabtec also admits that Siemens November 20, 2014 letter listed U.S. Patent No. 7,096,096.  Wabtec admits that Siemens' November 20, 2014 letter states that the patents are relevant to "Wabtec's business, especially in the areas of positive train control and end of train detection" and that "Siemens indicated that it would be willing to discuss the prospect of Wabtec obtaining a patent license from Siemens."   Wabtec admits that it never agreed to take a license to Siemens' patents. Wabtec denies the remaining allegations in Paragraph 37 of the Complaint.

38.    On information and belief, WRE and Wabtec were aware of several of the Patents-in-Suit and/or patents related thereto for almost ten years prior to the filing of this complaint. For instance, on July 28, 2006, Siemens' predecessor-in-interest with respect to certain of the Patents-in-Suit, Quantum Engineering, Inc. ("Quantum") provided WRE with express written notice of the '461 Patent, the '195 Patent, the '926 Patent, the '953 Patent, the '774 Patent, and the '110 Patent, as well as notice of the parent, grandparent, and great-grandparent of the '801 Patent, the parent of the '860 Patent, and the grandparent of the '471 Patent. Later, on March 9, 2007, Quantum provided WRE with notice of the parent of the '032 Patent and the grandparent of the '850 Patent. Quantum described the patents as being relevant to train control systems such as the ETMS system that WRE was reportedly testing at the time, and further indicated that the patents identified in its notices were part of a substantial portfolio of train control patents.

**ANSWER:**  Wabtec admits that Quantum's July 28, 2006 letter listed as an enclosure the '461 Patent, which Siemens purports to be the parent of the '860 Patent, the '195 Patent, which Siemens purports to be the grandparent of the '801 Patent and the '471 Patent, the '926 Patent, which Siemens purports to be the parent of the '801 Patent, the '953 Patent, the '774 Patent, the '110 Patent, and U.S. Patent No. 6,865,454, which Siemens purports to be the great-grandparent of the '801 Patent, among a total of seventeen patents.  Wabtec denies the remaining allegations in Paragraph 38 of the Complaint.

## INFRINGEMENT CLAIMS

### Count I – Infringement of U.S. Patent No. 6,996,461

39.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

40.    The '461 Patent is generally directed to a train control system that, in accordance with particular embodiments, includes a positioning system and consults a database to determine when the train is approaching a configurable device such as a switch or grade crossing. The system may interrogate the device to determine its status as the train approaches the device, and may force an engineer to acknowledge any detected malfunction. The train may be forced to come to a complete stop before proceeding past the device or may be slowed down to a speed that will allow the engineer to visually determine whether it is safe to proceed past the device. *See* '461 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 40 of the Complaint.

41.    On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '461 Patent, either literally or under the

doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:** Wabtec denies the allegations in Paragraph 41 of the Complaint.

42.     Claim 1 of the '461 Patent recites as follows:

1.      A system for controlling a train, the system comprising:

a control unit; and

a transceiver, the transceiver being located on the train and being in communication with the control unit;

wherein the control unit is configured to perform the steps of

transmitting an interrogation message to a configurable device near the train;

listening for a response from the configurable device, the response including a configuration of the configurable device and an identifier of the device;

allowing the train to continue if a response with a correct configuration is received within a period of time; and

stopping the train otherwise;

wherein the control unit is further configured to perform the step of confirming that the identifier received in the response corresponds to the device to which the interrogation message was directed.

**ANSWER:** Wabtec admits that claim 1 of the '461 Patent contains the language recited in Paragraph 42 of the Complaint.

43.     On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 1. The "control unit" limitation is satisfied by the TMC, which contains multiple CPUs and is configured to perform, or to control the performance of, the various steps involved in communicating with a wayside device. In addition, the I-ETMS System includes, or interfaces with, a "transceiver" for communicating

with wayside devices, with such communications being controlled by the TMC in combination with the Commlink II. *See* Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5.

**ANSWER:**  Wabtec denies the allegations in Paragraph 43 of the Complaint.

44.     In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '461 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 44 of the Complaint.

45.     Claim 14 of the '461 Patent recites as follows:

14.     A method for controlling a train comprising the steps of:

transmitting an interrogation message from the train to a configurable device near the train;

listening for a response from the configurable device, the response including a configuration of the configurable device and an identifier of the configurable device;

confirming that the identifier received in the response corresponds to the configurable device to which the interrogation message was directed;

allowing the train to continue if a response with a correct configuration is received; and

stopping the train otherwise.

**ANSWER:**  Wabtec admits that claim 14 of the '461 Patent contains the language recited in Paragraph 45 of the Complaint.

46.     On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 14. As discussed with reference to claim 1 above, the I-ETMS System, under control of the TMC and using the Commlink II, interrogates a wayside device and takes appropriate enforcement actions depending upon the response received. *See* Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5.

**ANSWER:**  Wabtec denies the allegations in Paragraph 46 of the Complaint.

47.     The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 14 of the '461 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '461 Patent by Siemens and Quantum, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '461 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '461 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 47 of the Complaint.

48.     On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '461 Patent and by encouraging customers to use the I-ETMS System in a manner that Defendants know infringes the '461 Patent, Defendants are inducing infringement of the '461 Patent by their customers in violation of 35 U.S.C. § 271(b). For example, Defendants' marketing literature touts functionality of the I-ETMS System that falls within the scope of the above-identified claims of the '461 Patent. *See* Wabtec Product Finder at 3; Wabtec Catalog at 36-37.

**ANSWER:**  Wabtec denies the allegations in Paragraph 48 of the Complaint.

49.     Defendants' infringement of the '461 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 49 of the Complaint.

50.    On information and belief, Defendants' infringement of the '461 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '461 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C. § 284.

**ANSWER:**  Wabtec denies the allegations in Paragraph 50 of the Complaint.

51.    Defendants' willful infringement of the '461 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees in accordance with 35 U.S.C. § 285.

**ANSWER:**  Wabtec denies the allegations in Paragraph 51 of the Complaint.

## Count II – Infringement of U.S. Patent No. 7,092,801

52.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

53.    The '801 Patent is generally directed to, in accordance with particular embodiments, a computerized train control system in which a dispatcher sends track warrants (*e.g.*, speed restrictions) directly to a locomotive cab. In one aspect, a control module may calculate required stopping distances based on factors such as the weight of the train and the grade of the track on which the train will be operating. In another aspect, braking "penalties" can be imposed when an engineer or conductor fails to apply the brakes in a manner sufficient to comply with speed restrictions. In yet another aspect, a positioning system may be used to provide train location information. *See* '801 Patent, Summary of the Invention.

**ANSWER:**  Wabtec denies the allegations in Paragraph 53 of the Complaint.

54.   On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '801 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 54 of the Complaint.

55.   Claim 10 of the '801 Patent recites as follows:

10.   An apparatus for controlling a train comprising:

a positioning system;

a receiver for recovering a wireless transmission including a speed restriction, the speed restriction including a maximum allowable speed;

a brake interface configured to control a braking system on the train;

and a processor connected to the positioning system, the receiver and the brake interface, the processor being configured to perform the steps of:

receiving a speed restriction via the receiver;

determining a position of the train using information obtained from the positioning system;

determining when a train is in danger of violating the speed restriction based at least in part on a grade of a track on which the train is traveling and at least in part upon a weight of the train; and
controlling the braking system via the brake interface such that violation of the speed restriction is prevented.

**ANSWER:**  Wabtec admits that claim 10 of the '801 Patent contains the language recited in Paragraph 55 of the Complaint.

56.   On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 10. The I-ETMS System, and particularly the TMC, includes an on-board geographic database and a GPS system to determine the location of the train, the GPS system being incorporated in the Navigation Sensor Module and/or the

Commlink II. *See* Wabtec Catalog at 36-37. The Commlink II, which serves as the gateway for PTC-related communications, includes a receiver for recovering wireless transmissions including speed restrictions. *Id*. at 36. The TMC uses the location information and speed restriction information, along with track and train consist information, to determine whether the train is in danger of violating a speed restriction. If such danger exists, the TMC will enforce the speed restriction by causing the brakes to be applied as necessary if the operator does not take appropriate corrective action first. *See* Wabtec Catalog at 34-36.

**ANSWER:** Wabtec denies the allegations in Paragraph 56 of the Complaint.

57. In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '801 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:** Wabtec denies the allegations in Paragraph 57 of the Complaint.

58. Claim 1 of the '801 Patent recites as follows:

1. A method for controlling a train comprising the steps of:

receiving a speed restriction at a train, the speed restriction including a maximum allowable speed;

determining a position of the train using a positioning system;
determining when a train is in danger of violating the speed restriction based at least in part on a grade of a track on which the train is traveling and at least in part upon a weight of the train; and

applying a train brake such that violation of the speed restriction is prevented.

**ANSWER:** Wabtec admits that claim 1 of the '801 Patent contains the language recited in Paragraph 58 of the Complaint, except that Siemens has added "and" before the last limitation.

59. On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 1. As discussed with reference to claim 10 above, the TMC uses GPS location information and speed restriction information, along with track and train

consist information, to determine whether the train is in danger of violating a speed restriction. If such danger exists, the TMC will enforce the speed restriction by causing the brakes to be applied as necessary if the operator does not take appropriate corrective action first. *See* Wabtec Catalog at 34-36.

**ANSWER:** Wabtec denies the allegations in Paragraph 59 of the Complaint.

60.    The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 1 of the '801 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, Defendants have known since at least the filing date of this complaint, if not sooner as a result of having been put on notice of the parent, grandparent and great-grandparent of the '801 Patent, that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '801 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '801 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:** Wabtec denies the allegations in Paragraph 60 of the Complaint.

61.    On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '801 Patent and by encouraging customers to use the I-ETMS System in a manner that Defendants know infringes the '801 Patent, Defendants have been inducing infringement of the '801 Patent by their customers in violation of 35 U.S.C. § 271(b) at least since the filing date of this complaint. For example, Defendants' marketing literature touts functionality of the I-ETMS System that falls within the scope of the above-identified claims of the '801 Patent. *See* Wabtec Product Finder at 3; Wabtec Catalog at 36-37.

**ANSWER:** Wabtec denies the allegations in Paragraph 61 of the Complaint.

62.     Defendants' infringement of the '801 Patent has directly caused substantial monetary harm to Siemens, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 62 of the Complaint.

### Count III – Infringement of U.S. Patent No. 7,236,860

63.     Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

64.     The '860 Patent is generally directed to, in accordance with particular embodiments, a train control system that may include a positioning system and may consult a database to determine when the train is approaching a configurable device such as a switch or grade crossing gate. The system may continuously interrogate the device to determine its status as the train approaches the device. The train may be forced to come to a complete stop before proceeding past the device or may be slowed down to a speed that will allow the engineer to visually determine whether it is safe to proceed past the device. *See* '860 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 64 of the Complaint.

65.     On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '860 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 65 of the Complaint.

66.     Claim 1 of the '860 Patent recites as follows:

1.      A system for controlling a train, the system comprising:

a control unit located on the train;

a database connected to the control unit, the database including position information for a plurality of configurable devices, the database further including an identifier for each of the configurable devices;

a positioning system connected to the control unit, the position system being operable to provide position information pertaining to the train to the control unit; and

a transceiver connected to the control unit;

wherein the control unit is configured to perform the steps of:

obtaining a position of the train from the positioning system;

identifying a configurable device in the database as a next configurable device the train will approach;

determining a proximity of the train to the next configurable device;

comparing the proximity to a threshold;

transmitting an interrogation message to the next configurable device when the proximity is below a threshold;

receiving a response to the interrogation message, the response including an identifier associated with a configurable device and a configuration of the configurable device;

allowing the train to pass the configurable device if the response is received within a first period of time, the identifier included in the response matches the identifier associated with the configurable device of interest, and the configuration included in the response is acceptable; and

taking corrective action otherwise.

**ANSWER:**  Wabtec admits that claim 1 of the '860 Patent contains the language recited in Paragraph 66 of the Complaint.

67.     On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 1. The "control unit" limitation is

satisfied by the TMC, which contains multiple CPUs and is configured to perform, or to control the performance of, the various steps involved in communicating with a PTC-enabled wayside device and taking enforcement actions in view of such communications. The TMC also includes, or interfaces with, a track database that includes information concerning the wayside devices along the train's route, and it is connected to a GPS system incorporated in the Navigation Sensor Module and/or the Commlink II for determining the position of the train. *See* Wabtec Catalog at 36-37. In addition, the I-ETMS System includes, or interfaces with, a "transceiver" for communicating with wayside devices, with such communications being controlled by the TMC in combination with the Commlink II. *See* Wabtec Catalog at 34-36; Wabtec Product Finder at 2-5.

**ANSWER:**  Wabtec denies the allegations in Paragraph 67 of the Complaint.

68.     In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '860 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 68 of the Complaint.

69.     Claim 15 of the '860 Patent recites as follows:

15.     A method for controlling a train, the method comprising:

obtaining a position of the train from a positioning system located on the train;

identifying a configurable device in a database located on the train as a next configurable device the train will approach, the database including position information for a plurality of configurable devices, the database further including an identifier for each of the configurable devices;

determining a proximity of the train to the next configurable device;

comparing the proximity to a threshold;

transmitting an interrogation message to the next configurable device when the proximity is below a threshold;

receiving a response to the interrogation message, the response including an identifier associated with a configurable device and a configuration of the configurable device;

allowing the train to pass the configurable device if the response is received within a first period of time, the identifier included in the response matches the identifier associated with the configurable device of interest, and the configuration included in the response is acceptable; and

taking corrective action otherwise.

**ANSWER:**  Wabtec admits that claim 15 of the '860 Patent contains the language recited in Paragraph 69 of the Complaint.

70.     On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 15. As discussed with reference to claim 1 above, the I-ETMS System, under control of the TMC and using the Commlink II, interrogates a wayside device and takes appropriate enforcement actions depending upon the response received. *See* Wabtec Catalog at 34-36; Wabtec Product Finder at 2-5.

**ANSWER:**  Wabtec denies the allegations in Paragraph 70 of the Complaint.

71.     The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 15 of the '860 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '860 Patent by Siemens, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '860 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '860 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 71 of the Complaint.

72. On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '860 Patent and by encouraging customers to use the I-ETMS System in a manner that Defendants know infringes the '860 Patent, Defendants are inducing infringement of the '860 Patent by their customers in violation of 35 U.S.C. § 271(b). For example, Defendants' marketing literature touts functionality of the I-ETMS System that falls within the scope of the above-identified claims of the '801 Patent. *See* Wabtec Product Finder at 3; Wabtec Catalog at 36-37.

**ANSWER:** Wabtec denies the allegations in Paragraph 72 of the Complaint.

73. Defendants' infringement of the '860 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:** Wabtec lacks an understanding as to what Siemens is referring to as "PTC products." Wabtec denies the allegations in Paragraph 73 of the Complaint.

74. On information and belief, Defendants' infringement of the '860 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '860 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C. § 284.

**ANSWER:** Wabtec denies the allegations in Paragraph 74 of the Complaint.

75. Defendants' willful infringement of the '860 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees, in accordance with 35 U.S.C. § 285.

**ANSWER:** Wabtec denies the allegations in Paragraph 75 of the Complaint.

## Count IV – Infringement of U.S. Patent No. 7,467,032

76.      Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

77.      The '032 Patent is generally directed to, in accordance with particular embodiments, an end of train unit (EOT) that includes a positioning system such as a GPS receiver and that is configured to transmit a message including the EOT unit's location. The EOT unit may communicate directly with a device located off the train. In one aspect, messages containing EOT unit locations are collected by an EOT unit monitoring station. The EOT unit monitoring station generates a message including the EOT location information and routes the message to appropriate personnel responsible for tracking the EOT units. *See* '032 Patent, Brief Summary of the Invention.

**ANSWER:**  Wabtec denies the allegations in Paragraph 77 of the Complaint.

78.      On information and belief, Defendants directly infringe one or more claims of the '032 Patent, either literally or under the doctrine of equivalents. A non-limiting example of such infringement is provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 78 of the Complaint.

79.      Claim 1 of the '032 Patent recites as follows:

1.      A communications system for a train comprising:

a head of train device located near a front of a train;

an end of train (EOT) unit mounted on a rear of a train, the EOT unit including a transducer connectable for fluid communication with an air brake pipe of the train, the EOT unit further including an end-of-train marker light, the EOT unit further including a GPS receiver, the EOT unit being configured for wireless communication with the head of train device;

34

an EOT unit monitoring station located off the train, the EOT unit monitoring station being configured for wireless communication with the end of train device; and

a central station located off the train and connected to the EOT unit monitoring station via a land based communication system;

wherein the EOT unit is configured to transmit wirelessly periodic messages to the head of train device, the periodic messages including a brake pipe pressure measured by the transducer;

wherein the EOT unit is further configured to transmit wirelessly a location message including a location of the EOT unit to the EOT unit monitoring station, the location being based on information from the GPS receiver; and

wherein the EOT unit monitoring station is configured to transmit the location of the EOT unit to the central station.

**ANSWER:** Wabtec admits that claim 1 of the '032 Patent contains the language recited in Paragraph 79 of the Complaint.

80.    On information and belief, Defendants' TrainLink ATX and TrainLink II 4G-ATX telemetry systems in combination with Defendants' Asset Management Website satisfy each and every limitation of claim 1. Defendants' telemetry systems include both an HOT and an EOT, the latter including all of the structural features required by the claim (*i.e.*, transducer, marker light, GPS receiver, wireless communication). On a periodic basis, the EOT transmits, via a wireless radio link, brake pipe pressure measurements to the HOT. *See* Wabtec Catalog at 6. On information and belief, the EOT is configured to transmit GPS-determined location information to one of a plurality of regional monitoring stations via cellular communication, and the regional monitoring station in turn communicates the location information to a central station, at least in part using a land-based communication system, for display to customers on the Asset Management Website. *See generally* Asset Management Website Users Guide.

**ANSWER:** Wabtec denies the allegations in Paragraph 80 of the Complaint.

81.    In view of the foregoing, Defendants' manufacture, sale, and offer to sell the TrainLink ATX and TrainLink II 4G-ATX telemetry systems for use with the Asset Management Website directly infringes the '032 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 81 of the Complaint.

82.    Defendants' infringement of the '032 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 82 of the Complaint.

**Count V – Infringement of U.S. Patent No. 7,742,850**

83.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

84.    The '850 Patent is generally directed to, in accordance with particular embodiments, an EOT that includes a positioning system such as a GPS receiver and that is configured to transmit a message including the EOT unit's location. The EOT unit may communicate directly with a device located off the train. In one aspect, messages containing EOT unit locations are collected by an EOT unit monitoring station. The EOT unit monitoring station generates a message including the EOT location information and routes the message to appropriate personnel responsible for tracking the EOT units. *See* '850 Patent, Brief Summary of the Invention.

**ANSWER:**  Wabtec denies the allegations in Paragraph 84 of the Complaint.

85.     On information and belief, Defendants directly infringe one or more claims of the '850 Patent, either literally or under the doctrine of equivalents. A non-limiting example of such infringement is provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 85 of the Complaint.

86.     Claim 8 of the '850 Patent recites as follows:

8.     An end of train unit comprising:

a processor;

an end of train marker light;

a pressure sensor for determining an air pressure in an air brake pipe;

a wireless transceiver connected to the processor; and

a positioning system connected to the processor;

wherein the processor is configured to perform the steps of

generating a first wireless message including a location of the end of train unit and an identifier that uniquely identifies the end of train unit; and
transmitting via the transceiver the first wireless message to an end of train unit monitoring station located off of any train;

generating a second wireless message, the second wireless message including an air pressure sensed by the pressure sensor; and

transmitting the second wireless message to a device located at the head of the train.

**ANSWER:**  Wabtec admits that claim 8 of the '850 Patent contains the language recited in Paragraph 86 of the Complaint.

87.     On information and belief, Defendants' TrainLink ATX and TrainLink II 4G-ATX telemetry systems satisfy each and every limitation of claim 8. Defendants' telemetry systems have an EOT that includes the required processor, marker light, pressure sensor, wireless transceiver and positioning system. On a periodic basis, the EOT transmits, via a wireless radio

link, brake pipe pressure measurements to the HOT component of the telemetry system. *See* Wabtec Catalog at 6. In addition, the EOT is configured to transmit GPS-determined location information to a monitoring station, via cellular communication, for display to customers on Wabtec's Asset Management Website. *See generally* Asset Management Website Users Guide.

**ANSWER:**  Wabtec denies the allegations in Paragraph 87 of the Complaint.

88.     In view of the foregoing, Defendants' manufacture, sale, and offer to sell the TrainLink ATX and TrainLink II 4G-ATX telemetry systems for use with the Asset Management Website directly infringes the '850 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 88 of the Complaint.

89.     Defendants' infringement of the '850 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 89 of the Complaint.

**Count VI – Infringement of U.S. Patent No. 8,714,494**

90.     Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

91.     The '494 Patent is generally directed to, in accordance with particular embodiments, a railway vital or critical application system that uses a pair of computers and operating systems with asymmetric communications capability. Both computers receive and verify vital systems input message data and security code integrity and separately generate output data responsive to the input message. The first computer has sole capability to send vital

system output messages including the output data and an output security code, but only the second computer has the capability of generating the output security code. A failure of either computer's hardware, software or processing capability results in failure to transmit a vital system output message or in transmission of an output message that cannot be verified by other vital systems. *See* '494 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 91 of the Complaint.

92.    On information and belief, Defendants directly infringe one or more claims of the '494 Patent, either literally or under the doctrine of equivalents. A non-limiting example of such infringement is provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 92 of the Complaint.

93.    Claim 1 of the '494 Patent recites as follows:

1.    A control system for a railway vital application system, comprising:

a first controller having an external bilateral communications interface capable of sending and receiving a vital systems message within a railway vital application system, the message including a security code and vital data;

a second controller having an external communications interface capable of receiving a vital systems message, but incapable of sending a vital systems message that is generated within the second controller, the second controller having a security code generator; and

an inter-controller communications pathway coupling the first and second controllers;

wherein the first and second controllers respectively receive an input vital systems message including input vital systems data and an input security code, verify the input message integrity and generate output vital systems data, the second controller generates an output security code and sends it to the first controller, and the first controller sends an output vital systems message including the output vital systems data and the second controller output security code for use within the railway vital application system.

**ANSWER:**  Wabtec admits that claim 1 of the '494 Patent contains the language recited in Paragraph 93 of the Complaint.

94.     On information and belief, material aspects of the I-ETMS System manufactured and sold by Defendants are described in Patent Application No. US 2014/0172205 A1, published June 19, 2014 and assigned to Wabtec Holding Corp. (hereinafter, "Wabtec '205 Application").

**ANSWER:**  Wabtec denies the allegations in Paragraph 94 of the Complaint.

95.     On information and belief, the I-ETMS System manufactured and sold by Defendants, and in particular the BOS component thereof, satisfies each and every limitation of claim 1. The BOS includes a first controller capable of receiving vital system messages (*e.g.*, mandatory directives, enforceable instructions) transmitted by, for example, the TMDS component of the I-ETMS System, and further capable of transmitting such vital system messages to, for example, the TMC on a locomotive. The BOS also includes a second controller capable of receiving such vital system messages but incapable of sending a vital system message, with the second controller being configured to generate a security code (*e.g.*, a cyclic redundancy check, or "CRC"). The two controllers in the BOS are coupled by a communications pathway. In operation, vital system messages are sent by the TMDS to both controllers within the BOS, each of which independently verifies the integrity of the vital systems message. The second controller generates a CRC, comprising or associated with output vital systems data, and provides it to the first controller. The first controller also generates output vital systems data, including a normalized version of the received vital system message, and transmits the output vital systems data and the CRC received from the second controller to the TMC. *See, e.g.*, Wabtec '205 Application at ¶¶ 53-59.

**ANSWER:**  Wabtec denies the allegations in Paragraph 95 of the Complaint.

96.     In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems, particularly including but not necessarily limited to the BOS component thereof, directly infringes the '494 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 96 of the Complaint.

97.     Defendants' infringement of the '494 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 97 of the Complaint.

## Count VII – Infringement of U.S. Patent No. 9,233,698

98.     Siemens incorporates by reference the allegations in Paragraphs 1 through 38 and 94 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 and 94 as if fully set forth herein.

99.     The '698 Patent is generally directed to, in accordance with particular embodiments, a railway safety critical application system that uses a pair of tasks with asymmetric communications capability. Both tasks receive and verify vital systems input message data and security code integrity and separately generate output data responsive to the input message. The first task has sole capability to send vital system output messages including the output data and an output security code, but only the second task has the capability of generating the output security code. A failure of any systems hardware, software or processing capability results in failure to transmit a safety critical system output message or in transmission of an output message that cannot be verified by other safety critical systems. *See* '698 Patent, Abstract.

**ANSWER:** Wabtec denies the allegations in Paragraph 99 of the Complaint.

100.    On information and belief, Defendants directly infringe one or more claims of the '698 Patent, either literally or under the doctrine of equivalents. A non-limiting example of such infringement is provided below, based on the limited information currently available to Siemens.

**ANSWER:** Wabtec denies the allegations in Paragraph 100 of the Complaint.

101.    Claim 1 of the '698 Patent recites as follows:

1.    A control system for a railway safety critical application system, comprising:

at least one controller executing first and second tasks;

the first task having an external bilateral communications interface capable of sending and receiving a safety critical systems message within a railway safety critical application system, the message including a security code and safety critical data;

the second task having an external communications interface capable of receiving a safety critical systems message, but incapable of sending a safety critical systems message that is generated with the second task, the second task having a security code generator; and

an inter-task communications pathway coupling the first and second tasks;

wherein the first and second tasks respectively receive an input safety critical systems message including input safety critical systems data and an input security code, verify the input message integrity and generate output safety critical systems data, the second task generates an output security code and sends it to the first task, and the first task sends an output safety critical systems message including the output safety critical systems data and the second task output security code for use within the railway safety critical application system.

**ANSWER:** Wabtec admits that claim 1 of the '698 Patent contains the language recited in Paragraph 101 of the Complaint.

102.    On information and belief, the I-ETMS System manufactured and sold by Defendants, and in particular the BOS component thereof, satisfies each and every limitation of claim 1. The BOS includes a first task capable of receiving safety critical system messages (*e.g.*,

mandatory directives, enforceable instructions) transmitted by, for example, the TMDS component of the I-ETMS System, and further capable of transmitting such safety critical system messages to, for example, the TMC on a locomotive. The BOS also includes a second task capable of receiving such safety critical system messages but incapable of sending a safety critical system message, with the second task being configured to generate a security code (*e.g.*, a CRC). These two tasks in the BOS are coupled by a communications pathway. In operation, safety critical system messages are sent by the TMDS to both tasks within the BOS, each of which independently verifies the integrity of the safety critical systems message. The second task generates a CRC, comprising or associated with output safety critical systems data, and provides it to the first task. The first task also generates output safety critical systems data, including a normalized version of the received safety critical system message, and transmits the output safety critical systems data and the CRC received from the second task to the TMC. *See, e.g.*, Wabtec '205 Application at ¶¶ 53-59.

**ANSWER:**  Wabtec denies the allegations in Paragraph 102 of the Complaint.

103.    In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems, particularly including but not necessarily limited to the BOS component thereof, directly infringes the '698 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 103 of the Complaint.

104.    Defendants' infringement of the '698 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 104 of the Complaint.

## Count VIII – Infringement of U.S. Patent No. 6,978,195

105.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

106.    The '195 Patent is generally directed to a train control system that, in accordance with particular embodiments, includes positioning systems at the end of the train and at the front of the train, allowing the conductor or engineer to unambiguously determine that no cars of the train have become detached. The positioning system at the end of the train is also used to verify that the entire train has cleared a block. This information can be relayed to a dispatcher, thereby eliminating the need for trackside sensing equipment. A control unit prevents the train from moving without an authorization that includes the train's current position. See '195 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 106 of the Complaint.

107.    On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '195 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 107 of the Complaint.

108.    Claim 1 of the '195 Patent recites as follows:

1.    A method for controlling the movement of a train from a section of track not on a main line to a section of main line track comprising the steps of:

receiving a track warrant to move a train within a block of main line track;

receiving a circulation authority to move from a section of track not on the main line on which the train is located to the block; and

preventing the train from being moved until both the track warrant and the circulation authority have been received.

**ANSWER:**  Wabtec admits that claim 1 of the '195 Patent contains the language recited in Paragraph 108 of the Complaint.

109.    On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 1. The I-ETMS System, under control of the TMC, is configured to perform, or to control the performance of, the various steps involved in receiving and enforcing track warrants and circulation authorities. See, e.g., WABTEC-DEL-00001331; WABTEC-DEL-00001357; WABTEC-DEL-00001387; WABTEC-DEL-00001429-30; Wabtec Catalog at 34-36.

**ANSWER:**  Wabtec denies the allegations in Paragraph 109 of the Complaint.

110.    The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 1 of the '195 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '195 Patent by Siemens and Quantum, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '195 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '195 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 110 of the Complaint.

111.    On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '195 Patent and by encouraging customers to use the I-ETMS System in a manner that Defendants know infringes the '195 Patent, Defendants are inducing infringement of the '195 Patent by their customers in violation of 35 U.S.C. § 271(b).

**ANSWER:**  Wabtec denies the allegations in Paragraph 111 of the Complaint.

112.    Defendants' infringement of the '195 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 112 of the Complaint.

113.    On information and belief, Defendants' infringement of the '195 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '195 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C.

**ANSWER:**  Wabtec denies the allegations in Paragraph 113 of the Complaint.

114.    Defendants' willful infringement of the '195 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees in accordance with 35 U.S.C. § 285.

**ANSWER:**  Wabtec denies the allegations in Paragraph 114 of the Complaint.

**Count IX – Infringement of U.S. Patent No. 7,079,926**

115.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

116.    The '926 Patent is generally directed to a train control system that, in accordance with particular embodiments, includes positioning systems at the end of the train and at the front of the train, allowing the conductor or engineer to unambiguously determine that no cars of the train have become detached. The positioning system at the end of the train is also used to verify

that the entire train has cleared a block. This information can be relayed to a dispatcher, thereby eliminating the need for trackside sensing equipment. A control unit prevents the train from moving without an authorization that includes the train's current position. See '926 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 116 of the Complaint.

117.    On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '926 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 117 of the Complaint.

118.    Claim 1 of the '926 Patent recites as follows:

A system for controlling a train, the system comprising:

a control unit;

a first positioning system connected to the control unit; and

a communications module connected to the control unit;

wherein the control unit is configured to perform the steps of

accepting at least one authorization from a dispatcher, the authorization defining a boundary within which a train is authorized to move;

preventing the train from moving from a current location if the current location is not within a boundary for an accepted authorization;

monitoring a position of the train reported by the positioning system; and

stopping the train before the train moves outside the boundary unless authorization to move outside the boundary is received.

**ANSWER:**  Wabtec admits that claim 1 of the '926 Patent contains the language recited in Paragraph 118 of the Complaint.

119.   On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 1. The "control unit" limitation is satisfied by the TMC, which contains multiple CPUs and is configured to perform, or to control the performance of, the various steps involved in accepting and enforcing movement authorizations received from a dispatcher and monitoring a position of the train reported by the positioning system. See, e.g., WABTEC-DEL-00001780; WABTEC-DEL-00001785; WABTEC-DEL-00001331; WABTEC-DEL-00001357; WABTEC-DEL-00001387-88; WABTEC-DEL-00001429-30; Wabtec Catalog at 34-36. In addition, the I-ETMS System, and particularly the TMC, includes a GPS system incorporated in the Navigation Sensor Module and/or the Commlink II. See Wabtec Catalog at 36-37. The I-ETMS System also includes, or interfaces with, a "communications module" connected to the TMC. See Wabtec Catalog at 35¬ 36; Wabtec Product Finder at 2-5.

**ANSWER:**  Wabtec denies the allegations in Paragraph 119 of the Complaint.

120.   In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '926 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 120 of the Complaint.

121.   Claim 20 of the '926 Patent recites as follows:

20.   A method for controlling a train comprising the steps of:

accepting at least one authorization from a dispatcher, the authorization defining a boundary within which a train is authorized to move;

preventing the train from moving from a current location if the current location is not within a boundary for an accepted authorization;

monitoring a position of the train reported by the positioning system; and

stopping the train before the train moves outside the boundary unless authorization to move outside the boundary is received.

**ANSWER:**  Wabtec admits that claim 20 of the '926 Patent contains the language recited in Paragraph 121 of the Complaint.

122.    On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 20. As discussed with reference to claim 1 above, the I-ETMS System, under control of the TMC, is configured to perform, or to control the performance of, the various steps involved in accepting and enforcing movement authorizations received from a dispatcher and monitoring a position of the train reported by the positioning system. See, e.g., WABTEC-DEL-00001780; WABTEC-DEL-00001785; WABTEC-DEL-00001331; WABTEC-DEL-00001357; WABTEC-DEL-00001387-88; WABTEC-DEL-00001429-30; Wabtec Catalog at 34-36.

**ANSWER:**  Wabtec denies the allegations in Paragraph 122 of the Complaint.

123.    The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 20 of the '926 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '926 Patent by Siemens and Quantum, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '926 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '926 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 123 of the Complaint.

124.    On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '926 Patent and by encouraging customers to use

the I-ETMS System in a manner that Defendants know infringes the '926 Patent, Defendants are inducing infringement of the '926 Patent by their customers in violation of 35 U.S.C. § 271(b).

**ANSWER:**  Wabtec denies the allegations in Paragraph 124 of the Complaint.

125.    Defendants' infringement of the '926 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 125 of the Complaint.

126.    On information and belief, Defendants' infringement of the '926 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '926 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C.

**ANSWER:**  Wabtec denies the allegations in Paragraph 126 of the Complaint.

127.    Defendants' willful infringement of the '926 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees in accordance with 35 U.S.C. § 285.

**ANSWER:**  Wabtec denies the allegations in Paragraph 127 of the Complaint.

### Count X – Infringement of U.S. Patent No. 7,200,471

128.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

129.    The '471 Patent is generally directed to a train control system that, in accordance with particular embodiments, ensures that a train cannot be moved from a section of track not on

a main line to a section of track on the main line until both a movement authority for the section of main line track and a circulation authority for the section of track not on the main line are received. See '471 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 129 of the Complaint.

130.    On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '471 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 130 of the Complaint.

131.    Claim 1 of the '471 Patent recites as follows:

1.    A system for controlling the movement of a train from a section of track not on a main line to a section of main line track, the system comprising:

a control module;

a positioning system connected to the control module; and

a receiver connected to the control module;

wherein the control module is configured to perform the steps of:

preventing the train from being moved until a circulation authority to move within the section of track not on the main line has been received, the section of track not on the main line being a section of track in which the train is located;

allowing the train to move within the section of track not on the main line provided that the circulation authority has been received;

preventing the train from entering the section of main line track until a movement authority to move a train within the section of main line track has been received; and

allowing the train to move from the section of track not on the main line to the section of main line track provided that the movement authority has been received.

**ANSWER:** Wabtec admits that claim 1 of the '471 Patent contains the language recited in Paragraph 131 of the Complaint.

132.    On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 1. The "control module" limitation is satisfied by the TMC, which contains multiple CPUs and is configured to perform, or to control the performance of, the various steps involved in receiving and enforcing movement and circulation authorizations. See, e.g., WABTEC-DEL-00001780; WABTEC-DEL-00001785; WABTEC-DEL-00001331; WABTEC-DEL-00001357; WABTEC-DEL-00001387-88; WABTEC-DEL-00001429-30; Wabtec Catalog at 34-36. In addition, the I-ETMS System, and particularly the TMC, includes a GPS system incorporated in the Navigation Sensor Module and/or the Commlink II. See Wabtec Catalog at 36-37. The I-ETMS System also includes, or interfaces with, a "receiver" connected to the TMC. See Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5.

**ANSWER:** Wabtec denies the allegations in Paragraph 132 of the Complaint.

133.    In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '471 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:** Wabtec denies the allegations in Paragraph 133 of the Complaint.

134.    Claim 6 of the '471 Patent recites as follows:

6.    A method for controlling the movement of a train from a section of track not on a main line to a section of main line track, the method comprising:

preventing the train from being moved until a circulation authority to move within the section of track not on the main line has been received, the section of track not on the main line being a section of track in which the train is located;

allowing the train to move within the section of track not on the main line provided that the circulation authority has been received;

preventing the train from entering the section of main line track until a movement authority to move a train within the section of main line track has been received; and

allowing the train to move from the section of track not on the main line to the section of main line track provided that the movement authority has been received.

**ANSWER:**  Wabtec admits that claim 6 of the '471 Patent contains the language recited in Paragraph 134 of the Complaint.

135.   On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 6. As discussed with reference to claim 1 above, the I-ETMS System, under control of the TMC, is configured to perform, or to control the performance of, the various steps involved in receiving and enforcing movement and circulation authorizations. See, e.g., WABTEC-DEL-00001780; WABTEC-DEL-00001785; WABTEC-DEL-00001331; WABTEC-DEL-00001357; WABTEC-DEL-00001387-88; WABTEC-DEL-00001429-30; Wabtec Catalog at 34-36.

**ANSWER:**  Wabtec denies the allegations in Paragraph 135 of the Complaint.

136.   The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 6 of the '471 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '471 Patent by Siemens and Quantum, including but not necessarily limited to by disclosing a closely related patent, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '471 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '471 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 136 of the Complaint.

137.    On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '471 Patent and by encouraging customers to use the I-ETMS System in a manner that Defendants know infringes the '471 Patent, Defendants are inducing infringement of the '471 Patent by their customers in violation of 35 U.S.C. § 271(b).

**ANSWER:**  Wabtec denies the allegations in Paragraph 137 of the Complaint.

138.    Defendants' infringement of the '471 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 138 of the Complaint.

139.    On information and belief, Defendants' infringement of the '471 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '471 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C. § 284.

**ANSWER:**  Wabtec denies the allegations in Paragraph 139 of the Complaint.

140.    Defendants' willful infringement of the '471 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees in accordance with 35 U.S.C. § 285.

**ANSWER:**  Wabtec denies the allegations in Paragraph 140 of the Complaint.

### Count XI – Infringement of U.S. Patent No. 6,845,953

141.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

142.    The '953 Patent is generally directed to a train control system that, in accordance with particular embodiments, includes a control module that determines a position of a train using a positioning system and consults a database to determine when the train is approaching a portion of track monitored by a track circuit. When the train is near a track circuit, but while the train is still far enough away from the track circuit such that the train can be stopped before reaching the portion of track monitored by the track circuit, the train transmits an interrogation message to a transceiver associated with the track circuit. When the track circuit receives the interrogation message, a test is initiated. The test results are transmitted back to the train. The train takes corrective action if the track circuit fails to respond or indicates a problem. See '953 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 142 of the Complaint.

143.    On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '953 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 143 of the Complaint.

144.    Claim 1 of the '953 Patent recites as follows:

1.    A system for controlling a train, the system comprising:

a control unit;

a warning device in communication with the control unit;

a brake interface unit, the brake interface unit being in communication with the control unit and a train brake, the brake interface unit being operable to activate the train brake under control of the control unit; and

a transceiver, the transceiver being located on the train and being in communication with the control unit;

wherein the control unit is configured to perform the steps of

transmitting an interrogation message to a track circuit transceiver associated with a track circuit;

listening for a response from the track circuit transceiver, the response including an indication as to a condition of a section of track monitored by the track circuit;

allowing the train to continue if a response with an indication that it is safe for the train to proceed is received; and

activating the warning device if the response indicates that it is not safe for the train to proceed.

**ANSWER:** Wabtec admits that claim 1 of the '953 Patent contains the language recited in Paragraph 144 of the Complaint.

145.   On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 1. The "control unit" limitation is satisfied by the TMC, which contains multiple CPUs and is configured to perform, or to control the performance of, the various steps involved in communicating with a track circuit transceiver associated with a track circuit and taking appropriate enforcement actions depending upon the response received. See, e.g., Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5; WABTEC-DEL-00000343-44; WABTEC-DEL-00001375-77; WABTEC-DEL-00000854-62. In addition, the I-ETMS System includes, or interfaces with, a "transceiver" for communicating with track circuit transceivers associated with track circuits, with such communications being controlled by the TMC in combination with the Commlink II. See Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5. The I-ETMS System also includes a warning device in communication with the TMC, in the form the I-ETMS Display. See Wabtec Catalog at 34-35. A brake interface unit is

also included in the I-ETMS System, allowing the TMC to activate the train brakes as necessary for enforcement actions. See Wabtec Catalog at 34-36; WABTEC-DEL-00001230.

**ANSWER:** Wabtec denies the allegations in Paragraph 145 of the Complaint.

146.    In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '953 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:** Wabtec denies the allegations in Paragraph 146 of the Complaint.

147.    Claim 20 of the '953 Patent recites as follows:

20.    A method for controlling a train comprising the steps of:

transmitting an interrogation message to a track circuit transceiver associated with a track circuit near the train;

listening for a response from the track circuit transceiver, the response including an indication as to a condition of a section of track monitored by the track circuit; and

reporting the response to a person operating the train.

**ANSWER:** Wabtec admits that claim 20 of the '953 Patent contains the language recited in Paragraph 147 of the Complaint.

148.    On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 20. As discussed with reference to claim 1 above, the I-ETMS System, under control of the TMC, is configured to perform, or to control the performance of, the various steps involved in communicating with a track circuit transceiver associated with a track circuit and reporting the response to a person operating the train. See, e.g., Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5; WABTEC-DEL-00000343-44; WABTEC-DEL-00001375-77; WABTEC-DEL-00000854-62.

**ANSWER:** Wabtec denies the allegations in Paragraph 148 of the Complaint.

149.    The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 20 of the '953 Patent, being programmed to cause each of the method steps to be

performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '953 Patent by Siemens and Quantum, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '953 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '953 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 149 of the Complaint.

150.    On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '953 Patent and by encouraging customers to use the I-ETMS System in a manner that Defendants know infringes the '953 Patent, Defendants are inducing infringement of the '953 Patent by their customers in violation of 35 U.S.C. § 271(b).

**ANSWER:**  Wabtec denies the allegations in Paragraph 150 of the Complaint.

151.    Defendants' infringement of the '953 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 151 of the Complaint.

152.    On information and belief, Defendants' infringement of the '953 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '953 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C. § 284.

**ANSWER:**  Wabtec denies the allegations in Paragraph 152 of the Complaint.

153.    Defendants' willful infringement of the '953 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees in accordance with 35 U.S.C. § 285.

**ANSWER:**  Wabtec denies the allegations in Paragraph 153 of the Complaint.

## Count XII – Infringement of U.S. Patent No. 7,036,774

154.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

155.    The '774 Patent is generally directed to a train control system that, in accordance with particular embodiments, includes a control module that determines a position of a train using a positioning system and consults a database to determine when the train is approaching a portion of track monitored by a track circuit. When the train is near a track circuit, but while the train is still far enough away from the track circuit such that the train can be stopped before reaching the portion of track monitored by the track circuit, the train transmits an interrogation message to a transceiver associated with the track circuit. When the track circuit receives the interrogation message, a test is initiated. The test results are transmitted back to the train. The train takes corrective action if the track circuit fails to respond or indicates a problem. See '774 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 155 of the Complaint.

156.    On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '774 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 156 of the Complaint.

157.    Claim 1 of the '774 Patent recites as follows:

1.      A system for controlling a train, the system comprising:

a control unit;

a warning device in communication with the control unit;

a brake interface unit, the brake interface unit being in communication with the control unit and a train brake, the brake interface unit being operable to activate the train brake under control of the control unit; and

a transceiver, the transceiver being located on the train and being in communication with the control unit;

wherein the control unit is configured to perform the steps of

transmitting an interrogation message to a track circuit transceiver associated with a track circuit;

listening for a response from the track circuit transceiver, the response including an indication as to a condition of a section of track monitored by the track circuit;

activating the warning device to provide a warning to the operator if the response indicates that it is not safe for the train to proceed; and

activating the train's brake via the brake interface unit if an operator of the train fails to acknowledge the warning or fails to reduce the speed of the train to a safe speed within a period of time after the warning.

**ANSWER:**  Wabtec admits that claim 1 of the '774 Patent contains the language recited in Paragraph 157 of the Complaint.

158.    On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 1. The "control unit" limitation is satisfied by the TMC, which contains multiple CPUs and is configured to perform, or to control the performance of, the various steps involved in communicating with a track circuit transceiver associated with a track circuit and taking appropriate enforcement actions depending upon the response received and the operator's response to warnings activated by the TMC. See, e.g.,

Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5; WABTEC-DEL-00000343-44; WABTEC-DEL-00001375-77; WABTEC-DEL-00001369; WABTEC-DEL-00000854-62.  In addition, the I-ETMS System includes, or interfaces with, a "transceiver" for communicating with track circuit transceivers associated with track circuits, with such communications being controlled by the TMC in combination with the Commlink II. See Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5. The I-ETMS System also includes a warning device in communication with the TMC, in the form the I-ETMS Display. See Wabtec Catalog at 34-35. A brake interface unit is also included in the I-ETMS System, allowing the TMC to activate the train brakes as necessary for enforcement actions. See Wabtec Catalog at 34-36; WABTEC-DEL-00001230.

**ANSWER:**  Wabtec denies the allegations in Paragraph 158 of the Complaint.

159.    In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '774 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:**  Wabtec denies the allegations in Paragraph 159 of the Complaint.

160.    Claim 19 of the '774 Patent recites as follows:

19.    A method for controlling a train comprising the steps of:

transmitting an interrogation message to a track circuit transceiver associated with a track circuit near the train;

listening for a response from the track circuit transceiver, the response including an indication as to a condition of a section of track monitored by the track circuit;

activating a warning device to provide a warning to the operator if the response indicates that it is not safe to proceed or no response is received; and

activating the train's brake to stop the train if an operator of the train fails to acknowledge the warning or fails to reduce the speed of the train to a safe speed within a time period.

**ANSWER:**  Wabtec admits that claim 19 of the '774 Patent contains the language recited in Paragraph 160 of the Complaint.

161.    On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 19. As discussed with reference to claim 1 above, the I-ETMS System, under control of the TMC, is configured to perform, or to control the performance of, the various steps involved in communicating with a track circuit transceiver associated with a track circuit and taking appropriate enforcement actions depending upon the response received and the operator's response to warnings activated by the TMC. See, e.g., Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5; WABTEC-DEL-00000343-44; WABTEC-DEL-00001369; WABTEC-DEL-00001375-77; WABTEC-DEL-00000854-62.

**ANSWER:**  Wabtec denies the allegations in Paragraph 161 of the Complaint.

162.    The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 19 of the '774 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '774 Patent by Siemens and Quantum, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '774 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '774 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 162 of the Complaint.

163.    On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '774 Patent and by encouraging customers to use

the I-ETMS System in a manner that Defendants know infringes the '774 Patent, Defendants are inducing infringement of the '774 Patent by their customers in violation of 35 U.S.C. § 271(b).

**ANSWER:**  Wabtec denies the allegations in Paragraph 163 of the Complaint.

164.    Defendants' infringement of the '774 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 164 of the Complaint.

165.    On information and belief, Defendants' infringement of the '774 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '774 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C. § 284.

**ANSWER:**  Wabtec denies the allegations in Paragraph 165 of the Complaint.

166.    Defendants' willful infringement of the '774 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees in accordance with 35 U.S.C. § 285.

**ANSWER:**  Wabtec denies the allegations in Paragraph 166 of the Complaint.

## Count XIII – Infringement of U.S. Patent No. 6,824,110

167.    Siemens incorporates by reference the allegations in Paragraphs 1 through 38 above.

**ANSWER:**  Wabtec incorporates by reference all of its answers to Paragraphs 1 through 38 as if fully set forth herein.

168.    The '110 Patent is generally directed to a train control system that, in accordance with particular embodiments, automatically activates a train warning device that uses a positioning system such as a global positioning system (GPS) receiver or an inertial navigation system (INS) to determine the train's position. The system further includes a database containing locations of grade crossings and other locations at which a train is required to give a warning signal and what regulations govern activation of the warning device at such locations. See '110 Patent, Abstract.

**ANSWER:**  Wabtec denies the allegations in Paragraph 168 of the Complaint.

169.    On information and belief, Defendants directly infringe, induce others to infringe, and/or contributorily infringe one or more claims of the '110 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Siemens.

**ANSWER:**  Wabtec denies the allegations in Paragraph 169 of the Complaint.

170.    Claim 11 of the '110 Patent recites as follows:

11.    A system for automatically activating a warning device on a train at a location, the system comprising:

a control unit connected to the warning device;

a storage device connected to the control unit, the storage device having stored therein a database of locations at which the warning device must be activated and corresponding regulations concerning activation of the warning device;

a positioning system in communication with the control unit, the positioning system being configured to supply a position of the train to the control unit; and

wherein the control unit is configured to perform the steps of

selecting a next upcoming location from among the locations in the database;

determining a point at which to activate the warning device in compliance with a regulation corresponding to the next upcoming location; and

activating the warning device at the point.

**ANSWER:** Wabtec admits that claim 11 of the '110 Patent contains the language recited in Paragraph 170 of the Complaint.

171. On information and belief, the I-ETMS System manufactured and sold by Defendants satisfies each and every limitation of claim 11. The "control unit" limitation is satisfied by the TMC, which contains multiple CPUs and includes, or interfaces with, a track database stored on a storage device containing information concerning locations at which a warning device is to be activated. The TMC is configured to perform, or to control the performance of, the various steps involved in determining when a warning device is to be activated and activating that device accordingly. See, e.g., Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5; WABTEC-DEL-0001447; WABTEC-DEL-00001230. In addition, the I-ETMS System, and particularly the TMC, includes a GPS system incorporated in the Navigation Sensor Module and/or the Commlink II. See Wabtec Catalog at 36-37.

**ANSWER:** Wabtec denies the allegations in Paragraph 171 of the Complaint.

172. In view of the foregoing, Defendants' manufacture, sale, and offer to sell I-ETMS Systems directly infringes the '110 Patent in violation of 35 U.S.C. § 271(a).

**ANSWER:** Wabtec denies the allegations in Paragraph 172 of the Complaint.

173. Claim 1 of the '110 Patent recites as follows:

1. A computerized method for activating a warning device on a train at a location comprising the steps of:

maintaining a database of locations at which the warning device must be activated and corresponding regulations concerning activation of the warning device;

obtaining a position of the train from a positioning system;

selecting a next upcoming location from among the locations in the database based at least in part on the position;

65

determining a point at which to activate the warning device in compliance with a regulation corresponding to the next upcoming location; and

activating the warning device at the point.

**ANSWER:**  Wabtec admits that claim 1 of the '110 Patent contains the language recited in Paragraph 173 of the Complaint.

174.   On information and belief, use of the I-ETMS System by Defendants' customers satisfies each and every limitation of claim 1. As discussed with reference to claim 11 above, the I-ETMS System, under control of the TMC, is configured to perform, or to control the performance of, the various steps involved in determining when a warning device is to be activated and activating that device accordingly. See, e.g., Wabtec Catalog at 35-36; Wabtec Product Finder at 2-5; WABTEC-DEL-0001447; WABTEC-DEL-00001230.

**ANSWER:**  Wabtec denies the allegations in Paragraph 174 of the Complaint.

175.   The I-ETMS System sold by Defendants constitutes a material part of the method recited in claim 1 of the '110 Patent, being programmed to cause each of the method steps to be performed, and it is not a staple article or commodity of commerce suitable for substantial noninfringing use. Moreover, at least as a result of having been put on notice of the '110 Patent by Siemens and Quantum, Defendants know that the I-ETMS System is especially made or especially adapted for use in a manner that infringes the '110 Patent. Accordingly, Defendants' sale of I-ETMS Systems contributes to infringement of the '110 Patent by their customers in violation of 35 U.S.C. § 271(c).

**ANSWER:**  Wabtec denies the allegations in Paragraph 175 of the Complaint.

176.   On information and belief, both by configuring the I-ETMS System to operate in a manner that Defendants know infringes the '110 Patent and by encouraging customers to use

the I-ETMS System in a manner that Defendants know infringes the '110 Patent, Defendants are inducing infringement of the '110 Patent by their customers in violation of 35 U.S.C. § 271(b).

**ANSWER:**  Wabtec denies the allegations in Paragraph 176 of the Complaint.

177.    Defendants' infringement of the '110 Patent has caused Siemens to suffer substantial monetary harm, including lost profits and price erosion relating to Siemens' sale of competing PTC products.

**ANSWER:**  Wabtec lacks an understanding as to what Siemens is referring to as "PTC products."  Wabtec denies the allegations in Paragraph 177 of the Complaint.

178.    On information and belief, Defendants' infringement of the '110 Patent has been willful, done deliberately and with full knowledge that the manufacture, sale, offer for sale, and use of I-ETMS Systems infringes the '110 Patent, justifying an increase in the damages to be awarded Siemens up to three times the amount found or assessed, in accordance with 35 U.S.C. § 284.

**ANSWER:**  Wabtec denies the allegations in Paragraph 178 of the Complaint.

179.    Defendants' willful infringement of the '110 Patent renders this an exceptional case, justifying an award to Siemens of its reasonable attorney fees in accordance with 35 U.S.C. § 285.

**ANSWER:**  Wabtec denies the allegations in Paragraph 179 of the Complaint.

## ANSWER TO SIEMENS' PRAYER FOR RELIEF

As to all Prayers for relief set forth in the Complaint, Wabtec denies that Siemens is entitled to any relief, as alleged or otherwise.

All other allegations in the Complaint not specifically admitted or denied are hereby denied.

## JURY DEMAND

Wabtec admits that Siemens has demanded a trial by jury on all triable issues.

## WABTEC'S AFFIRMATIVE AND OTHER DEFENSES

Without admitting or acknowledging that it bears the burden of proof as to any of them, Wabtec's affirmative and other defenses are listed below.  Wabtec reserves the right to amend its Answer to add additional defenses consistent with the facts discovered in the case.

## FIRST DEFENSE

The Complaint, and each purported claim asserted, fails to state a cause of action for which relief can be granted and/or fails to plead the allegations with sufficient particularity.

## SECOND DEFENSE

Wabtec does not infringe, and has not infringed under any theory (including jointly, directly, willfully, contributorily, or by inducement), any valid claim of the '461 Patent, the '801 Patent, the '860 Patent, the '032 Patent, the '850 Patent, the '494 Patent, the '698 Patent, the '195 Patent, the '926 Patent, the '471 Patent, the '953 Patent, the '774 Patent, and/or the '110 Patent (hereinafter, "Patents-in-Suit").

## THIRD DEFENSE

One or more claims of the Patents-in-Suit are invalid, as discussed in Wabtec's Counterclaims below, which are incorporated herein by reference, for failing to comply with the conditions for patentability set forth in Title 35, United States Code § 101, *et seq.* including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112 and the rules, regulations, and laws pertaining thereto.

## FOURTH DEFENSE

Under 35 U.S.C. § 287, Wabtec is not liable to Siemens for any alleged damages that allegedly occurred before Siemens provided actual notice of the Patents-in-Suit to Wabtec.

## FIFTH DEFENSE

Siemens' attempted enforcement of the Patents-in-Suit against Wabtec is barred in whole or in part by the equitable doctrines of estoppel, laches, waiver, acquiescence, and/or other equitable doctrines.

## SIXTH DEFENSE

Siemens' attempted enforcement of the Patents-in-Suit against Wabtec is barred in whole or in part by a license to Wabtec and/or its customers for the Patents-in-Suit.

## SEVENTH DEFENSE

As a result of the proceedings before the United States Patent and Trademark Office during the prosecution of the applications leading to the Patents-in-Suit, and/or related patent applications, including the admissions, representations, and amendments made on behalf of the applicant, Siemens is estopped from asserting any construction of the claims of the Patents-in-Suit to cover any activity engaged in or product used or sold by Wabtec.

## EIGHTH DEFENSE

Siemens is estopped from applying the doctrine of equivalents to the claims of the Patents-in-Suit in light of arguments and amendments that were made to the United States Patent and Trademark Office during the prosecution of the Patents-in-Suit.

## NINTH DEFENSE

Wabtec's methods, systems, products, or services have substantial non-infringing uses so they do not contributorily infringe the Patents-in-Suit.

## TENTH DEFENSE

Wabtec has engaged in all relevant activities in good faith, thereby precluding Siemens, even if it prevails, from recovering its reasonable attorneys' fees and/or costs under 35 U.S.C. § 285.

## ELEVENTH DEFENSE

Siemens' claims for damages are limited by 35 U.S.C. § 286, which prohibits recovery for any infringement committed more than six years before the filing of the Complaint.

## COUNTERCLAIMS

For its counterclaims against Plaintiff Siemens Industry, Inc. ("Siemens"), Defendant Westinghouse Air Brake Technologies Corporation (d/b/a Wabtec Corporation) and Wabtec Railway Electronics, Inc. (collectively "Wabtec") states:

## THE PARTIES, JURISDICTION AND VENUE

1.      Westinghouse Air Brake Technologies Corporation ("Wabtec Corp.") is a corporation organized under the laws of the State of Delaware, with a principal place of business at 1001 Air Brake Avenue in Wilmerding, Pennsylvania.  Wabtec Railway Electronics, Inc. ("Wabtec Railway Electronics") is a corporation organized under the laws of the State of Delaware, with a principal place of business at 21200 Dorsey Mill Road in Germantown, Maryland.

2.      Upon information and belief, Siemens is a corporation organized under the laws of the State of Delaware, with a principal place of business at 3333 Old Milton Parkway in Alpharetta, Georgia.

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over Siemens because, among other things, Siemens has asserted the '461 Patent, the '801 Patent, the '860 Patent, the '032 Patent, the '850 Patent, the '494 Patent, the '698 Patent, the '195 Patent, the '926 Patent, the '471 Patent, the '953 Patent, the '774 Patent, and the '110 Patent (hereinafter, "Patents-in-Suit") against Wabtec in its Complaint in this jurisdiction.

5.      Venue is proper in this district under 28 U.S.C. § 1391 and because Siemens has consented to venue in this Court by filing the instant action in this jurisdiction.

6.      In this action, Wabtec has asserted the Patents-in-Suit against Wabtec, and has alleged that Wabtec has directly and indirectly infringed said patents.

## BACKGROUND OF THE DISPUTE

### Pulse Electronics

7.      Pulse Electronics was started in 1977 by Emilio Fernandez and Angel Bezos.

8.      Pulse Electronics was "a leading manufacturer of advanced electronic systems for trains."  (Ex. A, Pulse Electronics Prepares for Move to Germantown, News Gazette (Jan. 11, 1997), http://www.gazette.net/gazette_archive/1997/199724/aspenhill/news/a57574-1.html).

9.      Pulse Electronics developed data recorders for trains.

10.     Mark Kane, the first named inventor of the '461 Patent, the '801 Patent, the '860 Patent, the '032 Patent, and the '850 Patent, was the marketing director of Pulse Electronics in 1985.  (Ex. B, T.R. Reid, Caboose May Be Nearing End of Line, Wash. Post, Feb. 17, 1985 ("Caboose Article")).

11.     Mark Kane left Pulse Electronics and founded Quantum Engineering, Inc. prior to January 19, 1990.

12.     Specifically, Mark Kane and James Shockley, inventors of certain of the Patents-in-Suit, founded Quantum Engineering, Inc. in October, 1988.

13.     Pulse Electronics was acquired by Westinghouse Air Brake Company ("WABCO") in 1995.

14.     Pulse Electronics is now known as Wabtec Railway Electronics.

### Rockwell Collins, Inc.

15.     Rockwell Collins, Inc. ("Rockwell Collins"), initially called Collins Radio Company, was founded by Arthur Collins in Cedar Rapids, Iowa in 1933.

16.     Rockwell Collins initially designed and produced short wave radio equipment. (Ex. C, Rockwell Collins History, https://www.rockwellcollins.com/Our_Company/History.aspx (downloaded June 9, 2016) ("Rockwell Collins History") at 1).

17.     In 1973, Rockwell International, a high-technology company, acquired Collins Radio Company.  (*Id.*).

18.     Since 1985, Rockwell Collins has been a systems engineering contractor for the rail industry in the development of Positive Train Control ("PTC") technology and related rail systems-integration solutions.   (Ex. D, Positive Train Control, Arinc Rail, https://www.rockwellcollins.com/Services_and_Support/Information_Management/ARINC_Rail /Control_Systems/Positive_Train_Control.aspx (downloaded June 9, 2016) ("Arinc Rail PTC") at 1).

19.     In August 1998, Rockwell Collins sold its Railroad Electronics business to WABCO.  (Ex. E, Press Release, Westinghouse Air Brake Company, Westinghouse Air Brake Company Announces Agreement to Purchase Rail Elec. Div. of Rockwell Int'l (Aug. 18, 1998)).

20.     Acquiring this division of Rockwell International allowed WABCO to augment its train and brake communications product lines.

21.     In 2001, Rockwell Collins, Inc. was spun-off from Rockwell International.  (Ex. D, Arinc Rail PTC at 1).

**Westinghouse Air Brake Technologies Corporation**

22.     Westinghouse Air Brake Technologies Corporation ("Wabtec Corp.") was formed by the merger of WABCO and MotivePower Industries Corporation in 1999.

23.     Wabtec Corp. has been a leading innovator in the development and success of PTC since its predecessor, Rockwell Collins, opened the door to improving safety in the rail

sector in the early 1980's.  (*See* Ex. F, Railroad Safety Advisory Committee, Report (Aug. 1999) ("RSAC Report") at 25).

24.     Another one of Wabtec Corp.'s predecessors, Pulse Electronics, pioneered the revolutionary communications system, TrainGuard$^{TM}$, as early as 1993.  (*Id.* at 32).

## Wabtec and the History of Train Control

25.     Since the early 1980s, the railroad industry has acknowledged the potential advantages of using data radio communications, emerging microprocessor-based systems, and other contemporary technologies to enhance train control performance.  (*Id.* at 1).

26.     Throughout the past 25 or so years, the railroad industry experimented with various iterations of advanced train control.  (*See* Ex. G, William C. Vantuono, PTC: Is Everyone on Board?, Railway Age (Apr. 28, 2010), http://www.railwayage.com/index.php/ptc/ptc-is-everyone-on-board.html ("Railway Age Article")).

27.     Advanced Train Control Systems ("ATCS") were developed in the mid-1980s after the enactment of the Staggers Rail Act of 1980.  (Ex. F, RSAC Report at viii).

28.     The primary goal was to create a comparable or even safer train control system that would cost less than prior conventional systems.

29.     At least 12 projects were already in progress by 1999 to develop communications-based control systems, now sometimes referred to as PTC.  (*Id.* at 20).

30.     In late 1983, the Canadian National, British Columbia, Canadian Pacific, Burlington Northern, Norfolk Southern, Seaboard System, Union Pacific and Southern Pacific railroads, together commenced a project to establish operating requirements for a communications-based train control system.  That control system would later be known as ATCS.  (*Id.*).

31.     In 1983, the Burlington Northern Railroad ("BN") and the Collins Air Transport Division of Rockwell International devised the Advanced Railroad Electronic System ("ARES"). (*Id.* at 25).

32.     In 1984, BN tested data radios and GPS on two locomotives near Minneapolis-St. Paul.  (*Id.*).

33.     In 1985, BN contracted with Rockwell to develop and test ARES in revenue service operations.  (*Id.*).

34.     ARES was composed of three major segments: (1) the Control Segment; (2) the Data Segment; and (3) the Vehicle Segment.  (*Id.*).

35.     ARES was developed according to specifications advanced by BN and Rockwell Collins.  (*Id.*).

36.     Rockwell Collins and Pulse Electronics, among few other railroad equipment suppliers, supplied the necessary components.  (*Id.*).

37.     Among other features, ARES allowed for communications between onboard computers and wayside devices via wayside interface units ("WIUs").  (Ex. H, Rockwell Int'l, Operators Manual for Advanced R.R. Elecs. Sys. For Burlington Northern R.R., (June 1, 1987) at vi ("ARES Operators Manual")).

38.     The following figure is a Functional Diagram illustrating the architecture of the ARES system:



(*Id.*).

39.    The ARES system could receive "OVER SWITCH CLEAR MESSAGE[S] FROM WAYSIDE TRACK INDICATOR[S]."  (*Id.* at 25).

40.    An over switch clear message indicates that an upcoming switch is in the expected position.

41.    Such a switch is a configurable device.

42.    According to ARES, the over-the-switch clear message is received from a wayside track indicator, which is in communication with a switch to which the message pertains.

43.    ARES also displayed one or more signals in its TRACK PLAN view.  (*Id.* at 32-33).

44.     Specifically,    ARES    illustrated    SIGNAL    LOCATIONS,    WAYSIDE
DETECTORS, GRADE CROSSINGS, and TRACK CROSSINGS in its TRACK PLAN view.
(*Id.* at 38-39).

45.     On information and belief, ARES obtained information from configurable devices
along the wayside when the onboard computer requested such information by sending messages
to one or more WIUs.

46.     As discussed in the Federal Railroad Administration ("FRA") Railroad
Communications and Train Control Report to Congress, dated July 1994, PTC systems were
already being tested as of July 8, 1994.  (Ex. I, Federal Railroad Administration, Report to
Congress (July 1994) at 3 ("FRA Report")).

47.     In 1997 and 1998, Conrail, CSX Transportation ("CSXT") and Norfolk Southern
("NS") railroads received a grant from the FRA to develop, test, and demonstrate an on-board
PTC platform.  (Ex. F, RSAC Report at 31).

48.     WABCO finalized the design specifications and along with GE-Harris, worked to
build prototypes to implement the PTC platform described in Paragraph 47.  (*Id.* at 32).

49.     In early 1993, a BN labor and management safety committee devised
TrainGuard^{TM}, a system that would improve communications between surrounding trains.  (*Id.*).

50.     TrainGuard^{TM}, was intended to "make train crew members aware of other trains
in their vicinity in non-signaled territory."  (*Id.*).

51.     When BN and Santa Fe railroads merged, the development of this system fell
upon BNSF's Technical Research and Development staff.  (*Id.*).

52.     Shortly thereafter, the BNSF retained Pulse Electronics (now Wabtec Railway
Electronics) to design and develop a system.  (*Id.*).

53.     In the late 1990's, CSXT began testing a PTC platform known as Communications-Based Train Management System ("CBTM").  (*Id.* at 34).

54.     CSXT retained Wabtec Railway Electronics to develop and test CBTM using the object oriented design concept and the CR/CSXT/NS joint platform design.  (*Id.*).

55.     In 2008, Congress enacted the Rail Safety Improvement Act ("RSIA") which required all Class I railroads and passenger rail operators to implement a mandatory PTC collision avoidance system by December 31, 2015.

56.     Prior to the RSIA in 2008 there had been multiple train control initiatives based on various technologies and systems from different vendors.  (Dkt. 1, Ex. H, PTC White Paper, May 2012 at 10).

57.     By early 2009 there were no less than eleven different PTC projects involving nine different railroads in sixteen states, covering 4,000 track miles.  (*Id.*).

58.     Four individual PTC platforms were developed to implement advanced train control.

59.     The individual PTC platforms comprise Vital Train Management System (UP), Optimized Train Control (NS), Communications-Based Train Management (CSXT), and Electronic Train Management System (BNSF).

60.     Interoperability between such systems presented a challenge.

61.     To tackle interoperability, the "Big Four"—UP, NS, CSXT, and BNSF—have come together under the auspices of the Association of American Railroads and formed the Interoperable Train Control ("ITC") Working Committee.  (*See* Ex. G, Railway Age Article).

62.     The ITC implemented interoperability by selecting the ETMS platform offered by US-based Wabtec Railway Electronics as it met all the RSIA PTC requirements and was already in trials by many of the Class 1s and other rail operators.

63.     As a result of its acceptance by the ITC, Wabtec's I-ETMS solution became the main technical architecture for PTC in North America.

64.     Since acquiring Pulse and Rockwell Collins, Wabtec Corp. has continuously expanded the scope of its long developed and innovative advancements in PTC.

65.     Wabtec Corp. continues to be the most significant vendor in the PTC space.  (Dkt. 1, Ex. H, PTC White Paper, May 2012 at 13).

66.     Wabtec Railway Electronics, a wholly owned subsidiary of Wabtec Corp., "has a diverse product portfolio including electronic air brakes, digital event and video recorders, and its ETMS solution upon which the Class 1s have standardized for PTC architecture."  (*Id.*).

67.     "Wabtec designs and manufactures components for Office, Locomotive and Wayside segments."  (*Id.*).

### Wabtec and the History of End of Train ("EOT") Device

68.     The caboose, or final car coupled at the end of a train, was once an integral component to the overall function of the railway system.

69.     The caboose historically "housed crew members who would observe the cars ahead for defects, process the train's paperwork, operate track switches, monitor the air-brake system to see if it was functioning throughout the train, observe if the train was moving or stopped as intended by the engineer, and apply the brakes in an emergency."  (Ex. J, Robert C. McGonigal, <u>End-of-Train     Devices</u>, Trains     Mag.     (May     1,     2006), http://trn.trains.com/railroads/abcs-of-railroading/2006/05/end-of-traindevices ("EOT Devices") at 1).

70.     Cabooses carried marker lights to warn following trains of the presence of the last car.  (*Id.*).

71.     In 1969, Florida East Coast Railway pioneered the use of end-of-train ("EOT") devices in place of a caboose.

72.     By the mid-1980's most other railroads followed suit.

73.     Early EOT devices included a brake line connection/termination, a battery, and a flashing tail light.

74.     As the use of EOT devices became more widespread, the EOT devices were equipped with radio telemetry transmitters to send brake pressure data to a receiver in the locomotive.

75.     A two-way telemetry system allows the EOT device to apply the train brakes on radio command from the engine crew, sometimes necessary in emergencies.  (*Id.*).

76.     To reduce the cost of battery replacements, ambient light sensors were added so the flashing light on the EOT would illuminate only during dusk and after dark.

77.     Later models had a small turbine-powered electrical generator using air pressure from the brake line to power the EOT's radio and sensors.

78.     As EOT devices gained popularity, cabooses became obsolete.

79.     In 1997, the FRA issued a requirement that all trains exceeding 30 miles per hour which operate on heavy grades be equipped with two-way EOT telemetry devices.

80.     In the early 1980's Pulse Electronics revolutionized the EOT devices by designing its Trainlink[TM] EOT device.

81.     In 1985, Pulse Electronics was the largest US supplier of EOT devices.  (Ex. B, Caboose Article).

82.     Wabtec continues to offer Trainlink™ telemetry systems.

83.     Trainlink™ provides a critical link to last car information such as brake pipe pressure, motion status, battery condition, and marker light status.

**Wabtec's Development of its IC3 Technology**

84.     Prior to April 20, 2012, the Joint Railroad Safety Team ("JRST") identified a potential hazard in Wabtec's Back Office Segment ("BOS") regarding the integrity of mandatory directives transmitted to customer locomotives.

85.     Specifically, the JRST identified a hazard whereby if the BOS fails to properly associate a mandatory directive to a proper locomotive, the discrepancy would potentially never be detected by the then-existing system.

86.     Under this hazard, JRST noted that it was possible that the mandatory directive received on the locomotive may not equal the data sent by a customer's Computer Aided Dispatch ("CAD") system.

87.     On or around April 20, 2012, JRST formally published its identified hazard in the BOS to Wabtec.

88.     On or around April 20, 2012, JRST formally published its identified hazard in the BOS to non-Wabtec companies.

89.     On information and belief, Siemens was aware of the JRST's published hazard prior to September 10, 2012.

90.     Between April 20, 2012, and July 13, 2012, Wabtec personnel Kristofer Richland, Karen Shaw, and Jim Fenske (hereinafter "Wabtec inventors") worked to address JRST's identified hazard.

91.     At least by July 13, 2012, the Wabtec inventors had conceived of a solution to the JRST's identified hazard.

92.     At least by July 13, 2012, the Wabtec inventors conceived of a solution whereby four different Cyclic Redundancy Checks ("CRCs") are calculated and provided to the locomotive for validating that the data received by the locomotive is the data sent by the CAD.

93.     At least by August 28, 2012, the Wabtec inventors had continued developing their solution to the JRST's published hazard.

94.     At least by August 28, 2012, the Wabtec inventors had conceived of the component called the Individual and Composite CRC Calculator ("IC3").

95.     At least by August 28, 2012, the Wabtec inventors had conceived of a solution whereby an independent process is used to verify BOS normalization and train association of mandatory directive data.

96.     At least by August 28, 2012, the Wabtec inventors had conceived of a solution whereby the IC3 independently creates two types of CRCs used by the locomotive:  individual mandatory directive CRCs and the IC3 Composite CRC.

97.     At least by August 28, 2012, the Wabtec inventors had conceived of a proposed hazard mitigation schematically illustrated below:



Figure 3 High-Level Individual CRC Proposed Hazard Mitigation

98.     The IC3-based solution conceived by August 28, 2012 relied on a unidirectional communication link between the IC3 and an external CAD and between the IC3 and the BOS, and on a bidirectional communication link between the CAD and the BOS.

99.     Prior to September 11, 2012, Wabtec asked third parties, including Union Pacific, Norfolk Southern, and CSXT to review a white paper describing the Wabtec inventors' solutions to the JRST-identified hazard.

100.     Between August 28, 2012 and September 20, 2012, the Wabtec inventors worked with outside patent counsel to prepare a provisional patent application describing their IC3-based solution to the JRST-identified hazard.

101.     On September 20, 2012, the Wabtec inventors filed U.S. Provisional Application No. 61/703,531 directed to the IC3-based solution to JRST's identified hazard.

102.     The filing of U.S. Provisional Application No. 61/703,531 indicates that the Wabtec inventors did not abandon, suppress, or conceal the solution to JRST's identified hazard.

103.    The Wabtec inventors filed U.S. Non-Provisional Application No. 14/032,710 directed to the solution to JRST's identified hazard on September 20, 2013.

104.    U.S. Non-Provisional Application No. 14/032,710, which describes aspects of the IC3 (as well as embodiments not practiced in the IC3) published on June 19, 2014 as U.S. Patent Publication No. 2014/0172205 ("'205 Publication").

## COUNT I

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '461 PATENT

105.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

106.    Siemens has alleged in its Complaint that Wabtec has directly and indirectly infringed the '461 Patent, that the alleged infringement is willful, and that Wabtec will continue to engage in these acts.

107.    Wabtec has not directly and contributorily infringed and has not induced the infringement of the '461 Patent, and Wabtec thus is not continuing to directly and contributorily infringe and induce the infringement of the '461 Patent.  Wabtec thus also has not willfully infringed the '461 Patent.

108.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '461 Patent.

109.    Wabtec is entitled to a judicial declaration that it does not infringe, directly or indirectly, any valid and enforceable claim of the '461 Patent.

110.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '461 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT II

## <u>DECLARATORY JUDGMENT OF INVALIDITY OF THE '461 PATENT</u>

111.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

112.    Wabtec maintains that the '461 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

113.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '461 Patent.

114.    Systems that relied on on-board computers for controlling trains were known before the earliest priority date of the '461 Patent.

115.    For example, the ARES system was a known system for controlling trains using an on-board computer prior to the earliest priority date of the '461 Patent.

116.    Known systems, including the ARES system, included a control unit and a transceiver on the train to communicate with devices off the train.

117.    In the ARES system, the control unit on the train could transmit a message to a WIU near the train.

118.    In response to some such messages, in the ARES system, the control unit received information indicating a configuration of a configurable device (e.g., a switch) connected to the WIU.

119.    It was known, in prior art systems such as ARES, to provide positive train control to avoid potentially dangerous conditions.

120.    For example, in the ARES system, if an unexpected switch configuration was determined by the onboard computer, the system applied the train's brakes to prevent the train from passing the configurable device.

121.    Also in the ARES system, part of the checks performed by the onboard computer involved verifying that the WIU and configurable device whose status information was received were the correct, expected WIU, and configurable device.

122.    This technique of verifying configurable device configuration and identity and stopping a train if an anomaly is detected is also described in the patent literature, such as U.S. Patent No. 5,092,544 to Petit ("Petit").

123.    For example, Petit discloses that an onboard computer communicates with configurable devices such as crossing equipment.  (Petit at 4:32-38).

124.    Petit also discloses that if an error in a component of the system (e.g., a trackside configurable device) is detected, the "train may then be stopped or allowed to proceed at a restricted speed until the failure is corrected."  (*Id.* at 6:5-7).

125.    Petit discloses that this stopping may be achieved by an "output to set the brakes. . ."  (*Id.* at 6:4-5).

126.    Petit claims "safety checks in said communications link at said train and at said crossing equipment, and stopping said train or operating said equipment to its second state when said vital checks indicate an error in said messages."  (*Id.* at claim 11).

127.    Petit also claims "means for stopping said train and operating said equipment to its second state when said vital checks indicate an error in said messages."  (*Id.* at claim 25).

128.    Petit thus discloses that signals indicating the state of trackside equipment can result in the on-board computer causing the train to stop by applying the brakes.

129.    The technique of verifying configurable device configuration and identity and stopping a train if an anomaly is detected is also described in U.S. Patent No. 5,950,966 to Hungate ("Hungate").

130.    Hungate discloses that embodiments of its disclosed invention "can be implemented to accommodate monitored manual switches or remote powered switches." (Hungate at 2:22-27).

131.    Hungate discloses the use of an on-board computer (OBC) 31 with an interface to the train's brakes via brake interface 38.  (*Id.* at 4:40-50, Fig. 4).

132.    Hungate discloses that the brake interface 38 can "automatically appl[y] train brakes prior to violation of" an authority on the train.  (*Id.* at 5:40-44).

133.    Hungate discloses that "block signal aspect" is one condition that can be used to cause brake interface 38 to automatically apply brakes.  (*Id.* at 6:35-37).

134.    Hungate also discloses that certain circuitry can "confirm the absence of conflicting switch settings."  (*Id.* at claim 8).

135.    A person of skill in the art would have understood that conflicting switch settings could be used by the on-board computer 31 of Hungate to cause brake interface 38 to automatically apply brakes.

136.    Hungate thus discloses that signals indicating the state of trackside equipment can result in the onboard computer causing the train to stop by applying the brakes.

137.    Those of skill in the art would have been motivated to read prior art regarding ARES in combination with the prior art Petit and Hungate patents because all three are directed to positive train control systems and methods.

138.    Those of skill in the art would have had a reasonable expectation of success in combining the ARES system with Petit and/or Hungate.

139.    When the art is combined as discussed above, claim 1 of the '461 Patent is invalid as obvious under 35 U.S.C. § 103.

140.    When the art is combined as discussed above, claim 14 of the '461 Patent is invalid as obvious under 35 U.S.C. § 103.

141.    Wabtec is entitled to a judicial declaration that the '461 Patent and each of its claims are invalid.

## COUNT III

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '801 PATENT

142.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

143.    Siemens has alleged in its Complaint that Wabtec has directly and indirectly infringed the '801 Patent and that Wabtec will continue to engage in these acts.

144.    Wabtec has not directly and contributorily infringed and has not induced the infringement of the '801 Patent, and Wabtec thus is not continuing to directly and contributorily infringe and induce the infringement of the '801 Patent.

145.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '801 Patent.

146.    Wabtec is entitled to a judicial declaration that it does not infringe, directly or indirectly, any valid and enforceable claim of the '801 Patent.

147.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '801 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT IV

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '801 PATENT

148.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

149.    Wabtec maintains that the '801 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

150.    The '801 Patent claims priority to the '926 Patent and the '195 Patent.

151.    PTC systems for controlling a train and "enforc[ing] movement and speed limits by stopping the train before a violation occurs" have been known and described in printed publications at least as early as August 1999.  (Ex. F, RSAC Report, Appendix C at C-1).

152.    An example of a known prior art PTC system including train on board equipment is illustrated below:



(*Id*. at C-2).

153.    Indeed, the '801 Patent includes Applicant admissions in the Background that several prior art systems existed that would "automatically apply the [train] brakes if a track warrant is about to be exceeded."  ('801 Patent at 2:44-62).

154.    The Applicants further admitted that prior art systems existed that "used on-board receivers" and "anticipated signaling and [would] stop or slow the train automatically without operator input."  (*Id.* at 3:1-13).

155.    Wabtec was a pioneer in the development of this technology.

156.    Over two years before July 2, 2002 (the earliest claimed priority date of the '801 Patent), Wabtec owned at least one issued patent describing a system for "controlling train movement" including a "brake interface [that] automatically applies train brakes prior to violation of the incremental authority including speed restrictions."  (Hungate at Abstract, 5:40-44).

157.    Hungate described applying these brakes using braking algorithms based on several train dynamics including train weight.  (*Id.* at 5:45-6:10).

158.    At least as early as August 1999, PTC systems were described as including "on-board equipment" that would receive "[a]uthority and speed limits" and subsequently "enforce[] [these] authority and speed limits."  (Ex. F, RSAC Report, Appendix C at C-2).

159.    Patents published over a year before July 2, 2002, described a train control system configured to "receive and activate a variety of commands received from the central traffic control center." (U.S. Patent No. 6,144,901 to Nickles et al. ("Nickles") at 8:22-23).

160.    Patents published over a year before July 2, 2002, described that "[t]his received information would include impeding slow orders, speed limit changes, aspects of approaching signals, etc."  (*Id.* at 8:23-25).

161.    Over a year before July 2, 2002, train control systems and methods were publicly known that included a receiver for recovering wireless transmissions including a speed restriction (e.g., a speed limit or maximum allowable speed) and a processor to perform the step of receiving a speed restriction via the receiver.

162.     The '801 Patent includes statements that a positioning system may include a "GPS receiver" and "[o]ther types of positioning systems such as inertial navigation systems (INSs) and Loran systems."  ('801 Patent at 5:41-45).

163.     The Applicants of the '801 Patent admitted that "[s]uch positioning systems are well known in the art and will not be discussed in further detail herein."

164.     The August 1999 RSAC report discussed above describes multiple PTC systems that use a positioning system (e.g., a GPS receiver) to determine the location of the train in order to make appropriate train control decisions including the enforcement of speed restrictions.

165.     Specifically, the RSAC report describes that "[t]he OBC carries a track profile database containing GPS coordinates and all relevant targets, which the train must respond to, including all fixed and temporary speed restrictions." (Ex. F, RSAC Report, Appendix C at C-4).

166.     "Using GPS receivers and axle tachometers to track its location, the OBC continually calculates its position relative to each target and determines if a speed reduction will be required." (*Id.*).

167.     Publicly known prior art PTC systems used a train positioning system that determined a position of the train using information obtained from the positioning system.

168.     At least as early as November 7, 2000, issued patents were available that described an on-board train system that determined a risk of violating a speed and "compute[d] a braking force" based on "the average grade (G) over the ensuing distance to be traveled" and "based on train weight (W)."  (Nickles at Fig. 10).

169.     On-board train control modules were publicly described and/or available prior to July 2, 2002, that calculated required stopping distances based on factors such as the weight of the train and the grade of the track on which the train will be operating.

170.    As discussed above, the August 1999 RSAC Report describes prior art PTC systems for "enforc[ing] movement and speed limits by stopping the train before a violation occurs." (Ex. F, RSAC Report, Appendix C at C-1).

171.    Prior to July 2, 2002, it was known that automatic braking "penalties" can be imposed when an engineer or conductor fails to apply the brakes in a manner sufficient to comply with speed restrictions.

172.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '801 Patent.

173.    When the art discussed above is combined, claim 1 of the '860 Patent is invalid as obvious under 35 U.S.C. § 103.

174.    When the art discussed above is combined, claim 10 of the '860 Patent is invalid as obvious under 35 U.S.C. § 103.

175.    Wabtec is entitled to a judicial declaration that the '801 Patent and each of its claims are invalid.

## COUNT V

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '860 PATENT

176.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

177.    Siemens has alleged in its Complaint that Wabtec has directly and indirectly infringed the '860 Patent, that the alleged infringement is willful and that Wabtec will continue to engage in these acts.

178.    Wabtec has not directly and contributorily infringed and has not induced the infringement of the '860 Patent, and Wabtec thus is not continuing to directly and contributorily infringe and induce the infringement of the '860 Patent.  Wabtec thus also has not willfully infringed the '860 Patent.

179.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '860 Patent.

180.    Wabtec is entitled to a judicial declaration that it does not infringe, directly or indirectly, any valid and enforceable claim of the '860 Patent.

181.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '860 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

**COUNT VI**

**<u>DECLARATORY JUDGMENT OF INVALIDITY OF THE '860 PATENT</u>**

182.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above and Paragraphs 113 through 142 above.

183.    Wabtec maintains that the '860 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

184.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '860 Patent.

185.    The '860 Patent claims priority to the '461 Patent.

186.    Systems that relied on on-board computers for controlling trains were known before the earliest priority date of the '860 Patent.

187.    For example, the ARES system was a known system for controlling trains using an on-board computer prior to the earliest priority date of the '860 Patent.

188.    Known systems, including the ARES system, included a control unit and a transceiver on the train to communicate with devices off the train.

189.    In the ARES system, the control unit on the train could transmit a message to a WIU near the train.

190.    In response to some such messages, in the ARES system, the control unit received information indicating a configuration of a configurable device (e.g., a switch) connected to the WIU.

191.    It was known, in prior art systems such as ARES, to provide positive train control to avoid potentially dangerous conditions.

192.    For example, in the ARES system, a Satellite Based Location System was used to allow a locomotive to determine its geographic position.  (Ex. H, ARES Operators Manual at 1).

193.    The ARES system also relies on a database listing configurable devices to allow those devices to be displayed to the train operator.

194.    In the ARES system, if an unexpected switch configuration was determined by the onboard computer, the system applied the train's brakes to prevent the train from passing the configurable device.

195.    Also in the ARES system, part of the checks performed by the onboard computer involved verifying that the WIU and configurable device whose status information was received were the correct, expected WIU and configurable device.

196.    This technique of verifying configurable device configuration and identity and stopping a train if an anomaly is detected is also described in the patent literature, such as Petit.

197.    For example, Petit discloses that an onboard computer communicates with configurable devices such as crossing equipment.  (Petit at 4:32-38).

198.    Petit also discloses that if an error in a component of the system (e.g., a trackside configurable device) is detected, the "train may then be stopped or allowed to proceed at a restricted speed until the failure is corrected."  (*Id.* at 6:5-7).

199.    Petit discloses that this stopping may be achieved by an "output to set the brakes…"  (*Id.* at 6:4-5).

200.    Petit claims "safety checks in said communications link at said train and at said crossing equipment, and stopping said train or operating said equipment to its second state when said vital checks indicate an error in said messages."  (*Id.* at claim 11).

201.    Petit also claims "means for stopping said train and operating said equipment to its second state when said vital checks indicate an error in said messages."  (*Id.* at claim 25).

202.    Petit thus discloses that signals indicating the state of trackside equipment can result in the on-board computer causing the train to stop by applying the brakes.

203.    The technique of verifying configurable device configuration and identity and stopping a train if an anomaly is detected is also described in Hungate.

204.    Hungate discloses that embodiments of its disclosed invention "can be implemented to accommodate monitored manual switches or remote powered switches." (Hungate at 2:22-27).

205.    Hungate discloses the use of an on-board computer (OBC) 31 with an interface to the train's brakes via brake interface 38.  (*Id.* at 4:40-50, Fig. 4).

206.    Hungate discloses that the brake interface 38 can "automatically appl[y] train brakes prior to violation of" an authority on the train.  (*Id.* at 5:40-44).

207.    Hungate discloses that "block signal aspect" is one condition that can be used to cause brake interface 38 to automatically apply brakes.  (*Id.* at 6:35-37).

208.    Hungate also discloses that certain circuitry can "confirm the absence of conflicting switch settings."  (*Id.* at claim 8).

209.     A person of skill in the art would have understood that conflicting switch settings could be used by the on-board computer 31 of Hungate to cause brake interface 38 to automatically apply brakes.

210.     Hungate thus discloses that signals indicating the state of trackside equipment can result in the on-board computer causing the train to stop by applying the brakes.

211.     Those of skill in the art would have been motivated to read prior art regarding ARES in combination with the prior art Petit and Hungate patents because all three are directed to positive train control systems and methods.

212.     Those of skill in the art would have had a reasonable expectation of success in combining the ARES system with Petit and/or Hungate.

213.     When the art is combined as discussed above, claim 1 of the '860 Patent is invalid as obvious under 35 U.S.C. § 103.

214.     When the art is combined as discussed above, claim 15 of the '860 Patent is invalid as obvious under 35 U.S.C. § 103.

215.     Wabtec is entitled to a judicial declaration that the '860 Patent and each of its claims are invalid.

## COUNT VII

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '032 PATENT

216.     Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

217.     Siemens has alleged in its Complaint that Wabtec has directly infringed the '032 Patent and that Wabtec will continue to engage in these acts.

218.     Wabtec has not directly infringed the '032 Patent, and Wabtec thus is not continuing to directly infringe the '032 Patent.

219.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '032 Patent.

220.    Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '032 Patent.

221.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '032 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT VIII

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '032 PATENT

222.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

223.    Wabtec maintains that the '032 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

224.    The '032 Patent is directed to a train communication system including an end of train unit.

225.    End of train units were developed as a replacement for cabooses at least as early as 1985.  (*See* Ex. B, Caboose Article).

226.    More than one year before July 2, 2003, known end of train units allowed for the monitoring of brake pressure and sending radio reports forward to the engineer in the locomotive.

227.    Pulse Electronics developed "Trainlink" at least as early as 1985. (*See id.*).

228.    Trainlink featured sensors that monitored the train's airbrake pressure and the motion of the rear car.  (*See id.*).

229.    TrainGuard was a Wabtec technology introduced at least by 1999.  (Ex. F, RSAC Report, Appendix C at C-9).

230.    TrainGuard used the end of train radio to broadcast the train's location, including both the end of train and the locomotive, to off-train locations.

231.    TrainGuard used GPS to determine the train's location.

232.    Using GPS to determine the location of an end of train unit was known at least as early as February 23, 1998.  (*See* U.S. Patent No. 6,081,769 to Curtis ("Curtis") at 3:61-63).

233.    Systems that included onboard computer systems, monitoring sensors on freight cars, and satellite transmission of the location of individual cars were known at least as early as 2000.  (Ex. K, Linda Rosencrance, Railroads Hot for Satellite Monitoring, Computerworld (April 3,   2000),   http://www.computerworld.com/article/2594370/it-management/railroads-hot-for-satellite-monitoring.html).

234.    Head of train units that were in wireless communication with end of train units were known in the art at least as early as February 23, 1998.  (Curtis at 4:5-9).

235.    End of train units that included brake pipe pressure gauges, marker lights, GPS receivers and transceivers for communicating with the head of train were known at least as early as February 23, 1998.  (*Id.* at 1:34-42).

236.    End of train units that monitored air brake pressure, included marker lights, included a GPS receiver and were configured to communicate wirelessly with a head of train device were known in the art more than a year before July 2, 2003.

237.    Wayside stations for monitoring the location of end of train units were known in the art at least as early as April 6, 2001.  (U.S. Patent No. 6,505,104 to Collins ("Collins") at 5:42-45).

238.    End of train unit monitoring stations located off the train were known in the art at more than a year before July 2, 2003.

239.     Central computing units that included processing units and memory and that were connected via a communication link, such as a telephone connection, to wayside stations were known in the art at least as early as April 6, 2001.  (*Id.* at 6:46-60, 7:40-60).

240.     Central stations located off the train and connected to the end of train unit monitoring stations were known in the art more than a year before July 2, 2003.

241.     End of train units have been configured for periodic transmission to a head of train device at least as early as February 23, 1998.  (*Id.* at 7:30-33).

242.     End of train units that periodically communicated with head of train devices about the status of the air brake pressure were known in the art more than a year before July 2, 2003.

243.     End of train units that were configured to transmit a location message to a monitoring station off the train were known at least as early as August 1999.  (Ex. F, RSAC Report, Appendix C at C-10).

244.     End of train units that were configured to transmit wirelessly a location message including a location of the end of train unit to an end of train unit monitoring station, the location being based on information from the GPS receiver, were known in the art more than a year before July 2, 2003.

245.     End of train unit monitoring stations that were communicably coupled to and configured to transmit location messages were known in the art at least as early as April 6, 2001. (Collins at 3:55-4:30).

246.     End of train unit monitoring stations that transmitted end of train unit locations to a central station were known in the art more than a year before July 2, 2003.

247.     Each element of each claim of the '032 Patent was known in the prior art described above more than a year before July 2, 2003.

248.   There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '032 Patent.

249.   When the art discussed above is combined, claim 1 of the '032 Patent is invalid as obvious under 35 U.S.C. § 103.

250.   Wabtec is entitled to a judicial declaration that the '032 Patent and each of its claims are invalid.

## COUNT IX

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '850 PATENT

251.   Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

252.   Siemens has alleged in its Complaint that Wabtec has directly infringed the '850 Patent and that Wabtec will continue to engage in these acts.

253.   Wabtec has not directly infringed the '850 Patent, and Wabtec thus is not continuing to directly infringe the '850 Patent.

254.   There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '850 Patent.

255.   Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '850 Patent.

256.   Siemens knows or should know that Wabtec has not and is not in any way infringing the '850 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT X

### DECLARATORY JUDGMENT OF INVALIDITY OF THE '850 PATENT

257.   Wabtec repeats and incorporates herein Paragraphs 1 through 105 and Paragraphs 223 through 250 above.

258.     Wabtec maintains that the '850 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

259.     The '850 Patent claims priority to the '032 Patent.

260.     The '850 Patent is directed towards a method for end of train unit operation and an end of train unit.

261.     Each and every element of representative independent claim 1 was known in the prior art more than a year before the priority date of the '850 Patent, July 2, 2003.

262.     End of train units that were configured to transmit a location message to a monitoring station off the train were known at least as early as August 1999.  (Ex. F, RSAC Report, Appendix C at C-9).

263.     Wireless messages that included location and end of train unit identifiers were known in the art at least as early as April 6, 2001.  (Collins at 1:53–59).

264.     Transmitting a first wireless message, including location and a unique identifier, from an end of train unit to an end of train monitoring station was known in the art more than a year before July 2, 2003.

265.     End of train units that included brake pipe pressure gauges, marker lights, GPS receivers and transceivers for communicating with the head of train were known at least as early as February 23, 1998.  (Curtis at 1:34–42).

266.     End of train units that included an end of train marker light and a pressure sensor configured to determine air pressure in an air brake pipe were well known in the art more than a year before July 2, 2003.

267.     Wayside stations configured to receive communications from end of train units were known in the art at least as early as April 6, 2001.  (Collins at 5:42–45).

268.    End of train units monitoring stations that were communicably coupled to and configured to transmit location messages were known in the art at least as early as April 6, 2001. (*Id.* at 3:55–4:30).

269.    End of train unit monitoring stations that transmitted end of train unit locations to a central station were known in the art more than a year before July 2, 2003.

270.    Transmitting, from the central location, the location message to a user interface accessible by railway personnel was known in the art at least as early as April 6, 2001.  (*Id.* at 7:54–61).

271.    Transmitting the location of the end of train unit from the central authority to a fourth device was known in the art more than a year before July 2, 2003.

272.    Displaying the location of the end of train unit on a map image was known in the art as early as February 23, 1998.  (Curtis at 5:15–18).

273.    Receiving the location of the end of train unit at the fourth device and displaying a location of the end of train unit on a map image on a display connected to the fourth device was known in the art more than a year before July 2, 2003.

274.    Transmitting a wireless message about brake pipe pressure from the end of train unit to the head of train unit was known in the art as early as February 23, 1998.  (*Id.* at 1:46–50, 7:30–33).

275.    Transmitting a second wireless message to a fifth device located at the head of the train, the second wireless message including an air pressure sensed by the pressure sensor was known in the art more than a year before July 2, 2003.

276.    Each and every element of representative independent claim 8 was known in the prior art more than a year before the priority date of the '850 patent, July 2, 2003.

277.    End of train units that included processors, marker lights, pressure sensors for determining air pressure in an air brake pipe, wireless transceivers and GPS receivers were known in the art as early as February 23, 1998.  (*Id.* at 1:34–42).

278.    An end of train unit that comprises a processor, an end of train marker light, a pressure sensor for determining an air pressure in an air brake pipe, a wireless transceiver connected to the processor and a positioning system connected to the processor was known in the art more than a year before July 2, 2003.

279.    Wireless messages that included end of train location and end of train unit identifiers were known in the art at least as early as April 6, 2001.  (Collins at 7:40–60).

280.    Generating, by a processor, a first wireless message that includes a location of the end of train unit and an identifier that uniquely identifies the end of train unit was known in the art more than a year before July 2, 2003.

281.    Wayside stations configured to receive communications from end of train units were known in the art at least as early as April 6, 2001.  (*Id.* at 5:42–45).

282.    Transmitting a first wireless message to an end of train unit monitoring station located off of any train via the transceiver was known in the art more than a year before July 2, 2003.

283.    Transmitting a wireless message about brake pipe pressure from the end of train unit to the head of train unit was known in the art as early as February 23, 1998.  (Curtis at 1:35–47).

284.    Transmitting a generated wireless message that includes an air pressure sensed by the pressure sensor to a device located at the head of train was known more than a year before July 2, 2003.

285.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '850 Patent.

286.    When the art discussed above is combined, claim 1 of the '850 Patent is invalid as obvious under 35 U.S.C. § 103.

287.    When the art discussed above is combined, claim 8 of the '850 Patent is invalid as obvious under 35 U.S.C. § 103.

288.    Wabtec is entitled to a judicial declaration that the '850 Patent and each of its claims are invalid.

### COUNT XI

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '494 PATENT

289.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

290.    Siemens has alleged in its Complaint that Wabtec has directly infringed the '494 Patent and that Wabtec will continue to engage in these acts.

291.    Wabtec has not directly infringed the '494 Patent, and Wabtec thus is not continuing to directly infringe the '494 Patent.

292.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '494 Patent.

293.    Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '494 Patent.

294.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '494 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XII

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '494 PATENT

295.   Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

296.   The '494 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

297.   The '494 Patent is generally directed to "Railway Train Critical Systems Having Control System Redundancy and Asymmetric Communications Capability."

298.   Use of fault-tolerant computing systems to meet the stringent safety and dependability requirements of automatic train control systems is well known in the prior art. (*See* Ex. L, D. Essamé et al., <u>PADRE: A Protocol for Asymmetric Duplex Redundancy,</u> ("PADRE Article") at Introduction).

299.   Also, it is well known in the prior art that safety and availability are issues of major importance in many critical systems.  (*Id.* at Abstract).

300.   Relying on redundant components for increasing the overall system availability with respect to physical component failures is known in the prior art.  (*Id.* at Introduction).

301.   The control systems of the '494 Patent are known in the prior art.  (*See* U.S. Patent No. 7,721,149 Essame et al. ("Essame") at Abstract).

302.   Employing the control system of the '494 Patent in the railroad industry is also known.  (*See id.* at 3:47-49 ("The processing system is described as being included in a railway vehicle as it is an application that meets the required level of safety.")).

303.   Like the '494 Patent, the processing system of Essame each includes first and second controllers.  (*See id.* at 3:53-54).

304.   As early as 1999, the prior art disclosed a protocol for duplex redundancy management in critical systems to increase the system availability without jeopardizing its safety

and an application of the same in a fully-automated train control system.  (Ex. L, PADRE Article

at Abstract).

305.    "A   distributed   real-time   system   for   critical   applications   with   networked

controllers made up of two fail-safe units" was considered by an inventor of Essame.  (*See id.* at

Section 3, System Model).

306.    The   diagram   below,   taken   from   the   PADRE   Article,   illustrates   units   that

communicate with each other and with remote units by messages sent over a network.  (*See id.* at

Section 3, System Model, Fig. 3).



and an application of the same in a fully-automated train control system.

307.    The   first   and   second   computers   of   Essame   each   include   an   external

communications interface.  (Essame at 3:57-62 ("Each computer has a plurality of local inputs, a

plurality   of   remote   inputs,   a   plurality   of   remote   outputs,   a   plurality   of   secure   outputs,

synchronization inputs/outputs, duplex inputs/outputs and command inputs.  Each computer also has a processor, a memory and a means of securization.")).

308.    Asymmetric Duplex Redundancy is known as a mechanism in the prior art to achieve more reliable computing systems.

309.    Asymmetric Duplex Redundancy is known in the prior art in connection with the railroad industry.

310.    Essame discloses one example of Asymmetric Duplex Redundancy.

311.    Specifically, Essame discloses that the external communications interface of the first computer is bilateral and sends remote outputs, and the external communications interface of the second computer is unilateral and does not send remote outputs.  (*See id.* at 3:62-63 ("As a general rule, only one unit (master), for example the first computer, generates remote outputs."); s*ee also id.* at 6:57-59 ("The only operating difference between a master and a slave concerns the remote outputs, which are neutralized by the slave computer.")).

312.    Other prior art, described in Essame, also discloses Asymmetric Duplex Redundancy.  (S*ee id.* at 1:44-52 ("A redundant processing system is described in the article by D. Essamé, J. Arlat and D. Powell entitled '*PADRE: a Protocol for Asymmetric Duplex Redundancy*' published in Dependable Computing for Critical Applications (DCCA-7), C. B. Weinstock and J. Rushby, Eds., and *Dependable Computing and Fault-Tolerant Systems* 12, pp. 229-248, IEEE Computer Society Press, 1999 (Proc. IFIP 7th Working Conf. held in San Jose, Calif., USA, January 1999)."); *see also id.* at 1:52-54 ("This article describes . . . an asynchronous system for managing duplex redundancy in the basis of intrinsically safe processing units.")).

313.    The diagram below, taken from the PADRE Article, illustrates an implementation of PADRE using two protocol entities.  (*See* Ex. L, PADRE Article at Section 5, Fig. 6).



**Fig. 6: Padre**

314.    The PADRE Article also discloses asymmetric coordination of replicated units that consists of letting one unit, called the Primary, have a dominating role with respect to the other unit.  (*Id.* at Section 4).

315.    The integrity of messages exchanged between the units is ensured by error-detecting codes. (*Id.* at Section 3).

316.    The first and second controllers of Essame are coupled via an inter-controller communications pathway.  (*See* Essame at 4:62-65 ("The duplex synchronization links for the computers [] are linked together to ensure the synchronization of the two computers.")).

317.    The units of the PADRE Article can also communicate with each other.  (*See* Ex. L, PADRE Article at Figs. 3 and 6).

318.    Positive Train Control techniques often find their roots in avionics.

319.    Periodic error checking of data is well known in avionics applications.

320.    For example, U.S. Patent No. 6,003,146 to Beutler ("Beutler") discloses "[a] method [] of providing an error free error detection of critical aircraft data transmitted periodically from a sending unit over a data bus to a receiving unit."  (*See* Beutler at 2:13-16; *see also id.* at 1:6-6; *see also id.* at 2:34-35 ("A method is disclosed to provide CRC integrity for ARINC 429 periodic data.")).

321.    Figure 3 of Beutler, reproduced below, "shows the structure required to perform this method." (*Id.* at 2:34-35).



*Fig.3*

322.    The same principle architecture for message transmission that is disclosed in Beutler is relied upon by the '494 Patent.

323.    Specifically, the diagram below, reproduced from Figures 3 and 4 of the '494 Patent, shows that the principle architecture of message transmission of Beutler is also employed by the '494 Patent.



FIG. 3

324.    Beutler indicates that its transmission units, which are analogous to the control systems of the '494 Patent, "are well known in this area of technology and any [] transmission unit which transmits aircraft data can be used."  (*Id.* at 2:37-40).

325.    Units 4 and 6 of Beutler respectively receive input messages.  (*See id.* at Fig. 3).

326.    Unit 6 of Beutler comprises an external bilateral communications interface and sends a remote output.  (*See id.* at Fig. 3).

327.    Unit 4 of Beutler comprises a unilateral external communications interface that receives but does not send a remote output.  (*See id.* at Fig. 3; 2:41-42 ("The message is sent to a means for determining the CRC.")).

328.    An inter-controller pathway is depicted between units 4 and 6 of Beutler.  (*See id.* at Fig. 3).

329.    The security code generated by the second controller of the '494 Patent can be any "known security code generated by known CHECK-SUM, HASH, etc. protocols."  ('494 Patent at 6:54-55).

330.    Unit 4 of Beutler generates a security code and sends the security code to unit 6 through the inter-controller pathway.  (*See* Beutler at 2:40-42 ("The message is sent to a means for determining the CRC 4.  Once the CRC is determined for the message, it is sent to a formatting and transmitting means 6 . . ."); *see also id.* at Fig. 3).

331.    Unit 6 of Beutler adds the security code to data.  (*See id.* at 2:42-47, 1:25-27).

332.    The technique of generating a security code by a second controller and transmitting the security code to a first controller that adds the security code to data is disclosed by at least the prior art Beutler reference.  (*See id.* at 1:22-23 ("CRCs are well known in the data communications area of technology."); *see also id.* at 1:25-27 ("Usually, the CRC is added at the end of the data when it is transmitted.")).

333.    At least based on the disclosures of these prior art references, the claims of the '494 Patent are invalid under 35 U.S.C. §§ 102 and/or 103.

334.    The claims of the '494 Patent are invalid based on Wabtec's prior invention of the accused subject matter in the United States without abandoning, suppressing, or concealing, which constitutes prior art under 35 U.S.C. § 102(g)(2).

335.    Prior to the earliest possible priority date of the '494 Patent, the Wabtec inventors invented the subject matter of the '494 Patent in this country and did not abandon, suppress, or conceal it.

336.    Siemens believes that Wabtec's '205 Publication discloses each limitation of each claim of the '494 Patent.

337.    Under Siemens' interpretation of the '494 Patent, if the '205 Publication constituted prior art to the '494 Patent, it would invalidate the '494 Patent under 35 U.S.C. §§ 102 and/or 103.

338. The activities by the Wabtec inventors to develop what became the IC3 as a solution to the JRST-identified hazard, beginning in April 2012, constitutes an invention of that subject matter before the filing of the '494 Patent, in this country by another inventor.

339. The Wabtec inventors did not abandon, suppress, or conceal their invention, as evidenced by their research and implementation work in consumer products such as the IC3.

340. The Wabtec inventors did not abandon, suppress, or conceal their invention, as evidenced by the filing of the U.S. Provisional Application No. 61/703,531 and the eventual filing of U.S. Application No. 14/032,710 and publication of the '205 Publication.

341. Upon information and belief, the subject matter of the '494 Patent was derived from Wabtec's work in developing the IC3.

342. To the extent the claims of the claims of the '494 Patent cover the IC3/BOS as presently implemented, those claims are invalid under 35 U.S.C. §§ 102(g)(2) and/or 103 based on Wabtec's prior invention of that subject matter in the United States without abandonment, suppression, or concealment of the invention.

343. There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '494 Patent.

344. Wabtec is entitled to a judicial declaration that the '494 Patent and each of its claims are invalid.

## COUNT XIII

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '698 PATENT

345. Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

346. Siemens has alleged in its Complaint that Wabtec has directly infringed the '698 Patent and that Wabtec will continue to engage in these acts.

347.    Wabtec has not directly infringed the '698 Patent, and Wabtec thus is not continuing to directly infringe the '698 Patent.

348.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '698 Patent.

349.    Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '698 Patent.

350.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '698 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XIV

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '698 PATENT

351.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above and Paragraphs 294 through 342 above.

352.    Wabtec maintains that the '698 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112 under the same grounds of invalidity presented herein in Paragraphs 294 through 342 above regarding the '494 Patent.

353.    The '698 Patent was filed on April 16, 2014 and claims priority to the '494 Patent, which was filed September 12, 2012.

354.    The '698 Patent is a continuation-in-part of the '494 Patent.

355.    The '698 Patent includes new matter not disclosed in the '494 Patent.

356.    For example, the specification of the '698 Patent replaced the term "vital" throughout the specification of the '494 Patent with "safety critical."

357.    The '698 Patent claims recite "safety critical systems."

358.    The term "vital" with respect to railway systems does not mean the same thing as "safety critical" with respect to railway systems.

359.    The phrase "safety critical" in the '698 Patent constitutes new matter not disclosed in the '494 Patent.

360.    The claims of the '698 Patent, which recite "safety critical," are not supported by the '494 Patent.

361.    The specification of the '698 Patent replaced the phrase "vital systems message" throughout the specification of the '494 Patent with "safety critical systems message."

362.    The '698 Patent claims recite "safety critical systems message."

363.    The phrase "vital systems message" does not mean the same thing as "safety critical systems message" with respect to railway systems.

364.    The phrase "safety critical systems message" in the claims of the '698 Patent constitutes new matter not disclosed in the '494 Patent.

365.    The specification of the '698 Patent replaced "[t]he control system has a first controller having an external bilateral communications interface capable of sending and receiving a vital systems message that is generated within a railway vital application system" in the specification of the '494 Patent with "[t]he control system has at least one controller executing first and second tasks.  The first task has an external bilateral communications interface capable of sending and receiving a safety critical systems message that is generated within a railway safety critical application system."

366.    Claim 10 of the '698 Patent recites "at least one controller executing first and second tasks; the first task having an external bilateral communications interface capable of

sending and receiving a safety critical systems message that is generated within the railway system."

367.    The phrase "[t]he control system has at least one controller executing first and second tasks.  The first task has an external bilateral communications interface capable of sending and receiving a safety critical systems message that is generated within a railway safety critical application system" in the '698 Patent has a different meaning from the phrase "[t]he control system has a first controller having an external bilateral communications interface capable of sending and receiving a vital systems message that is generated within a railway vital application system" in the '494 Patent with respect to railway systems.

368.    The phrase "at least one controller executing first and second tasks; the first task having an external bilateral communications interface capable of sending and receiving a safety critical systems message that is generated within the railway system" in claims 10 of the '698 Patent constitutes new matter not disclosed in the '494 Patent.

369.    The specification of the '698 Patent replaced "[t]he control system also has a second controller with an external communications interface capable of receiving but incapable of sending a vital systems message that is generated within the second controller" in the '494 Patent with "[t]he second task has an external communications interface capable of receiving but incapable of sending a safety critical systems message that is generated within the second task."

370.    Claim 10 of the '698 Patent recites "the second task having an external communications interface capable of receiving a safety critical systems message, but incapable of sending a safety critical systems message that is generated within the second task, the second task having a security code generator."

371.    The phrase "[t]he second task has an external communications interface capable of receiving but incapable of sending a safety critical systems message that is generated within the second task" in the '698 Patent has a different meaning from the phrase "[t]he control system also has a second controller with an external communications interface capable of receiving but incapable of sending a vital systems message that is generated within the second controller" in the '494 Patent.

372.    The phrase "the second task having an external communications interface capable of receiving a safety critical systems message, but incapable of sending a safety critical systems message that is generated within the second task, the second task having a security code generator" in the '698 Patent constitutes new matter and the claims are not supported by the prior specification of the '494 Patent.

373.    The specification of the '698 Patent replaced "[t]he control system has an inter-controller communications pathway coupling the first and second controllers" in the specification of the '494 Patent with "[t]he control system has an inter-task communications pathway coupling the first and second task."

374.    Claims 1 and 10 of the '698 Patent recite "an inter-task communications pathway."

375.    The phrase "an inter-task communications pathway" in the '698 Patent has a different meaning from the phrase "an inter-controller communications pathway" in the '494 Patent.

376.    The phrase "an inter-task communications pathway" recited in claims 1 and 10 of the '698 Patent constitutes new matter and the claims are not supported by the prior specification of the '494 Patent.

377.   For the reasons described above in paragraphs 351 to 374, the '698 Patent contains at least one claim that is supported only by the additional disclosure.

378.   None of the claims of the '698 Patent are entitled to the filing date of the '494 Patent.

379.   To the extent the accused functionality satisfies the claims of the '698 Patent, the claims of the '698 Patent are invalid under 35 U.S.C. §§ 102(e) and/or 103 in view of the '205 Publication.

380.   To the extent the claims of the '698 Patent are supported by the specification of the '494 Patent, the claims of the '698 Patent are invalid based on Wabtec's prior invention of the accused subject matter in the United States without abandoning, suppressing, or concealing, which constitutes prior art under 35 U.S.C. § 102(g)(2).

381.   Prior to the earliest possible priority date of the '698 Patent, the Wabtec inventors invented the subject matter of the '698 Patent in this country and did not abandon, suppress, or conceal it.

382.   Siemens believes that Wabtec's '205 Publication discloses each limitation of each claim of the '698 Patent.

383.   Under Siemens' interpretation of the '698 Patent, if the '205 Publication constituted prior art to the '698 Patent, it would invalidate the '698 Patent under 35 U.S.C. §§ 102 and/or 103.

384.   The activities by the Wabtec inventors to develop what became the IC3 as a solution to the JRST-identified hazard, beginning in April 2012, constitute an invention of that subject matter before the earliest priority date of the '698 Patent, in this country by another inventor.

385.   The Wabtec inventors did not abandon, suppress, or conceal their invention, as evidenced by their research and implementation work in consumer products such as the IC3.

386.   The Wabtec inventors did not abandon, suppress, or conceal their invention, as evidenced by the filing of the U.S. Provisional Application No. 61/703,531 and the eventual filing of U.S. Application No. 14/032,710 and publication of the '205 Publication.

387.   Upon information and belief, the subject matter of the '698 Patent was derived from Wabtec's work in developing the IC3.

388.   To the extent the claims of the '698 Patent cover the IC3/BOS as presently implemented, those claims are invalid under 35 U.S.C. §§ 102(g)(2) and/or 103 based on Wabtec's prior invention of that subject matter in the United States without abandonment, suppression, or concealment of the invention.

389.   In addition, the claims of the '698 Patent, which can be satisfied by two controllers, are invalid under 35 U.S.C. § 101 because of statutory "same invention" type double patenting based on the '494 Patent.

390.   There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '698 Patent.

391.   Wabtec is entitled to a judicial declaration that the '698 Patent and each of its claims are invalid.

## COUNT XV

## <u>DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '195 PATENT</u>

392.   Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

393.   Siemens has alleged in its Complaint that Wabtec has directly infringed the '195 Patent and that Wabtec will continue to engage in these acts.

394.    Wabtec has not directly infringed the '195 Patent, and Wabtec thus is not continuing to directly infringe the '195 Patent.

395.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '195 Patent.

396.    Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '195 Patent.

397.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '195 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XVI

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '195 PATENT

398.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

399.    Wabtec maintains that the '195 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

400.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '195 Patent.

401.    The '195 Patent is generally directed to a "[t]rain control system and method of controlling a train or trains."

402.    Each and every element of independent claim 1 was known in the art more than a year before July 2, 2002 (the earliest claimed priority date of the '195 Patent).

403.    Train control and dispatch systems for directing the movement of trains from sections of track not on the main line to sections of main line track were well known in the art before July 2, 2002.  (*See* Ex. M, Burns et al., Safety and Productivity Improvement of Railroad Operations by Advanced Train Control Systems, ("Burns") at 33).

119

404.    Train control systems that transmitted movement authorities such as track warrants to a train so that the train could move along a block of main line track were well known in the art more than a year before July 2, 2002.

405.    At least as early as April 1989, train dispatch systems were known that generated movement authorities that were approved by dispatchers and transmitted to the train control systems of affected locomotives.  (*Id*. at 37).

406.    For example, Burns states that "[m]ovement authorities separate[d] and protect[ed] trains in unsignaled portions of the railroad, by commanding movements between designated points over particular track segments [and] into and out of sidings."  (*Id*.).

407.    Burns describes a train control system in which movement authorities were generated by dispatch computers, approved by dispatchers, and sent to train control computers inside affected locomotives.  (*Id*.).

408.    Transmitting movement authorities such as circulation authorities to a train so that the train could move from a section of track not on the main line to the block of main line track was known in the art more than a year before July 2, 2002.  (Ex. N, Monfalcone et al., Safety Modeling of a Direct Traffic Control (DTC) Traffic Control System Using the Axiomatic Safety-Critical Assessment Process, ("Monfalcone") at 354).

409.    At least as early as January 2001, train dispatch systems were known that prevented trains from leaving the yard without authority.  (*Id*. at 354).

410.    For example, Monfalcone describes a system in which train crews requested permission to leave the yard where the train was located, and authority was granted and sent by the dispatcher only if traffic conditions allowed it.  (*Id*. at 355).

411.     Preventing trains from moving until movement authorities were received by the train was known in the art more than a year before July 2, 2002.

412.     At least as early as January 2001, train dispatch centers that did not allow trains to leave the yard unless they had been granted authority to do so were known in the art.  (*Id*. at 354).

413.     The system described in Monfalcone also conditioned movement through defined boundaries on the receipt of dispatcher-generated movement authorities.  (*Id*.).

414.     A person of skill in the art would understand that conditioning train movement through subsequent track segments on receiving movement authorities from the dispatcher would prevent movement into the segment if the movement authority had not been received.

415.     Those of skill in the art would have been motivated to read Burns in combination with Monfalcone because both were directed to train operations involving movement authorities.

416.     Those of skill in the art would have had a reasonable expectation of success in combining Burns and Monfalcone.

417.     When the art is combined as discussed above, claim 1 of the '195 Patent is invalid as obvious under 35 U.S.C. § 103.

418.     Wabtec is entitled to a judicial declaration that the '195 Patent and each of its claims are invalid.

## COUNT XVII

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '926 PATENT

419.     Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

420.     Siemens has alleged in its Complaint that Wabtec has directly infringed the '926 Patent and that Wabtec will continue to engage in these acts.

421.     Wabtec has not directly infringed the '926 Patent, and Wabtec thus is not continuing to directly infringe the '926 Patent.

422.     There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '926 Patent.

423.     Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '926 Patent.

424.     Siemens knows or should know that Wabtec has not and is not in any way infringing the '926 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XVIII

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '926 PATENT

425.     Wabtec repeats and incorporates herein Paragraphs 1 through 105 and Paragraphs 399 to 414 above.

426.     Wabtec maintains that the '926 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

427.     There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '926 Patent.

428.     The '926 Patent claims priority to the '195 Patent.

429.     The '926 Patent is generally directed to a "[t]rain control system and method of controlling a train or trains."

430.     Each and every element of representative independent claim 1 was known in the art more than a year before July 2, 2002 (the earliest claimed priority date of the '926 Patent).

431.    Train control and dispatch systems for directing the movement of trains from sections of track not on the main line to sections of main line track were well known in the art before July 2, 2002.  (Ex. M, Burns at 33).

432.    At least as early as April 1989, train control systems were known that directed functions such as yard operations.  (*Id*.).

433.    Burns describes a train control system that "collect[ed], processe[d], and distribute[d] information to other railroad functions, including yard operations . . ."  (*Id*.).

434.    The use of control units in train control systems was well known in the art more than a year before July 2, 2002.

435.    At least as early as April 1989, train control computers were well known in the art.  (*Id*. 34).

436.    For example, Burns describes "an on-board computer, designated the Train Control Computer (TCC)," which "enforce[d] movement and speed authority limits by applying train brakes when it predict[ed] the train would otherwise exceed its authorized limits."  (*Id*.).

437.    The use of positioning systems in conjunction with train control systems was well known in the art before July 2, 2002.

438.    At least as early as April 1989, connecting GPS receivers to train control computers was a known practice in the art.  (*Id*.).

439.    For example, Burns describes "a Global Positioning System (GPS) receiver [that] permit[ed] the locomotive to determine its absolute position and velocity anywhere on earth" and whose signals were interpreted by the TCC.  (*Id*.).

440.    Train control systems that included communications modules were known in the art prior to July 2, 2002.

441.   At least as early as April 1989, the use of data networks for communication between components of train control systems, as well as between train control systems and train dispatch centers, was known in the art.  (*Id*. at 34-35).

442.   For example, Burns describes a "Data Network [that] communicate[d] commands, status, and data between [the Rail Operations Control System (ROCS)] and the wayside and locomotive equipment," such as the TCC.  (*Id*. at 35).

443.   Burns also discloses a "Data Management Unit (DMU) [that] handle[d] all data communications between the locomotive and other ATCS equipment, including other locomotives in a train."  (*Id*. at 34).

444.   Transmitting movement authorities to train control computers so that the train could move within a defined boundary was a known practice in the art more than a year before July 2, 2002.

445.   At least as early as April 1989, train dispatch systems were known in that art that generated movement authorities that were approved by dispatchers and transmitted to affected locomotives.  (*Id*. at 37).

446.   For example, Burns states that "[m]ovement authorities separate[d] and protect[ed] trains in unsignaled portions of the railroad, by commanding movements between designated points over particular track segments [and] into and out of sidings."  (*Id*.).

447.   At least as early as April 1989, movement authorities that were approved and sent by dispatchers to the train control computers of affected locomotives were known in the art. (*Id*.).

448.    Preventing the train from moving from its current location if the current location was not within the boundary for an accepted authorization was a well known practice in the art before July 2, 2002.

449.    At least as early as January 2001, preventing movement of trains from a yard prior to receiving authorization was known in the art.  (Ex. N, Monfalcone at 354).

450.    For example, Monfalcone states that "[t]rains [were] allowed to leave the yard [where it was located] only when the dispatcher grant[ed] authority."  (*Id.*).

451.    The system described in Monfalcone also conditioned movement through defined boundaries on the receipt of dispatcher-generated movement authorities.  (*Id.*).

452.    A person of skill in the art would understand that conditioning train movement through subsequent track segments on receiving movement authorities from the dispatcher would prevent movement into the segment if the movement authority had not been received.

453.    Systems that monitored the position of the train reported by the positioning system were known in the art more than a year before July 2, 2002.

454.    At least as early as April 1989, train control computers were known that determined and/or displayed the position of a train on a track.  (Ex. M, Burns at 34).

455.    For example, Burns discloses that the TCC "determine[d] the train's position on the track by interpreting GPS or transponder signals and dead reckoner position data and comparing it to the track data base."  (*Id.*).

456.    Burns also states that "ROCS monitor[ed] and display[ed] the position, speed, status, and schedule performance of all trains."  (*Id.* at 37).

457.    Train systems that stopped the train before it moved outside the boundary unless it had authorization to do so were known in the art before July 2, 2002.

458.   At least as early as April 1989, train control computers were known that monitored movement authority limits and applied the brakes of the train if the train was about to exceed its authority.  (*Id*.).

459.   At least as early as January 2001, traffic control systems were known that conditioned movement through subsequent boundaries on the receipt of dispatcher-provided authorities.  (Ex. N, Monfalcone at 354).

460.   A person of skill in the art would understand that conditioning train movement through subsequent track segments on the receipt of dispatcher-generated movement authorities would result in stopping the train before it enters the next track segment if it had not received the necessary authority to continue.

461.   Those of skill in the art would have been motivated to read Burns in combination with Monfalcone because both were directed to train control systems that enforced movement authorities sent by a dispatcher.

462.   Those of skill in the art would have had a reasonable expectation of success in combing Burns and Monfalcone.

463.   When the art is combined as discussed above, claim 1 of the '926 Patent is invalid as obvious under 35 U.S.C. § 103.

464.   When the art is combined as discussed above, claim 20 of the '926 Patent is invalid as obvious under 35 U.S.C. § 103.

465.   Wabtec is entitled to a judicial declaration that the '926 Patent and each of its claims are invalid.

## COUNT XIX

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '471 PATENT

466.   Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

467.     Siemens has alleged in its Complaint that Wabtec has directly infringed the '471 Patent and that Wabtec will continue to engage in these acts.

468.     Wabtec has not directly infringed the '471 Patent, and Wabtec thus is not continuing to directly infringe the '471 Patent.

469.     There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '471 Patent.

470.     Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '471 Patent.

471.     Siemens knows or should know that Wabtec has not and is not in any way infringing the '471 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.


## COUNT XX

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '471 PATENT

472.     Wabtec repeats and incorporates herein Paragraphs 1 through 105, Paragraphs 399 to 414, and Paragraphs 424 to 460 above.

473.     Wabtec maintains that the '471 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

474.     There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '471 Patent.

475.     The '471 Patent claims priority to the '926 Patent and the '195 Patent.

476.     The '471 Patent is generally directed to a "[t]rain control system and method of controlling a train or trains."

477.    Each and every element of representative independent claim 1 was known in the prior art more than a year before July 2, 2002 (the earliest claimed priority date of the '471 Patent).

478.    Train control and dispatch systems for directing the movement of trains from sections of track not on the main line to sections of main line track were well known in the art before July 2, 2002.  (Ex. M, Burns at 33).

479.    At least as early as April 1989, train control systems were known that directed functions such as yard operations.  (*Id.*).

480.    For example, Burns describes a train control system that "collect[ed], processe[d], and distribute[d] information to other railroad functions, including yard operations . . ." (*Id.*).

481.    Train control systems that included control modules were well known in the art more than a year before July 2, 2002.

482.    At least as early as April 1989, the use of train control computers was well known in the art.  (*Id.* 34).

483.    For example, Burns describes "an on-board computer, designated the Train Control Computer (TCC)," which "enforce[d] movement and speed authority limits by applying train brakes when it predict[ed] the train would otherwise exceed its authorized limits." (*Id.*).

484.    The use of positioning systems in conjunction with train control systems was well known in the art before July 2, 2002.

485.    At least as early as April 1989, connecting GPS receivers to train control computers was a known practice in the art.  (*Id.*).

486.    For example, Burns describes "a Global Positioning System (GPS) receiver [that] permit[ed] the locomotive to determine its absolute position and velocity anywhere on earth" and whose signals were interpreted by the TCC.  (*Id.*).

487.    Train control systems that included receivers were well known in the art prior to July 2, 2002.

488.    At least as early as April 1989, the use of data networks for communication between components of train control systems, as well as between train control systems and train dispatch centers, was known in the art.  (*Id.* at 34-35).

489.    For example, Burns describes a "Data Network [that] communicate[d] commands, status, and data between [the Rail Operations Control System (ROCS)] and the wayside and locomotive equipment," such as the TCC.  (*Id.* at 35).

490.    Burns also discloses a "Data Management Unit (DMU) [that] handle[d] all data communications between the locomotive and other ATCS equipment, including other locomotives in a train."  (*Id.* at 34).

491.    Train control systems that prevented a train from being moved until the train received a circulation authority were well known in the art more than a year before July 2, 2002.

492.    At least as early as January 2001, preventing a train from moving prior to receiving a movement authority was a known practice in the art.

493.    For example, Monfalcone states that "[t]rains [were] allowed to leave the yard only when the dispatcher grant[ed] authority."  (Ex. N, Monfalcone at 354).

494.    Monfalcone also discloses that a train could not proceed to subsequent boundaries if the train had not received a movement authority from the dispatcher.  (*Id.*).

495.    Allowing trains to move within the section of track not on the main line provided a circulation authority had been received was a well known practice in the art before July 2, 2002.

496.    At least as early as April 1989, train control systems that were applicable to yard operations were known in the art.  (Ex. M, Burns at 33).

497.    For example, Burns describes a system that "integrate[d] train planning, control, and monitoring in CTC and previously dark territories. It also collect[ed], processe[d], and distribute[d] information to other railroad functions, including yard operations . . ." (*Id.*).

498.    A person of ordinary skill in the art would understand that Burns describes a system in which a train is permitted to move within a yard provided the train had received authority to do so.

499.    Preventing a train from entering the main line until a movement authority to do so had been received was well known in the art before July 2, 2002.

500.    At least as early as 1989, systems were known that enforced movement authorities covering specific areas of a track, and the movement authorities were applicable to main line track and sidings.  (*Id.* at 34, 37).

501.    For example, Burns states that movement authorities commanded movements over specific portions of track and into and out of sidings.  (*Id.* at 37).

502.    Burns also discloses a train control system in which a train control computer enforces movement authorities by applying the train brakes.  (*Id.* at 34).

503.    At least as early as January 2001, preventing movement of trains from a yard prior to authorization was received was a known practice in the art.  (Ex. N, Monfalcone at 354).

504.     Systems that allowed a train to move from a section of track not on the main line to the section of main line track once a movement authority had been received were well known in the art before July 2, 2002.

505.     For example, Burns discloses a system of movement authorities that dictated train movement into and out of sidings.  (Ex. M, Burns at 37).

506.     Burns states that a train control computer enforced movement authorities by applying the train brakes it the computer predicted the authorities were about to be exceeded.

507.     To the extent that each and every element of independent claim 1 was known in the art more than a year before July 2, 2002, each and every element of independent claim 11 was also known in the art more than a year before July 2, 2002.

508.     The use of messages including a signal generated by devices located along the track wayside, the signal indicating that movement of the train into the main line is permitted, was well known in the art before July 2, 2002.

509.     At least as early as April 1989, the use of wayside signal devices to generate movement authorities, including in yard operations, was known in the art.  (*Id*. at 36).

510.     For example, Burns describes Wayside Interface Units (WIUs) that gave the "ATCS the capability to monitor switch and signal status of interlockings and [] track occupancy indications."  (*Id*.).

511.     Burns also states that the WIUs were connected to the data network and communicated signal status information to the train control computer.  (*Id*.).

512.     A person of ordinary skill in the art would understand that information related to track occupancy as reported by a WIU to the train control computer was directed to generating movement authorities for the train.

513.     Those of skill in the art would have been motivated to read Burns in combination with Monfalcone because both were directed to train operations involving movement authorities in yard operations.

514.     Those of skill in the art would have had a reasonable expectation of success in combining Burns and Monfalcone.

515.     When the art is combined as discussed above, claim 1 of the '471 Patent is invalid as obvious under 35 U.S.C. § 103.

516.     When the art is combined as discussed above, claim 11 of the '471 Patent is invalid as obvious under 35 U.S.C. § 103.

517.     Wabtec is entitled to a judicial declaration that the '471 Patent and each of its claims are invalid.

## COUNT XXI

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '953 PATENT

518.     Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

519.     Siemens has alleged in its Complaint that Wabtec has directly infringed the '953 Patent and that Wabtec will continue to engage in these acts.

520.     Wabtec has not directly infringed the '953 Patent, and Wabtec thus is not continuing to directly infringe the '953 Patent.

521.     There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '953 Patent.

522.     Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '953 Patent.

523.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '953 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XXII

## **DECLARATORY JUDGMENT OF INVALIDITY OF THE '953 PATENT**

524.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

525.    Wabtec maintains that the '953 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

526.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '953 Patent.

527.    Each and every element of representative independent claim 1 was known in the art more than a year before October 10, 2002 (the earliest claimed priority date of the '953 Patent).

528.    The '953 Patent is directed to a "[m]ethod and system for checking track integrity."

529.    A system for controlling a train was well known in the art over a year before October 10, 2002.  (Ex. O, Japanese Patent Publication No. JP9226583A to Tsukimata ("Tsukimata") at Abstract).  Tsukimata contains the Japanese publication (Ex. O at 5-8) along with a machine translation of the Abstract and specification (Ex. O at 1, 9-21).

530.    At least as early as September 2, 1997, a train system was known in the art for automatically initiating a brake for stopping a train.  (*Id.*)

531.    For example, the Abstract of Tsukimata describes a train system that "judges when to brake for stopping the train..." and "....outputs a train stop control signal."  (*Id.*).

532.    The '953 Patent describes how the control module "calculates the braking force necessary to stop the train prior to reaching the section of track monitored by the track circuit…" and claims "the brake interface unit being operable to activate the train brake under control of the control unit."

533.    Train control systems that used control units were well known in the art over a year before October 10, 2002.  (*Id.*).

534.    At least as early as September 2, 1997, the use of control units was well known in the art.  (*Id.*).

535.    The Abstract of Tsukimata discloses an identical functionality as the control unit in the '953 Patent.   The control unit (signal receiving part 9) in the Abstract of Tsukimata "judges when to brake for stopping the train, based on the braking distance and the travel distance, and reports to a trainman accordingly.   I[f] the train approaches the railroad crossing and there is no time to be lost, the signal receiving part 9 outputs a train stop control signal." (*Id.*).

536.    A warning device in communication with a control unit was well known in the art over a year before October 10, 2002, as shown in U.S. Patent No. 5,092,544 to Petit ("Petit"). (*See* Petit at 4:49-51).

537.    At least as early as March 3, 1992, the use of a warning device in communication with a control unit was known in the art.

538.    For example, Petit discloses "[t]he CPU has an output port which is connected [] to actuate the train's [] alarm."  (*Id.*).

539.    A brake interface unit in communication with a control unit and a train brake, and being operable to activate the train brake under control of the control unit, was well known in the art over a year before October 10, 2002.  (*Id.* at 4:49-55).

540.    At least as early as March 3, 1992, a brake interface in communication with the control unit and a train brake, and the brake interface unit being operable to activate the train brake under control of the control unit, was well known in the art.  (*Id.*).

541.    For example, Petit discloses "[t]he CPU has an output port which is connected to drive the controller of a brake or to actuate the train's brakes or an alarm.  This brake is referred to as a penalty brake, since braking is the result of either a failure in the system, or a failure to establish a communication link or the failure to pre-acknowledge or communicate with the transponders after a pre-acknowledge, if the optional pre-acknowledgement is included in the system." (*Id.*).

542.    A transceiver being located on the train and being in communication with the control unit was well known in the art over a year before October 10, 2002.  (*Id.* at 4:3-6).

543.    As early as March 3, 1992, a transceiver being located on the train and being in communication with the control unit was well known in the art.  (*Id.*).

544.    For example, Petit discloses "[r]eferring to Fig. 2, there is shown one of the transponders 38.  It is shown in radio communication with an interrogator 54 which activates and powers the transponder and receives messages therefrom."  (*Id.*).  As Fig. 2 reflects, "[t]he CPU program causes it to establish the communications link by transmitting a message, when the beacon transponder 38 communicates with the locomotive equipment via the interrogator 54." (*Id.* at 4:58-61).

545.    The control unit being configured to perform the steps of transmitting an interrogation message to a track circuit transceiver associated with a track circuit was known in the art over a year before October 10, 2002.  (*Id.* at 4:3-13).

546.    At least as early as March 3, 1992, control units were configured to perform transmission of interrogation messages to track circuits in the prior art.  (*Id.*).

547.    For example, Petit discloses a "transponders 38… shown in radio communication with an interrogator 54 which activates and powers the transponder and receives messages therefrom.  These messages are digitally coded bits containing fields.  Fields of data which are provided included representations of the identity of the upcoming crossing (crossing I.D.); the direction of approach of the train which will be from the west or the east, the track…and the distance to the crossing."  (*Id.*).

548.    The step of listening for a response from the track circuit transceiver, the response to include an indication as to the condition of a section of track monitored by the track circuit, was well known in the art over a year before October 10, 2002, as described in U.S. Patent No. 4,932,614 to Birkin ("Birkin").  (*See* Birkin at Abstract).

549.    As early as June 12, 1990, the step of listening for a response from the track circuit transceiver, the response to include an indication as to the condition of a section of track monitored by the track circuit, was well known in the art.  (*Id.*).

550.    For example, Birkin discloses "[t]he response of the transponder to an interrogator on the train is dependent upon the condition of the rail circuit."  (*Id.*).  Further, Birkin discloses "FIG. 5 indicates that the rail circuit is open-circuited by either a broken rail or a track feature such as a switch or relay contact not being made.  The transponder could then be internally controlled either to give no response to the interrogator or be so arranged as to give a message

indicating high impendence.  For example, the messages for high and low impedance could be different frequencies.  If the detected impedance is within the accepted level for the track configuration then a message is returned by the transponder indicating that the track is safe to traverse." (*Id.* at 3:8-16).

551.    The step of allowing the train to continue if a response with an indication that it is safe for the train to proceed is received, was known in the art over a year before October 10, 2002.  (Birkin 6:34-37).

552.    As early as March 3, 1992, the step of allowing the train to continue if a response with an indication that it is safe for the train to proceed is received, was well known in the art.

553.    For example, Birkin discloses "[i]f a transponder read 102 occurs, the time out . . . will be disregarded and the brake or alarm operation 104 will not be carried out." (*Id.*).

554.    The step of activating the warning device if the response indicates that it is not safe for the train to proceed, was known in the art over a year before October 10, 2002.  (*Id.* at 4:29-31).

555.    As early as March 3, 1992, the step of activating the warning device if the response indicates that it is not safe for the train to proceed, was known in the art.  (*Id.*).

556.    For example, Birkin discloses "a decision 100 is made to activate the alarm or the brake if the time has timed out." (*Id.*).

557.    When the art is combined as discussed above, claim 1 of the '953 Patent is invalid as obvious under 35 U.S.C. § 103.

558.    Wabtec is entitled to a judicial declaration that the '953 Patent and each of its claims are invalid.

## COUNT XXIII

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '774 PATENT

559.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

560.    Siemens has alleged in its Complaint that Wabtec has directly infringed the '774 Patent and that Wabtec will continue to engage in these acts.

561.    Wabtec has not directly infringed the '774 Patent, and Wabtec thus is not continuing to directly infringe the '774 Patent.

562.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '774 Patent.

563.    Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '774 Patent.

564.    Siemens knows or should know that Wabtec has not and is not in any way infringing the '774 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XXIV

## DECLARATORY JUDGMENT OF INVALIDITY OF THE '774 PATENT

565.    Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

566.    Wabtec maintains that the '774 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

567.    There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '774 Patent.

568.    The '774 Patent claims priority to the '953 Patent.

569.    Each and every element of representative independent claim 1 was known in the art more than a year before October 10, 2002 (the earliest claimed priority date of the '774 Patent).

570.    The '774 Patent is directed to a "[m]ethod and system for checking track integrity."

571.    A system for controlling a train was well known in the art over a year before October 10, 2002.  (Ex. O, Tsukimata at Abstract).

572.    At least as early as September 2, 1997, a train system was known in the art for automatically initiating a brake for stopping a train.  (*Id.*)

573.    For example, Tsukimata describes a train system that "judges when to brake for stopping the train..." and "....outputs a train stop control signal."  (*Id.*).

574.    Train control systems that used control units were well known in the art over a year before October 10, 2002.  (*Id.*).

575.    At least as early as September 2, 1997, the use of control units were well known in the art.  (*Id.*).

576.    For example, Tsukimata discloses an identical functionality as the control unit in the '953 Patent.  The control unit of Tsukimata (the alarm signal receiving part 9) "judges when to brake for stopping the train, based on the braking distance and the travel distance, and reports to a trainman accordingly.  I[f] the train approaches the railroad crossing and there is no time to be lost, the signal receiving part 9 outputs a train stop control signal."  (*Id.*).

577.    A warning device in communication with the control unit was well known in the art over a year before October 10, 2002.  (Petit at 4:49-51).

578.    At least as early as March 3, 1992, the use of a warning device in communication with a control unit was known in the art.

579.    For example, Petit discloses "[t]he CPU has an output port which is connected …to actuate the train's… alarm." (*Id.*).

580.    A brake interface unit in communication with a control unit and a train brake, and being operable to activate the train brake under control of the control unit, was well known in the art over a year before October 10, 2002.  (*Id.* at 4:49-55).

581.    At least as early as March 3, 1992, a brake interface in communication with the control unit and a train brake, and the brake interface unit being operable to activate the train brake under control of the control unit, was well known in the art.  (*Id.*).

582.    For example, Petit discloses "[t]he CPU has an output port which is connected to drive the controller of a brake or to actuate the train's brakes or an alarm. This brake is referred to as a penalty brake, since braking is the result of either a failure in the system, or a failure to establish a communication link or the failure to pre-acknowledge or communicate with the transponders after a pre-acknowledge, if the optional pre-acknowledgement is included in the system." (*Id.*).

583.    A transceiver being located on the train and being in communication with the control unit was well known in the art over a year before October 10, 2002.  (*Id.* at 4:3-6).

584.    As early as March 3, 1992, a transceiver, the transceiver being located on the train and being in communication with the control unit was well known in the art.  (*Id.*).

585.    For example, Petit discloses "[r]eferring to Fig. 2, there is shown one of the transponders 38.  It is shown in radio communication with an interrogator 54 which activates and powers the transponder and receives messages therefrom." (*Id.*).  As Fig. 2 reflects, "[t]he CPU

program causes it to establish the communications link by transmitting a message, when the beacon transponder 38 communicates with the locomotive equipment via the interrogator 54." (*Id.* at 4:58-61).

586.    The control unit being configured to perform the steps of transmitting an interrogation message to a track circuit transceiver associated with a track circuit was known in the art over a year before October 10, 2002.  (*Id.* at 4:3-13).

587.    At least as early as March 3, 1992, control units were configured to perform transmission of interrogation messages to track circuits in the prior art.  (*Id.*).

588.    For example, Petit discloses a "transponders 38… in radio communication with an interrogator 54 which activates and powers the transponder and receives messages therefrom. These messages are digitally coded bits containing fields.  Fields of data which are provided included representations of the identity of the upcoming crossing (crossing I.D.); the direction of approach of the train which will be from the west or the east, the track…and the distance to the crossing."  (*Id.*).

589.    The step of listening for a response from the track circuit transceiver, the response to include an indication as to the condition of a section of track monitored by the track circuit was well known in the art over a year before October 10, 2002.  (Birkin at Abstract).

590.    As early as June 12, 1990, the step of listening for a response from the track circuit transceiver, the response to include an indication as to the condition of a section of track monitored by the track circuit, was well known in the art.  (*Id.*).

591.    For example, Birkin discloses "[t]he response of the transponder to an interrogator on the train is dependent upon the condition of the rail circuit."  (*Id.*).  Further, Birkin discloses "FIG. 5 indicates that the rail circuit is open-circuited by either a broken rail or a track feature

such as a switch or relay contact not being made.  The transponder could then be internally controlled either to give no response to the interrogator or be so arranged as to give a message indicating high impendence.  For example, the messages for high and low impedance could be different frequencies.  If the detected impedance is within the accepted level for the track configuration then a message is returned by the transponder indicating that the track is safe to traverse." (*Id.* at 3:8-16).

592.    The step of activating the warning device to provide a warning to the operator if a response indicates that it is not safe for the train to proceed, was well known in the art over a year before October 10, 2002.  (Ex. O, Tsukimata at Abstract).

593.    As early as September 2, 1997, the step of activating the warning device to provide a warning to the operator if a response indicates that it is not safe for the train to proceed was known in the art.  (*Id.*).

594.    For example, Tsukimata discloses "the alarm signal receiving part 9 judges when to brake for stopping the train … and reports to a trainman accordingly." (*Id.*).

595.    The step of activating the train's brake via the brake interface unit if an operator of the train fails to acknowledge the warning or fails to reduce the speed of the train to a safe speed within a period of time after the warning, was well known in the art over a year before October 10, 2002.  (Petit at 4:49-55).

596.    As early as March 3, 1992, activating the train's brake via the brake interface unit if an operator of the train fails to acknowledge the warning or fails to reduce the speed of the train to a safe speed within a period of time after the warning was known in the art.  (*Id.*).

597.    For example, Petit discloses "[t]he CPU has an output port which is connected to drive the controller of a brake or to actuate the train's brakes or an alarm.  This brake is referred

to as a penalty brake, since braking is the result of either a failure in the system, or a failure to establish a communication link or the failure to pre-acknowledge or communicate with the transponders after a pre-acknowledge, if the optional pre-acknowledgement is included in the system." (*Id.*). Further, "a decision 100 is made to activate the alarm or the brake if the timer has timed out." (*Id.* at 6:29-32).

598.   When the art is combined as discussed above, claim 1 of the '774 Patent is invalid as obvious under 35 U.S.C. § 103.

599.   Wabtec is entitled to a judicial declaration that the '774 Patent and each of its claims are invalid.

## COUNT XXV

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '110 PATENT

600.   Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

601.   Siemens has alleged in its Complaint that Wabtec has directly infringed the '110 Patent and that Wabtec will continue to engage in these acts.

602.   Wabtec has not directly infringed the '110 Patent, and Wabtec thus is not continuing to directly infringe the '110 Patent.

603.   There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged infringement of the '110 Patent.

604.   Wabtec is entitled to a judicial declaration that it does not directly infringe any valid and enforceable claim of the '110 Patent.

605.   Siemens knows or should know that Wabtec has not and is not in any way infringing the '110 Patent.  This is thus an exceptional case entitling Wabtec to an award of its attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XXVI

### DECLARATORY JUDGMENT OF INVALIDITY OF THE '110 PATENT

606.   Wabtec repeats and incorporates herein Paragraphs 1 through 105 above.

607.   Wabtec maintains that the '110 Patent and each of its claims are invalid under one or more of the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

608.   There is an actual, substantial, and continuing justiciable controversy between Siemens and Wabtec regarding the alleged invalidity of the '110 Patent.

609.   The '110 Patent is generally directed to a method and system for activating a warning device on a train at a certain location.

610.   Each and every element of independent claim 1 was known in the art more than a year before July 1, 2002 (the earliest claimed priority date of the '110 Patent).

611.   Systems that relied on on-board computers for controlling trains were known before the earliest priority date of the '110 Patent.

612.   For example, the ARES system was a known system for controlling trains using an on-board computer prior to the earliest priority date of the '110 Patent.

613.   Among other features, ARES allowed for communications between onboard computers and wayside devices via WIUs.  (*See* Ex. H, ARES Operators Manual.)

614.   Long before the earliest priority date of the '110 Patent it was desired to automate train control schemes in order to make the overall system safer.   As discussed in the FRA Railroad Communications and Train Control Report to Congress, dated July 1994, PTC systems were already being tested as of July 8, 1994.  (*See* Ex. I, FRA Report at 3).

615.   The use of a warning device was known before the earliest priority date of the '110 Patent.

616. For example, the FRA Federal Register describes the use locomotive horns at highway-rail crossings. (*See* Ex. P, 49 CFR §222, Use of Locomotive Horns at Highway-Rail Grade Crossings, January 13, 2000 ("49 CFR §222") at 15).

617. 49 CFR §222 requires a horn to be sounded when a locomotive is approaching and passing a high-way rail crossing. (Ex. P, 49 CFR §222 at 15).

618. A person of skill in the art would have found it obvious to combine the desire to automate train control systems with the known requirements of using a horn when approaching a high-way rail crossing.

619. Those of skill in the art would have had a reasonable expectation of success in combining the ARES system with 49 CFR §222.

620. When the art is combined as discussed above, claim 1 of the '110 Patent is invalid as obvious under 35 U.S.C. § 103.

621. When the art is combined as discussed above, claim 11 of the '110 Patent is invalid as obvious under 35 U.S.C. § 103.

622. Wabtec is entitled to a judicial declaration that the '110 Patent and each of its claims are invalid.

## **DEMAND FOR JURY TRIAL**

Wabtec hereby demands a jury trial on all issues which can be heard by a jury.

## **CONCLUSION AND PRAYER FOR RELIEF**

WHEREFORE, Wabtec respectfully requests that:

A. The Court deny any and all relief sought by Siemens;

B. The Court enter judgment in favor of Wabtec in this action and deny Siemens all requested relief;

C.      The Court find that the '461 Patent, the '801 Patent, the '860 Patent, the '032 Patent, the '850 Patent, the '494 Patent, the '698 Patent, the '195 Patent, the '926 Patent, the '471 Patent, the '953 Patent, the '774 Patent, and the '110 Patent are not infringed by Wabtec;

D.      The Court find that the '461 Patent, the '801 Patent, the '860 Patent, the '032 Patent, the '850 Patent, the '494 Patent, the '698 Patent, the '195 Patent, the '926 Patent, the '471 Patent, the '953 Patent, the '774 Patent, and the '110 Patent are invalid;

E.      The Court find that Siemens is entitled to no damages;

F.      The Court declare that this is an exceptional case entitling Wabtec to its reasonable attorneys' fees under 35 U.S.C. § 285;

G.      The Court award Wabtec its costs and reasonable attorneys' fees; and

The Court grant Wabtec all other and further relief to which it may be entitled.

Dated: January 26, 2017                **K&L GATES LLP**

                                    /s/ *Steven L. Caponi*
                                    Steven L. Caponi, Esq. (#3484)
                                    600 N. King Street
                                    Suite 901
                                    Wilmington, DE 19801
                                    Phone: 302.416.7080
                                    steven.caponi@klgates.com

                                    OF COUNSEL:

                                    Alan L. Barry, Esq.
                                    Jason A. Engel, Esq.
                                    K&L GATES LLP
                                    70 West Madison Street, Suite 3100
                                    Chicago, Illinois  60602
                                    Phone: 312.372.1121
                                    alan.barry@klgates.com

jason.engel@klgates.com

*Attorneys for Defendants Westinghouse Air Brake Technologies Corporation (d/b/a Wabtec Corporation) and Wabtec Railway Electronics, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2017 the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven L. Caponi
Steven L. Caponi (#3484)
*steven.caponi@klgates.com*
K&L Gates LLP
600 N. King St., Suite 901
Wilmington, DE 19801
(302) 416-7000