IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIEMENS MOBILITY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-284 (LPS) (CJB) |
| | ) | |
| WESTINGHOUSE AIR BRAKE | ) | |
| TECHNOLOGIES CORPORATION | ) | |
| (d/b/a WABTEC CORPORATION) and | ) | |
| WABTEC RAILWAY ELECTRONICS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## **JOINT PROPOSED FINAL JURY INSTRUCTIONS**

## TABLE OF CONTENTS

1.    General Instructions ...............................................................................................1

    1.1.    Introduction........................................................................................1

    1.2.    Jurors' Duties ....................................................................................2

    1.3.    Burdens of Proof ...............................................................................3

    1.4.    Evidence Defined ..............................................................................5

    1.5.    Direct and Circumstantial Evidence .................................................6

    1.6.    Consideration of Evidence ...............................................................7

    1.7.    Statements of Counsel.......................................................................8

    1.8.    Credibility of Witnesses....................................................................9

    1.9.    Number of Witnesses.......................................................................10

    1.10.    Expert Witnesses.............................................................................11

    1.11.    Deposition Testimony......................................................................12

    1.12.    Demonstrative Exhibits...................................................................13

    1.13.    Use of Notes....................................................................................14

    1.14.    Confidential Labels and Redactions ..............................................15

2.    The Parties and Their Contentions.......................................................................16

    2.1.    The Parties ......................................................................................16

    2.2.    Summary of Contentions and Patent Issues....................................17

3.    Patent Claims .......................................................................................................20

    3.1.    Patent Claims Generally .................................................................20

    3.2.    Claim Construction .........................................................................21

    3.3.    Dependent and Independent Claims ...............................................23

    3.4.    Open Ended or "Comprising" Claims.............................................24

4.    Infringement.........................................................................................................25

    4.1.    Direct Infringement.........................................................................27

        4.1.1.    Direct Infringement by "Literal Infringement" .................... 28

        4.1.2.    Direct Infringement under the Doctrine of Equivalents ......... 30

    4.2.    Indirect Infringement—Actively Inducing Patent Infringement ...........32

    4.3.    Indirect Infringement—Contributory Infringement...........................35

5.    Invalidity Defenses .............................................................................................37

6.    Prior Art ...............................................................................................................38

i

6.1.    Prior Art Defined ................................................................................38

   6.1.1.    Prior Art – Prior Invention ....................................................... 39

       6.1.1.1.  Prior Art – Prior Invention – Conception................................ 40

       6.1.1.2.  Prior Art – Prior Invention – Reasonably Diligent Reduction to Practice ............................................................. 41

   6.1.2.    Prior Art – Prior Public Use ...................................................... 42

   6.1.3.    Prior Art – On Sale Bar ............................................................ 44

6.2.    Prior Art Considered or Not Considered by United States Patent Office..............46

6.3.    Invalidity of Independent and Dependent Claims .................................................47

7.    Obviousness ................................................................................................................48

7.1.    Level of Ordinary Skill .........................................................................................51

7.2.    Scope and Content of the Prior Art........................................................................52

7.3.    Differences Between the Claimed Inventions and the Prior Art............................53

7.4.    Other Considerations .............................................................................................56

8.    Damages.......................................................................................................................58

8.1.    Date of Commencement of Damages ....................................................................60

8.2.    Damages – Kinds of Damages That May Be Recovered........................................61

8.3.    Lost Profits.............................................................................................................62

   8.3.1.    Lost Profits – the *Panduit* Factors ........................................... 63

   8.3.2.    Lost Profits – the *Panduit* Factors – Demand ........................ 64

   8.3.3.    Lost Profits – the *Panduit* Factors – Acceptable Non-Infringing Substitutes................................................................. 65

   8.3.4.    Lost Profits – the *Panduit* Factors – Capacity....................... 66

   8.3.5.    Lost Profits – the *Panduit* Factors – Amount of Profit ......... 67

   8.3.6.    Lost Profits – the *Panduit* Factors – Market Share ............... 68

   8.3.7.    Lost Profits – Collateral Sales .................................................. 69

8.4.    Reasonable Royalty ...............................................................................................70

   8.4.1.    Reasonable Royalty – Using the "Hypothetical Negotiation" Method....................................................................................... 71

   8.4.2.    Reasonable Royalty – Attribution/Apportionment.................... 74

   8.4.3.    Reasonable Royalty – Entire Market Value Rule..................... 75

   8.4.4.    Reasonable Royalty – Timing ................................................... 76

   8.4.5.    Reasonable Royalty – Use of Comparable License Agreements .......... 77

        8.4.6.    Reasonable Royalty – Availability of Non-Infringing Substitutes.........78

9.    Willful Infringement .................................................................................................79

10.    Deliberations and Verdict ........................................................................................82

        10.1.    Introduction................................................................................................82

        10.2.    Unanimous Verdict .....................................................................................83

        10.3.    Duty to Deliberate.......................................................................................84

        10.4.    Social Media ...............................................................................................85

        10.5.    Court Has No Opinion .................................................................................86

1.      **General Instructions**

    **1.1.    Introduction**

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

### 1.2.    Jurors' Duties

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in Court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way. You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

### 1.3.    Burdens of Proof

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a patent case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence." I told you about these two standards of proof during my preliminary instructions to you and I will now remind you what they mean.

A party asserting patent infringement has the burden of proving infringement by a preponderance of the evidence. That means the party asserting infringement—in this case, Siemens—has to produce evidence that, when considered in light of all of the facts, leads you to believe that what that party claims is more likely true than not. To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting the claims of the party asserting infringement—here, Siemens—must make the scales tip somewhat toward its side. A party asserting willful infringement—as Siemens does here with respect to several of its patents—also has the burden of proving that any infringement was willful by a preponderance of the evidence. And Siemens has the burden to establish the amount of its money damages by a preponderance of the evidence.

[**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"][1] contends that the asserted claims of the asserted patents are invalid. A patent is presumed to be valid. A party challenging the

---

[1]    **Siemens' Position:** Beginning with the pretrial submissions, Defendants have begun referring to themselves for the first time as "Westinghouse" instead of "Wabtec," and apparently intend to do so at trial. This move is obviously intended to take advantage of the name recognition of the "Westinghouse" name, but this last-minute name change is both improper and likely to cause jury confusion. Wabtec should be required to use the name under which it does business, which the caption of the case has reflected since the very beginning is "Wabtec." Moreover, permitting Wabtec to change its name solely for purposes

(continued…)

3

validity of a patent claim has the burden of proving by clear and convincing evidence that the

patent claim is invalid. Clear and convincing evidence means that it is highly probable that a fact

is true. Proof by clear and convincing evidence is thus a higher burden than proof by a

preponderance of the evidence.

Some of you may have heard the phrase "proof beyond a reasonable doubt." That burden

of proof applies only in criminal cases and has nothing to do with a civil case like this one. You

should therefore not consider it in this case.

---

(continued)

of trial is likely to cause jury confusion because the documents and witnesses in this case have, not surprisingly, consistently used the name "Wabtec," not "Westinghouse."

**Defendants' Position:** Westinghouse is the legal corporate name of the lead Defendant in this case and it is entitled to use it at trial. Westinghouse will explain during opening statements that Westinghouse and Wabtec may be used interchangeably. Westinghouse will address this issue further at the pre-trial conference as it has already been identified as an issue for discussion.

### 1.4.    Evidence Defined

You must make your decision based only on the evidence that you saw and heard here in Court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of Court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition transcript or previous trial transcript testimony that has been played or read to you), the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed. Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. You must completely ignore all of these things. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record.

Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

You must not conduct any independent research, investigation, or experiments about the case or its subject matter on your own. Make your decision based only on the evidence, as I have defined it here, and nothing else.

### 1.5. Direct and Circumstantial Evidence

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence." I will now remind you what each means.

Direct evidence is simply evidence like the testimony of an eyewitness that, if you believe the testimony, directly proves a fact. For example, if a witness testified that he or she saw it raining outside, and you believed the witness, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of facts and circumstances that indirectly proves a fact. If someone walked into the Courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

### 1.6.    Consideration of Evidence

You should use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

### 1.7.    Statements of Counsel

A further word about statements of counsel and arguments of counsel. The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.

### 1.8.   Credibility of Witnesses

You are the sole judges of each witness' credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave at the trial. You have the right to distrust such a witness' testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

### 1.9.    Number of Witnesses

One more point about witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference. Proof of a fact does not necessarily depend on the number of witnesses who testify about it. Unless I instruct you otherwise, the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary if after all of the other evidence you believe that single witness.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

### 1.10.    Expert Witnesses

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience. When knowledge of technical subject matter may be helpful to the jury, an expert is permitted to state an opinion on those technical matters.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing the testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

### 1.11. Deposition Testimony

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition. If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony as the parties have only a limited amount of time to present you with evidence. You should not attribute any significance to the fact that the deposition videos may appear to have been edited. Deposition testimony is out of Court testimony given under oath and is entitled to the same consideration you would give if the witness had appeared personally in Court.

### 1.12.   Demonstrative Exhibits

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The remainder of the exhibits (including charts and animations) were offered to help illustrate the testimony of the various witnesses. Unless I have specifically admitted them into evidence, these illustrative exhibits, called "demonstrative exhibits," have not been admitted, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

### 1.13.    Use of Notes

You may use notes taken during trial to assist your memory. However, as I instructed you at the beginning of the case, you should use caution in consulting your notes. There is always a tendency to attach undue importance to matters that you have written down. Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later on in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

### 1.14. Confidential Labels and Redactions

In the course of this case, the parties entered into an agreement that would protect each respective party's confidential and sensitive business information from disclosure to the public or third parties. Under that agreement, the parties have added confidentiality labels to their documents, and have redacted, obscured or removed information from documents to protect the confidential nature of the information. You may have seen documents with confidentiality labels or redactions during the course of the trial. The use of confidentiality labels and redactions has no bearing on the evidence, and should not be construed in any way against any party.

## 2.    The Parties and Their Contentions

### 2.1.    The Parties

I will now review for you the parties in this action and the positions of the parties that you will have to consider in reaching your verdict.

The plaintiff in this case is Siemens Mobility, Inc., which has been referred to throughout trial as "Siemens," and may have at times been referred to as "Siemens Industry, Inc.," its former name.

The defendants in this case are Westinghouse Air Brake Technologies Corporation (doing business as Wabtec Corporation) and Wabtec Railway Electronics, Inc., or "WRE." The Defendants have been referred to throughout trial collectively as [**Siemens:** "'Wabtec.'"] [**Defendants:** "'Westinghouse' or 'Wabtec.'"]

### 2.2.    Summary of Contentions and Patent Issues

I will now review for you the parties in this action and the positions of the parties that you will have to consider in reaching your verdict.

Siemens is the owner of the 11 patents at issue in this case, which the parties have treated as being divided into three categories. The first category of patents asserted by Siemens has been referred to collectively as the "On Board Unit patents" or the "OBU patents." The OBU patents consist of U.S. Patent Nos. 6,996,461, 7,236,860, 6,845,953, 7,036,774, 7,079,926, 7,200,471 and 6,824,110. Siemens contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] directly and indirectly infringes the asserted claims of the OBU patents by making, using, selling or offering for sale the [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] Interoperable Electronic Train Management System, which has been referred to as "I-ETMS" or "the I-ETMS system." Siemens further contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement of the OBU patents has been willful. Specifically, Siemens contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is willfully infringing claims 5 and 17 of the '461 patent; claims 1 and 15 of the '860 patent; claims 1 and 9 of the '953 patent; claim 9 of the '774 patent; claim 4 of the '926 patent; claim 19 of the '471 patent; and claim 11 of the '110 patent.

The second category of patents asserted by Siemens has been referred to collectively as the "Back Office Server patents" or "the BOS patents." The BOS patents consist of U.S. Patent Nos. 8,714,494 and 9,233,698. Siemens contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] directly and indirectly infringes the asserted claims of the BOS patents by making, using, selling or offering for sale the Back Office Server and IC3 components of the I-ETMS system, which has been referred to as a "BOS/IC3 System." Specifically, Siemens contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is infringing claims 1 and 17 of the '494 patent and claims 1 and 17 of the '698 patent.

17

The last category of patents asserted by Siemens has been referred to collectively as "the EOT patents," or "the EOT Monitoring patents." The EOT patents consist of U.S. Patent Nos. 7,467,032 and 7,742,850. Siemens contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] directly and indirectly infringes the asserted claims of the EOT monitoring patents by making using, selling or offering for sale certain [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] End-of-Train units, which may have been referred to as "TrainLink EOTs" or "TrainLink Products," and an associated EOT unit tracking service. Siemens further contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement of the EOT patents has been willful. Specifically, Siemens contends that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is willfully infringing claim 1 of the '032 patent and claims 1 and 4 of the '850 patent.

The OBU patents, BOS patents, and EOT patents have been collectively referred to throughout trial as "the patents-in-suit" or "the asserted patents." Siemens further contends that it is entitled to damages to compensate Siemens for [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement of the asserted patents.

[**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] denies all of these assertions, and alleges that the asserted claims of the patents-in-suit are invalid.

I will now summarize the issues that you must decide and for which I will provide instructions to guide your deliberations. You must decide the following main issues:

1.      For each asserted claim of each of the patents-in-suit, whether Siemens has proven by a preponderance of the evidence that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] infringed the claim;

2.      If you determine that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has infringed at least one asserted claim of any of the OBU or EOT monitoring patents [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"], whether Siemens has proven by a preponderance of the evidence that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement of that OBU or EOT monitoring patent was willful;

3.      For each asserted claim of each of the patents-in-suit, whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has proven by clear and convincing evidence that the claim is invalid; and

4.      If you determined that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] infringed at least one valid claim of at least one of the patents-in-suit, what amount of monetary damages has Siemens proven by a preponderance of the evidence that it is entitled to.

**3.      Patent Claims**

**3.1.    Patent Claims Generally**

At the beginning of the trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws relevant to this case. I will now give you more detailed instructions about the patent laws that specifically relate to this case.

Before you decide whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has infringed the claims of Siemens' patents or whether Siemens' patents are invalid, you will have to understand the patent claims. The patent claims are numbered sentences at the end of the patent. The claims are intended to define, in words, the boundaries of the inventor's rights. Only the claims of the patent can be infringed. Neither the written description, nor the drawings of a patent can be infringed.

Claims are usually divided into parts, called "limitations." For example, a claim that covers the invention of a table may recite the tabletop, four legs and the glue that secures the legs to the tabletop. The tabletop, legs, and glue are each a separate limitation of the claim.

Each of the claims must be considered individually. You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid. You must use the same claim meaning for both your decision on infringement and your decision on invalidity.

### 3.2.    Claim Construction

It is my duty under the law to define what the patent claims mean. As I instructed you at the beginning of the case, I have made my determinations, and I will now instruct you on the meaning of certain claim terms. You must apply the meaning that I give in each patent claim to decide if the claim is infringed or invalid. You must accept my definitions of these words or groups of words in the claims as being correct. You must ignore any different definitions used by the witnesses, including expert witnesses, or the attorneys.

You are advised that the following definitions for the following terms or groups of terms must be applied:

| Patent(s) | Claim Limitation | Construction |
|---|---|---|
| '461, '860, '953, '774 | interrogation message | a targeted request that requires a response containing status information |
| '461, '860 | transmitting … to [a / the next] configurable device | sending a message to [a selected / the next] configurable device [on the train's route] |
| '461, '860 | acknowledgement | confirmation by the train operator |
| '461, '860 | configurable device | a wayside device, such as a switch or crossing gate, that is capable of being in at least two physical states |
| '953, '774 | transmitting … to a track circuit transceiver | ending a message to a transceiver associated with a selected track circuit |
| '953, '774 | indication as to a condition of a section of track | data reflecting the state of a section of track |
| '926, '471 | positioning system | in a system for determining the location of a train, the portion of such a system that would commonly be located on a mobile vehicle, which may or may not be the entire system |
| '926, '471 | preventing the train from [being moved / moving] | ensuring that the train does not move |
| '926 | dispatcher | a person or system responsible for organizing the movement of trains in a specified area of a track |
| '926 | authorization | permission to move |
| '110 | in compliance with a regulation | in accordance with a rule or directive mandated by an authority |
| '494, '698 | controller | computer hardware and software that |

| Patent(s) | Claim Limitation | Construction |
|---|---|---|
| | | collectively control the operations of an associated system, subsystem or function |
| '494 | vital [noun] | [noun] that has a hazard rate of no more than $10^{-9}$ per operational hour |
| '698 | safety critical [noun] | [noun] that contributes to safety and, in so doing, has a data failure rate less than $10^{-4}$ per operational hour |
| '698 | task | a stand-alone application or subprogram that is run as an independent entity |
| '032, '850 | end of train (EOT) unit monitoring station | an off-train system for exchanging location-related messages with EOT units for tracking their location |
| '032 | [configured for] wireless communication | designed to communicate with another device not connected by a wire |
| '850 | [first / second] wireless message | messages sent between two devices not connected by a wire |

For any words in the claims for which I have not provided you with a definition, you should apply the plain and ordinary meaning.

22

### 3.3.    Dependent and Independent Claims

There are two different types of claims in the asserted patents. One type is called an independent claim. The other is called a dependent claim.

An independent claim does not refer to any other claim of the patent and sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look to any other claim to determine what an independent claim covers. For example, Claim 1 of the '850 patent is an independent claim. An independent claim must be read separately from the other claims to determine the scope of the claim.

A dependent claim does not itself recite all of the requirements of the claim but refers to at least one other claim in the patent for some requirements. In this way, the claim "depends" on another claim. For example, claim 4 of the '850 patent is a dependent claim that refers to claim 1. A dependent claim includes all of the elements recited in the dependent claim, as well as all of the elements of the claim or claims to which it refers, in this example, claim 1. To determine the scope of a dependent claim it is therefore necessary to look at both the dependent claim and any other claim or claims to which it refers.

23

### 3.4.    Open Ended or "Comprising" Claims

The beginning portion, or preamble, of each of the asserted claims contains the word "comprising" (for example, the preamble of claim 1 of the '850 patent recites "[a] method for end of train unit operation comprising the steps of"). The word "comprising" means "including the following but not excluding others." A claim that uses the word "comprising" or "including" is not limited to products or methods having only the elements that are recited in the claim, but also covers products and methods that have additional elements that are not recited in the claims.

Using our example of the claim that covers a table, if the claim recites a table "comprising" a tabletop, legs, and glue, then the claim will cover any table that contains these structures, even if the table also contains other structures, such as a leaf or wheels on the legs.

**4.      Infringement**

I will now instruct you as to the rules you must follow when deciding whether Siemens has proven that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] infringes any of the asserted claims of the patents-in-suit.

Patent law gives the owner of a valid patent the right to exclude others from making, using, selling or offering to sell a patented product, or performing a patented method, within the United States during the term of the patent. Any person or business entity that has engaged in any of those acts in the United States without the patent owner's permission infringes the patent. Infringement is assessed on a claim-by-claim and product-by-product basis. If, as here, a patent owner asserts multiple patent claims against the same product, then you must compare each claim separately against each product to determine whether the product or its use infringes that individual patent claim. [**Defendants:** "You should not compare Westinghouse's products with any specific example set out in the patents-in-suit, or with Siemens' products. The only correct comparison is with the language of the claim itself, as I have explained its meaning to you."][2]

---

[2]      **Siemens' Position:** Wabtec's proposed instruction is unnecessary as the remainder of the jury instruction already makes clear that infringement is analyzed on a claim-by-claim basis with respect to each accused product, and does so more accurately. Indeed, Wabtec's additional instruction could confuse the jury into believing that the specification, including any embodiments, should be ignored for all purposes altogether. Furthermore, Wabtec's instruction is an incomplete statement of the law in that it *is appropriate* to compare the accused products to the patented products where, as Siemens' asserts here, those commercial embodiments practice the patents. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1287-89 (Fed. Cir. 2010) ("[W]hen a commercial product meets all of the claim limitations, then a comparison to that product may support a finding of infringement.").

**Defendants' Position:** This proposed phrase is taken verbatim from the American Bar Association's Model Patent Jury Instruction #8.1, available on Chief Magistrate Judge Thynge's website, and is consistent with the Federal Circuit's admonishment that "[a] court may not, for instance, compare the accused product with a preferred embodiment described in the patent or with a commercial embodiment of the patented invention." *Atl.*

(continued…)

A patent may be infringed directly or indirectly. In this case, Siemens alleges that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is liable for both direct and indirect infringement.

I will now explain each of these types of infringement in more detail.

---

(continued)

*Thermoplastics Co., Inc. v. Faytex Corp.*, 974 F.2d 1299, 1300 (Fed. Cir. 1992), *accord Atl. Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834, 846 (Fed. Cir. 1992) ("This court has repeatedly emphasized that infringement analysis compares the accused product with the patent claims, not an embodiment of the claims."). This Court has adopted similar language in jury instructions. *See Intellectual Ventures I LLC v. Symantec Corp.*, Civil Action No. 10-cv-1067-LPS, Dkt. No. 673 at 10 (D. Del. February 5, 2015) ("You should not compare the Accused Products to either the patent specification or any figures in the patent.").

### 4.1.    Direct Infringement

There are two types of direct infringement: "literal infringement" and "infringement under the doctrine of equivalents." In this case, Siemens asserts that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] directly infringes the following asserted claims with the following accused products both "literally" and "under the doctrine of equivalents":

| OBU Patents | Asserted Claims | Accused Products |
|---|---|---|
| '461 | 5 | I-ETMS System |
| '860 | 1 | I-ETMS System |
| '953 | 1, 9 | I-ETMS System |
| '774 | 9 | I-ETMS System |
| '926 | 4 | I-ETMS System |
| '471 | 19 | I-ETMS System |
| '110 | 11 | I-ETMS System |

| BOS Patents | Asserted Claims | Accused Products |
|---|---|---|
| '494 | 1 | BOS/IC3 System |
| '698 | 1 | BOS/IC3 System |

| EOT Patents | Asserted Claims | Accused Products |
|---|---|---|
| '032 | 1 | TrainLink Products |

I will now explain each of these types of direct infringement in more detail.

### 4.1.1.  Direct Infringement by "Literal Infringement"

To determine literal infringement, you must compare the accused products with each claim that Siemens asserts is infringed, using my instructions as to the meaning of the patent claims. Siemens has asserted two types of claims in this case: "system" claims and "method" claims. In order to prove direct infringement by literal infringement of the asserted "system" claims, Siemens must prove that it is more likely than not that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] made, used, sold, or offered to sell the system defined in that claim without Siemens' permission. To prove direct infringement by literal infringement of the asserted "method" claims, Siemens must prove it is more likely than not that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] performed each and every step in that patent claim. If a product or its use omits even a single structure or step recited in the claim, then you must find that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has not directly infringed that claim by literal infringement.

Someone can directly infringe a patent without knowing of the patent or without knowing that what they are doing is an infringement of the patent. They also may directly infringe a patent even though they believe in good faith that what they are doing does not infringe a patent or if they believe in good faith that the patent is invalid. A patentee need not always have direct evidence of infringement, as infringement may be established by circumstantial evidence.

You must determine literal infringement with respect to each patent claim individually. Thus, each of the accused products and its use should be compared to the invention described in each patent claim it is alleged to infringe. The same element of an accused product may satisfy more than one element of a claim.

There is an exception to the rule I just described. If you find that a claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers

28

directly or indirectly to that independent claim. On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the product or its use meets additional requirements of any claims that depend from the independent claim, thus, whether those claims have also been infringed. A dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

### 4.1.2.  Direct Infringement under the Doctrine of Equivalents

If you decide that any of the accused [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] products or their use by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] does not literally infringe any asserted claim of the patents-in-suit, you must then decide whether it is more likely than not that the accused product or its use infringes the asserted claim under what is called the "doctrine of equivalents."

Under the doctrine of equivalents, an accused product can infringe an asserted system claim if it includes parts that are equivalent to those elements of the claim that are not literally present in the accused product, or if its use results in the performance of steps that are equivalent to those steps of the claim that are not literally performed through use of the accused product. If the accused product is missing an equivalent part to even one part of the asserted system claim, or if use of the accused product does not result in the performance of an equivalent step to even one step of the asserted method claim, there can be no infringement of the claim under the doctrine of equivalents. Thus, in making your decision under the doctrine of equivalents, you must look at each individual element of the asserted patent claim and decide whether the accused product has an equivalent part to the individual system claim element(s) that is not literally present in the accused product, or whether the accused product's use results in the performance of an equivalent step to the individual method claim step(s) that is not literally performed by use of the accused product.

An equivalent of an element is a component that a person having ordinary skill in the field of technology of the patent would consider to be insubstantially different from the claimed element. One way of showing that an element is insubstantially different is to show that it performs substantially the same function, in substantially the same way, to achieve substantially

30

the same result as would be achieved by the element that is not literally present in the accused product.

[**Defendants:** "Equivalence must be assessed on a limitation-by-limitation basis, rather than from the perspective of the invention as a whole. No limitation may be read completely out of the claim.

"The prior art may preclude a finding of infringement under the doctrine of equivalents. I will explain what "prior art" is, but, generally speaking, "prior art" is things that were already known or done before the invention. In reaching your decisions in this case, you must use the definition of "prior art" that I provide to you.

"To determine whether the prior art precludes a finding of infringement under the doctrine of equivalents for a particular product or process that is accused of infringing a particular claim, you must determine what products or processes are in the "prior art" as well as what products or processes would have been obvious from the "prior art" to a person having an ordinary level of skill in the field of technology of the patent at the time of the invention.

"If Westinghouse establishes by a preponderance of the evidence that a product or process that (1) meets the same claim requirements as the product or process that is accused of infringing and (2) has the same allegedly "equivalent" alternative feature(s) as the product or process that is accused of infringing is in the prior art or would have been obvious from the prior art to a person having ordinary skill in the field of technology of the invention at the time of the invention, you must find that the claim has not been infringed."][3]

---

[3]  **Siemens' Position:** The model instructions on which Wabtec relies plainly state that the additional instruction Wabtec seeks to insert is an issue "ultimately decided by the Court" and the additional instruction is only appropriate when "the Court decides to submit these issues to the jury for advisory findings." Federal Circuit Bar Association Model Patent Jury

(continued…)

31

### 4.2.    Indirect Infringement—Actively Inducing Patent Infringement

Siemens alleges that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is liable for infringement by actively inducing other entities, such as its railroad customers, to directly infringe Siemens' patents, either literally or under the doctrine of equivalents. As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

---

(continued)

Instruction 3.1d; *see also DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1324 (Fed. Cir. 2009) (ensnarement is a legal issue); (D.I. 406-1, Ex. 5 at 2-3). Here, the Court already rejected Wabtec's prior art, ensnarement-based DOE arguments "for the reasons stated by Siemens." (D.I. 403 at 13 (citing D.I. 314 at 14 and MSJ Hr'g Tr. at 100-05).) As Siemens has explained, Wabtec's entire "ensnarement" position was based on an "erroneous" statement made by the PTAB—i.e., a claim construction inconsistent with this Court's *Markman* order—"in the context of an institution decision concerning a since-withdrawn challenge." (D.I. 314 at 13-14; MSJ Hr'g Tr. at 100-108.) That institution decision was "reopened effectively, and then Wabtec withdrew that ground, so it was as though … it never existed." (MSJ Hr'g Tr. at 100-08.) Under this Court's construction (rather than the erroneous and withdrawn statement by the Board), Wabtec has simply failed to come forth with any prior art that would allegedly be ensnared by Siemens' DOE theory, as it is Wabtec's burden to do. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001) ("the burden of coming forward with evidence to show that the accused device is in the prior art is upon the accused infringer"). Indeed, Wabtec fails to identify any such art here or in the pre-trial order. Vitiation, which is also included in Wabtec's additional proposed instruction, is likewise a legal issue, as Wabtec concedes in the pre-trial order. (D.I. 406-1, Ex. 5 at 2-3.) It, too, has already been decided by this Court. (D.I. 403 at 13; MSJ Hr'g Tr. at 100-08; *see also* D.I. 314 at 13-14.) Moreover, as legal matters, neither of these issues is properly before the jury.

**Defendants' Position:** Siemens must prove by a preponderance of the evidence that the equivalents it seeks are not ensnared by the prior art. This proposed section is taken verbatim from the Federal Circuit Bar Association Model Patent Jury Instruction #3.1d, *available at* https://fedcirbar.org/IntegralSource/Model-Patent-Jury-Instructions, and is consistent with the Federal Circuit's statement of law on prior art ensnarement in *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.* 904 F.2d 677, 685 (Fed. Cir. 1990) ("the burden is on [patent owner] to prove that the range of equivalents which it seeks would not ensnare the prior art"); *see also Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 983 (Fed. Cir. 1999) ("[T]he burden of persuasion that the hypothetical claim does not ensnare the prior art remains with the patentee."). While the Court was "not persuaded that Siemens' DOE arguments are barred" (D.I. 403 at 13), the Court did not affirmatively find that Siemens' had met its burden of proof regarding DOE.

32

[**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is liable for active inducement of a patent claim only if Siemens proves by a preponderance of the evidence:

1.    That the acts are actually carried out by another entity, such as [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s railroad customers, and directly infringe that claim;

2.    That [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] took action during the time the Siemens patent was in force intending to cause the infringing acts by another entity, such as [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s railroad customers; and

3.    That [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] was aware of the Siemens patent and knew that the acts, if taken, would constitute infringement of that patent or that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] believed there was a high probability that the acts by its railroad customers infringed the patent and took deliberate steps to avoid learning of that infringement.

If you find that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] was aware of the patent, but believed that the acts it encouraged did not infringe that patent, [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] cannot be liable for inducement.

In order to establish active inducement of infringement, it is not sufficient that one or more of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s customers itself directly infringes the claim. Nor is it sufficient that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] was aware of the act(s) by one or more of its customers that allegedly constitute the direct infringement. Rather, in order to find active inducement of infringement, you must find either that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] specifically intended one or more of its customers to infringe the patents-in-suit or that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] believed there was a high probability that one or more of its customers would

infringe the patents-in-suit, but deliberately avoided learning the infringing nature of the acts of one or more of its customers. The mere fact, if true, that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] knew or should have known that there was a substantial risk that the acts of one or more of its customers would infringe the patents-in-suit would not be sufficient for active inducement of infringement.

To find inducement, it is not necessary to show that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has directly infringed as long as you find that someone has directly infringed. If you do not find that there is direct infringement by a single actor, or if you do not find that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] actively induced these acts, you must find that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] did not induce infringement of the patent.

Siemens asserts that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is liable for actively inducing infringement of the following asserted claims with the following accused products:

| OBU Patents | Asserted Claims | Accused Products |
|---|---|---|
| '461 | 5, 17 | I-ETMS System |
| '860 | 1, 15 | I-ETMS System |
| '953 | 1, 9 | I-ETMS System |
| '774 | 9 | I-ETMS System |
| '926 | 4 | I-ETMS System |
| '471 | 19 | I-ETMS System |
| '110 | 11 | I-ETMS System |

| BOS Patents | Asserted Claims | Accused Products |
|---|---|---|
| '494 | 1, 17 | BOS/IC3 System |
| '698 | 1, 17 | BOS/IC3 System |

| EOT Patents | Asserted Claims | Accused Products |
|---|---|---|
| '032 | 1 | TrainLink Products |
| '850 | 1, 4 | TrainLink Products |

### 4.3.    Indirect Infringement—Contributory Infringement

Siemens asserts that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has contributed to infringement by its railroad customers. As with direct infringement, you must determine contributory infringement on a claim-by-claim basis.

To establish contributory infringement of an asserted patent claim, Siemens must prove that it is more likely than not that:

1.    [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] sells or offers to sell within the United States a component of a product, or apparatus for use in a process, during the time the Siemens patent is in force;

2.    The component or apparatus has no substantial, non-infringing use;

3.    The component or apparatus constitutes a material part of the invention;

4.    [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is aware of the Siemens patent and knows that the product or process for which the component has no other substantial use may be covered by a claim of the Siemens patent or may satisfy a claim of the Siemens patent under the doctrine of equivalents; and

5.    That use directly infringes the claim.

A component or apparatus that capable of "substantial, non-infringing use" is something that has uses other than as a part or component of the patented product, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

To find contributory infringement, it is not necessary to show that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has directly infringed as long as you find that someone has directly infringed. If you find that there is no direct infringement by any one single entity, you must find that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] did not contribute to the infringement of the patent.

Siemens asserts that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] is liable for contributory infringement of the following asserted claims with the following accused products:

| OBU Patents | Asserted Claims | Accused Products |
|---|---|---|
| '461 | 5, 17 | I-ETMS System |
| '860 | 1, 15 | I-ETMS System |
| '953 | 1, 9 | I-ETMS System |
| '774 | 9 | I-ETMS System |
| '926 | 4 | I-ETMS System |
| '471 | 19 | I-ETMS System |
| '110 | 11 | I-ETMS System |

| BOS Patents | Asserted Claims | Accused Products |
|---|---|---|
| '494 | 1, 17 | BOS/IC3 System |
| '698 | 1, 17 | BOS/IC3 System |

| EOT Patents | Asserted Claims | Accused Products |
|---|---|---|
| '032 | 1 | TrainLink Products |
| '850 | 1, 4 | TrainLink Products |

**5.     Invalidity Defenses**

Patent invalidity is a defense to patent infringement because only a valid patent may be infringed. I will now instruct you on the rules you must follow in deciding whether or not [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has proven that any asserted claim is invalid. The law presumes, in the absence of clear and convincing evidence to the contrary, that the United States Patent Office acted correctly in issuing the patent—that is, the law presumes that claims are valid. To prove that any claim of a patent is not valid, Wabtec must persuade you by clear and convincing evidence that each claim is not valid. For a patent to be valid, the invention claimed must be new, useful, and non-obvious. A patent cannot take away from people their right to use what was known or would have been obvious when the invention was made.

[**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] contends that each of the asserted claims of the asserted patents is invalid as having been obvious in view of the alleged prior art to one of ordinary skill in the art at the time of the claimed inventions.

I will now instruct you in more detail why [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] alleges that the asserted claims of the asserted patents are invalid.

37

**6.      Prior Art**

**6.1.     Prior Art Defined**

Prior art is the legal term used to describe what others had done in the field before the invention was made. Prior art is the general body of knowledge in the public domain, such as articles, products, or other patents, before the invention was made. The prior art need not have been available to every member of the public, but it must have been available, without restriction, to that segment of the public most likely to avail itself of the prior art's contents.

For the asserted claims, prior art includes any of the following items received into evidence during trial:

1.      any product or method that was publicly known or used by others in the United States before the patented invention was made;

2.      any product or method that was in public use or on sale in the United States more than one year before the patent was filed;

3.      patents that issued more than one year before the filing date of the patent, or before the invention was made;

4.      publications having a date more than one year before the filing date of the patent, or publicly accessible in the United States before the invention was made; and

5.      any product or method that was invented by someone else in the United States before its invention by the named patent inventors, even if it was not known to the public, where such other person did not abandon, suppress, or conceal such invention.

### 6.1.1.  Prior Art – Prior Invention

For an invention "invented by someone else in the United States before it was invented by the named patent inventors" to qualify as prior art, [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] must prove, by clear and convincing evidence, that such person reduced his or her invention to practice first or conceived of the invention first and was reasonably diligent in reducing it to practice.

### 6.1.1.1.Prior Art – Prior Invention – Conception

"Conception" means the formation in the mind of an inventor of a definite and permanent idea of the complete and operative invention, such that, if the idea were communicated to a person of ordinary skill in the art, he or she would be able to make the invention without undue research or experimentation or the exercise of inventive skill. This requirement does not mean that the inventor has to have a prototype built, or have actually explained the invention to another person. But, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete and operative idea. In other words, the testimony of an inventor is not sufficient, standing alone, to prove a conception date. An inventor must provide independent, corroborating evidence in addition to his or her own oral testimony. Conception may be proven when the invention is shown in its complete form by drawings, disclosure to another person, or other forms of evidence presented at trial. Conception must include every feature or limitation of the claimed invention.

## 6.1.1.2.Prior Art – Prior Invention – Reasonably Diligent Reduction to Practice

"Reduction to practice" means an invention is sufficiently developed to show that it would work for its intended purpose. Reduction to practice may be an actual reduction or a constructive reduction to practice, which occurs when a patent application on the claimed invention is filed. An inventor must exercise reasonable diligence in reducing his invention to practice. "Reasonable diligence" means engaging in continuous activity to reduce the invention to practice. As with proof of the conception date, there must be evidence in addition to the inventor's testimony that shows diligence.

### 6.1.2.  Prior Art – Prior Public Use

For a product "that was publicly used by others in the United States" to qualify as prior art to an asserted claim of any of the patents-in-suit, [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] must prove, by clear and convincing evidence, that the claimed invention was publicly used by others in the United States before it was invented by the patent's inventor(s).

That invention was publicly used in the United States if an embodiment of the claimed invention was both: (1) accessible to the public or commercially exploited in the United States, and (2) ready for patenting.

An invention is publicly used if it is used by the inventor or by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor. Factors relevant to determining whether a claimed invention was in public use include: the nature of the activity that occurred in public; public access to the use; confidentiality obligations imposed upon observers; commercial exploitation; and the circumstances surrounding any testing and experimentation.

To be a public use, the invention also must have been ready for patenting at the time of the alleged public use. The invention is ready for patenting when there is reason to believe it would work for its intended purpose. An invention is ready for patenting either when it is reduced to practice or when the inventor has prepared drawings or other descriptions of the invention sufficient to allow a person of ordinary skill in the art to make or use the invention. An invention is reduced to practice when it has been (1) constructed or performed within the scope of the patent claims, and (2) determined that it works for its intended purpose.

[**Siemens:** "Testimony of Wabtec witnesses regarding when a product was purportedly 'publicly used by others in the United States' must be corroborated by some other evidence.'"][4]

---

[4]  **Siemens' Position:** Siemens would be unduly prejudiced if the jury were not informed as to this black letter law that uncorroborated oral testimony is insufficient to establish the date of a prior public use or sale for prior art purposes. *See TransWeb, LLC v. 3m Innovative Properties Co.*, 812 F.3d 1295, 1301-02 (Fed. Cir. 2015) ("Oral testimony by an interested party on its own will generally not suffice as 'clear and convincing' evidence of invalidity. Rather, such oral testimony must be corroborated by some other evidence."); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F. 3d 728, 737-38 (Fed. Cir. 2002) ("Generally, oral testimony of prior public use must be corroborated in order to invalidate a patent."). These cases make clear that corroboration is necessary as a general rule, and Wabtec does not identify any exception that should apply to that rule here. *Fleming v. Escort*, *Inc.*, on which Wabtec relies, reiterates this rule and, indeed, involved a finding where contemporaneous documentary evidence was necessary for corroboration purposes. 774 F.3d 1371, 1377 (Fed. Cir. 1993). The remaining cases further underscore that the corroboration rule applies to the oral testimony of interested parties, which is what Siemens' proposed instruction concerns (as opposed to testimony by non-interested parties). *Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999); *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1368-69 (Fed. Cir. 1999); *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998). The instruction is therefore neither duplicative nor confusing, as it simply seeks to instruct the jury as to black letter law that is not present elsewhere in the proposed instruction.

**Defendants' Position:** Siemens' proposed insertion is an incorrect statement of law. First, Siemens' use of the word "must" is inconsistent with the authority Siemens provided Defendants on this issue. Both cases Siemens' cites make clear that corroboration is "generally" needed, but do not create the bright-line rule Siemens advances. *See TransWeb, LLC v. 3m Innovative Props. Co.*, 812 F.3d 1295, 1301–02 (Fed. Cir. 2015) ("Oral testimony by an interested party on its own will generally not suffice as 'clear and convincing' evidence of invalidity. Rather, such oral testimony must be corroborated by some other evidence."); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F. 3d 728, 737–38 (Fed. Cir. 2002) ("Generally, oral testimony of prior public use must be corroborated in order to invalidate a patent."). Under the "rule of reason" analysis "all pertinent evidence is examined in order to determine whether the inventor's story is credible." *Fleming v. Escort, Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014); *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993) ("An evaluation of **all** pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached.") (emphasis in original). Second, Siemens' insertion suggests corroborating testimonial evidence is not sufficient to meet the clear and convincing burden, which the Federal Circuit has explicitly held it is. *Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999); *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1368–69 (Fed. Cir. 1999); *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371

(continued…)

### 6.1.3.   Prior Art – On Sale Bar

For a product "on sale in the United States" to qualify as prior art to an asserted claim of any of the patents-in-suit, [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] must prove, by clear and convincing evidence, that the claimed invention was on sale in the United States more than one year before the earliest priority date to which the patent is entitled.

For a claimed invention to be considered having been "on sale" at that time, a product embodying the invention must have been both (1) the subject of a commercial sale or offer for sale in the United States, and (2) ready for patenting.

A commercial offer for sale was made if another party could make a binding contract by simply accepting the offer. An invention was subject to an offer for sale if the claimed invention was embodied in an actual product and that product was commercially sold or offered for sale. It is not required that a sale was made. The essential question is whether a product embodying the invention was commercially marketed.

The invention also must have been ready for patenting at the time of the sale or offer for sale. The claimed invention is ready for patenting when there is reason to believe it would work for its intended purpose. An invention is ready for patenting either when it is reduced to practice or when the inventor has prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person of ordinary skill in the art to practice the invention. An invention is reduced to practice when it has been (1) constructed or performed within the scope of the patent claims, and (2) determined that it works for its intended purpose.

---

(continued)
   (Fed.Cir.1998). Moreover, as the burden of proof is clearly articulated in this section, the instruction is duplicative and confusing.

[**Siemens:** "Testimony of Wabtec witnesses regarding when a product was purportedly 'on sale in the United States' must be corroborated by some other evidence."][5]

---

[5]    **Siemens' Position:** Siemens' position regarding this insertion is identical to its argument to Siemens' proposed addition to Section 6.1.2, above.

**Defendants' Position:** Westinghouse's position regarding this insertion is identical to its argument to Siemens' proposed addition to Section 6.1.2, above.

### 6.2.    Prior Art Considered or Not Considered by United States Patent Office

Regardless of whether or not a particular prior art reference was considered by the patent Examiner during the prosecution of the application which matured into an asserted patent, Wabtec must prove by clear and convincing evidence that the challenged claim is invalid. This burden may be more difficult to meet when the accused infringer attempts to rely on prior art that was before the Patent Examiner during prosecution.

### 6.3.    Invalidity of Independent and Dependent Claims

You must evaluate the invalidity of each asserted claim separately. Even if an independent claim is invalid, this does not mean that a dependent claim that depends from it is automatically invalid. Rather, you must consider the validity of each claim, separately. You must decide this issue of validity on a claim-by-claim basis. However, if you find that a dependent claim is invalid, then you must find that the independent claim from which it depends is also invalid. This is because the dependent claim includes all of the elements of the independent claim from which it depends.

7.    **Obviousness**

[**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] contends that:

- claims 5 and 17 of the '461 patent are obvious in view of a Communications Based Train Management system, which you have heard referred to as CBTM;

- claims 1 and 15 of the '860 patent are obvious in view of a CBTM system;

- claims 1 and 9 of the '953 patent are obvious in view of a CBTM system and U.S. Patent No. 4,932,614 ("*Birkin*");

- claim 9 of the '774 patent is obvious in view of a CBTM system and *Birkin*;

- claim 4 of the '926 patent is obvious in view of a CBTM system;

- claim 19 of the '471 patent is obvious in view of a CBTM system and the General Code of Operating Rules ("*GCOR*");

- claim 11 of the '110 patent is obvious in view of a CBTM system;

- claims 1 and 17 of the '494 patent are invalid because Kristofer M. Ruhland, James L. Fenske, and Karen A. Shaw from [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] conceived of the claimed inventions first and exercised reasonable diligence in later reducing the inventions to practice;

- claims 1 and 17 of the '698 patent are invalid because Kristofer M. Ruhland, James L. Fenske, and Karen A. Shaw from [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] conceived of the claimed inventions first and exercised reasonable diligence in later reducing the inventions to practice;

- claim 1 of the '032 patent is obvious in view of U.S. Patent Publication No. 2002/0004693 ("*Collins*") and U.S. Patent No. 6,081,769 ("*Curtis*"); and

48

- claims 1 and 4 of the '850 patent are obvious in view of *Collins*, *Curtis*, U.S. Patent No. 5,267,473 ("*Bezos*") and U.S. Patent Publication No. 2001/0044695 ("*Doner*").

A claimed invention is invalid as "obvious" if it would have been obvious to a person of ordinary skill in the art of the claimed invention at the time the invention was made. Obviousness may be shown by considering one or more than one item of prior art.

In deciding obviousness, you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the asserted patents. You cannot use hindsight to pick and choose among isolated disclosures in the prior art to duplicate the claimed inventions. You should not use the asserted patents as a road map for selecting and combining items of prior art.

You must put yourself in the place of a person of ordinary skill in the art at the time the invention was made.

The following factors must be evaluated to determine whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has established that the claimed invention(s) is obvious:

1. the scope and content of the prior art relied upon by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"];

2. the difference or differences between each claim of the asserted patents that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] contends is obvious and the prior art;

3. the level of ordinary skill in the art at the time the invention of the asserted patents was made; and

4. additional considerations, if any, that indicate that the invention was obvious or not obvious.

Each of these factors must be evaluated, although they may be analyzed in any order, and you must perform a separate analysis for each of the claims.

It is [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s burden to prove by clear and convincing evidence that the invention would have been obvious. Again, you must analyze whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has met its burden separately for each claim that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] contends is obvious.

I will now explain each of the four factors in more detail.

50

### 7.1.   Level of Ordinary Skill

The determination of whether a claimed invention is obvious is based on the perspective of a person of ordinary skill in the art. The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant. The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.

When determining the level of ordinary skill in the art, you should consider all the evidence submitted by the parties, including evidence of:

1.      the level of education and experience of persons actively working in the field at the time of the invention, including the inventors;

2.      the types of problems encountered in the art at the time of the invention

3.      prior art solutions to those problems; and

4.      the sophistication of the technology in the art at the time of the invention, including the rapidity with which innovations were made in the art at the time of the invention.

51

## 7.2.     Scope and Content of the Prior Art

You must determine what is the prior art that may be considered in determining whether the asserted claims are obvious. A prior art reference may be considered if it discloses information designed to solve any problem or need addressed by the patent or if the reference discloses information that has obvious uses beyond its main purpose that a person of ordinary skill in the art would reasonably examine to solve any problem or need addressed by the patent.

### 7.3.    Differences Between the Claimed Inventions and the Prior Art

You should analyze whether there are any relevant differences between the prior art and the claimed inventions from the view of a person of ordinary skill in the art at the time of the invention. Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the claimed invention as a whole, and not merely on some portion.

In analyzing the relevance of the differences between the claimed invention and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the claimed invention. You may take into account the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention. For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claimed invention was obvious. On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claimed invention that successfully combined those elements was not obvious.

[**Siemens:** "To the extent an art is unpredictable, potential solutions may be less likely to be genuinely predictable."].[6]

---

[6]    **Siemens' Position:** This instruction is consistent with the Court's instruction in *Integra LifeSci. Corp. v. HyperBranch Med. Tech., Inc.*, C.A. No. 15-819-LPS-CJB, D.I. 749 at 47 (D. Del. June 7, 2018). Wabtec's authority does not limit this instruction to cases involving the chemical arts but rather notes that the chemical arts are an example of such unpredictable art. The jury is entitled to decide for itself whether the art at issue is unpredictable based

(continued…)

A claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long-known, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the inventions that would have prompted a person of ordinary skill in the art in the relevant field to combine the teachings in the way the claimed invention does. The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of any problem or need to be addressed, market demand, or common sense. You may also consider whether the problem or need was known, the possible approaches to solving the problem or addressing the need were known and finite, and the solution was predictable through use of a known option. Further you may consider whether the prior art teaches away from the proposed combination, which may tend to show the proposed combination was not obviousness.

If you find that a reason existed at the time of the inventions to combine the elements of the prior art to arrive at the claimed invention, and there would have been a reasonable expectation of success in doing so, this evidence would make it more likely that the claimed invention was obvious. If, on the other hand, you find that no reason existed at the time of the inventions to combine the elements of the prior art to arrive at the claimed invention, or there

---

(continued)

upon the evidence presented at trial and, if the jury so determines, it should be informed and able to decide that "potential solutions may be less likely to be genuinely predictable."

**Defendants' Position:** Siemens' proposed phrase is an oversimplification and a misstatement of the principle announced in *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, in which the Federal Circuit stated that "[t]o the extent an art is unpredictable, *as the chemical arts often are*, KSR's focus on these 'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable." 533 F.3d 1353, 1359 (Fed. Cir. 2008) (emphasis added). The phrase is inappropriate here because this case does not involve the chemical arts, and neither party has ever asserted that train control is an "unpredictable art." Including this phrase in the instruction would confuse the jury.

would have been no reasonable expectation of success for doing so, this evidence would make it more likely that the claimed invention was not obvious. Again, you must undertake this analysis separately for each claim that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] contends is obvious.

### 7.4.    Other Considerations

Before deciding the issue of obviousness for claim 11 of the '110 patent, you must also consider certain factors, which may help to determine whether or not the invention would have been obvious. No factor alone is dispositive, and you must consider the obviousness or nonobviousness of the invention as a whole. Certain of these factors include:

1.    Were products covered by the claim commercially successful due to the merits of the claimed invention rather than due to advertising, promotion, salesmanship, or features of the product other than those found in the claim?

2.    Was there long-felt need for a solution to the problem facing the inventors, which was satisfied by the claimed invention?

3.    Did others try, but fail, to solve the problem solved by the claimed invention?

4.    Did others invent the invention at roughly the same time?

5.    Did others copy the claimed invention?

6.    Were there changes or related technologies or market needs contemporaneous with the invention?

7.    Did the claimed invention achieve unexpectedly superior results over the closest prior art?

8.    Did others in the field praise the claimed invention or express surprise at the making of the claimed invention(s)?

9.    Did others accept licenses under the asserted patent(s) because of the merits of the claimed invention?

10.    Did the inventor proceed contrary to accepted wisdom in the field?

These factors are relevant only if there is a connection, or nexus, between the factor and the invention covered by the patent claims. Even if you conclude that some of the above

56

indicators have been established, those factors should be considered along with all the other evidence in the case in determining whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has proven that the claimed invention would have been obvious.

**8.**     <u>**Damages**</u>

If you find that an accused product infringes any of the asserted claims and that the infringed claim is not invalid, you must determine the amount of damages to be awarded to Siemens for the infringement. On the other hand, if you find that all of the asserted patent claims are either invalid or are not infringed, then you should not consider damages in your deliberations.

Siemens must prove each element of its damages—including the amount of the damages—by a preponderance of the evidence, which means more likely than not.

If proven by Siemens, damages must be in an amount adequate to compensate Siemens for the infringement. The purpose of a damage award is to put Siemens in about the same financial position it would have been in if the infringement had not happened. You may not add anything to the amount of damages to punish [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] or to set an example. You also may not add anything to the amount of damages for interest. Siemens must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision. [**Defendants:** "You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork."][7]

---

[7]    **Siemens' Position:** Siemens is not aware of any case in which Your Honor has adopted this construction, and for good reason. The instruction carries with it a significant risk of jury confusion and prejudice as it introduces a seeming multitude of undefined standards—i.e., "speculative," "possible," or "based on guesswork"—that are not readily squared with the preceding, more straightforward instruction that states only "reasonable certainty" is required, without the need for "mathematical precision." Some speculation and/or guesswork is usually required in the normal case and especially so here, where Wabtec's own witnesses had to speculate and guess as to some of their financials. Including this instruction might confuse the jury into believing that even some speculation or guesswork is not permissible. Similarly, the jury may be confused as to the meaning of the phrase "damages that are only

(continued…)

The fact that I am instructing you on damages does not mean that the Court believes that one party or the other should win in this case. My instructions about damages are for your guidance only in the event you find in favor of Siemens.

I will now give you more detailed instructions regarding damages.

---

(continued)

possible," as all damages analyses take into account some level of possibility rather than only certainty. The jury may be further confused into believing that it can choose to award no damages, contrary to 35 U.S.C. § 284. The preceding (and agreed-upon) instruction, that "Siemens must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision," sufficiently instructs the jury on the law without carrying any of the risks of confusion or prejudicial language of Wabtec's proposed additional instruction.

**Defendants' Position:** This proposed phrase is taken verbatim from the Federal Circuit Bar Association's Model Patent Jury Instructions. A patent holder is not entitled to damages that are remote or speculative. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1340 (Fed. Cir. 2009) (vacating and remanding jury award as excessive); Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1067 (Fed. Cir. 1983) (holding that lost profits, as well as the harm to the goodwill of the entire market stemming from the infringer's inferior product, were not remote or speculative, and thus recoverable). Moreover, this Court has endorsed the exact same (and very similar) language in numerous prior cases. *See, e.g.*, *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, C.A. 14-cv-878-LPS-CJB, Dkt. No. 440 at 48 (D. Del. Jun. 19, 2017) ("You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork."); *GreatBatch Ltd. v. AVX Corp.*, C.A. No. 13-cv-723-LPS, Dkt. No. 623 at 54 (D. Del. Jan. 25, 2016) ("On the other hand, Greatbatch is not entitled to speculative damages. You should not award any amount for loss, which, although possible, is remote or left to conjecture or guesswork."); *Idenix Pharms. LLC v. Gilead Sciences, Inc.*, C.A. No. 14-cv-846-LPS, Dkt. No. 516 at 41 (D. Del. Dec. 15, 2016) ("While Idenix is not entitled to damages that are remote or speculative, Idenix is not required to prove its damages with mathematical precision. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork."); *Helios Software, LLC v. Spectorsoft Corp.*, C.A. No. 12-cv-081-LPS, Dkt. No. 608 at 47 (D. Del. Jun. 19, 2015) ("The reasonable royalty rate may not be purely speculative.").

### 8.1.    Date of Commencement of Damages

Damages commence on the date that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has both infringed and been notified of the alleged infringement of a particular patent-in-suit. In this case, that date is April 21, 2016 for the '461, '860, '032, '850, '494, and '698 patents, and October 21, 2016 for the '926, '471, '953, '774, and '110 patents.

### 8.2.    Damages – Kinds of Damages That May Be Recovered

There are different types of damages that Siemens may be entitled to recover.

In this case, Siemens seeks lost profits for infringement of each of the asserted EOT monitoring patents.[8] Lost profits consist of any actual reduction in business profits Siemens suffered as a result of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement. In other words, lost profits are the additional profits that Siemens would have made "but for" [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement. [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] contends that a reasonable royalty is the proper measure of damages for any infringement of the EOT monitoring patents. A reasonable royalty is defined as the amount of money Siemens and [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] would have agreed upon as a fee for use of the inventions had they been negotiating a license at the time just prior to when infringement began. A reasonable royalty is the minimum amount of damages that a patent owner can be awarded for an infringement. Thus, even if you find that Siemens did not prove by a preponderance of the evidence its entitlement to lost profits for infringement of any EOT monitoring patent, you must nevertheless award Siemens a reasonable royalty for infringement of that patent.

As for the OBU and BOS patents, Siemens is only entitled to a reasonable royalty for infringement of any of those patents.

---

[8]  **Siemens' Position:** On November 26, 2018, the Court entered an oral order granting Wabtec's motion to preclude Siemens' damages expert, Andrew Carter, from testifying as to lost profits damages for infringement of the asserted OBU and BOS patents. In view of that decision, Siemens does not presently intend to pursue lost profits damages for the OBU and BOS patents at trial. However, Siemens has moved for reconsideration of the Court's order, and has conditionally moved for leave to serve a revised expert report of Mr. Carter on that issue. (D.I. 396-99.) Should either of those motions be granted, Siemens will seek lost profits damages for infringement of the asserted OBU and BOS patents at trial.

### 8.3.    Lost Profits

Siemens is seeking lost profits damages in this case for infringement of the EOT monitoring patents. To prove lost profits, Siemens must show a causal relationship between [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement and Siemens' loss of profit. Siemens must show that, but for [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement of the EOT monitoring patents, Siemens would have made additional profits through the sale of all or a portion of the sales of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s TrainLink Products. Siemens must prove this by a preponderance of the evidence, more likely than not. Part of your job is to determine what the customers who purchased [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s TrainLink Products would have done if the alleged infringement had not occurred. It is important to remember that the profits I have been referring to are the profits allegedly lost by Siemens, not the profits, if any, made by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] on the allegedly infringing sales.

### 8.3.1.  Lost Profits – the *Panduit* Factors

Siemens has proven its lost profits if you find that, with respect to infringement of the EOT monitoring patents by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s TrainLink Products and their use,"] Siemens has proven each of the following factors by the more likely than not standard:

1.     There was a demand for the patented product or method;

2.     That there were no available, acceptable non-infringing substitute products or, if there were, Siemens' market share of the number of sales made by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] that Siemens would have made;

3.     That Siemens had the manufacturing and marketing capacity to make the sales of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s TrainLink Products actually made by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] and for which Siemens seeks an award of lost profits—in other words, that Siemens was capable of satisfying the demand; and

4.     The amount of profit that Siemens would have made if [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] had not infringed.

I will now explain each of these factors.

63

### 8.3.2.  Lost Profits – the *Panduit* Factors – Demand

The first factor asks whether there was demand for the patented product or method in the relevant market. Siemens can prove demand for the patented invention claimed in the EOT patents by showing significant sales of its EOT systems or significant sales of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s TrainLink Products.

### 8.3.3.  Lost Profits – the *Panduit* Factors – Acceptable Non-Infringing Substitutes

The second factor asks whether there were non-infringing, acceptable substitutes for the patented products in the marketplace and the impact of such substitute products on the marketplace absent the sale of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringing products. If the realities of the marketplace are that competitors other than Siemens would likely have captured some or all of the sales made by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"], even despite a difference in the products, then Siemens is only entitled to lost profits on those sales that it would have captured, not those sales that would have been captured by others.

To be "acceptable" substitutes the products must have had one or more of the advantages of the patented invention that were important to the actual buyers of the infringing products, not the public in general. The acceptable substitutes or their use also must not infringe the patent because they did not include all the features required by the patent.

The acceptable substitutes, in addition, must have been available during the damages period. An acceptable non-infringing substitute is available if, during the damages period, a competitor or [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] had all the necessary equipment, materials, know-how, and experience to design and manufacture the acceptable non-infringing substitute. The substitute need not have actually been sold at that time. If you determine that some of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s customers would just as likely have purchased a non-infringing acceptable product, then Siemens has not shown it lost those sales but for [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s sales.

65

### 8.3.4.  Lost Profits – the *Panduit* Factors – Capacity

The third factor asks whether Siemens had the manufacturing and marketing capability to actually make the sales it allegedly lost due to [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement. Siemens must prove that it could have supplied the number of products needed to make the sales Siemens said it lost. Siemens must also prove that it is more likely than not it had the ability to market and sell the additional number of products for which it claims to have lost sales.

### 8.3.5.  Lost Profits – the *Panduit* Factors – Amount of Profit

A patent holder may calculate its lost profits on lost sales by computing the lost revenue for sales it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs. Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from a patent holder's lost revenue.

### 8.3.6.  Lost Profits – the *Panduit* Factors – Market Share

If Siemens establishes it would have made some, but not all, of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s sales of the TrainLink Products but for the infringement, the amount of sales that Siemens lost may be shown by proving Siemens' share of the relevant market, excluding infringing products. Siemens may be awarded a share of profits equal to its market share even if there were non-infringing substitutes available. In determining Siemens' market share, the market must be established first, which requires determining which products are in that market. Products are considered in the same market if they are considered "sufficiently similar" to compete against each other. Two products are sufficiently similar if they do not have significantly different prices or characteristics.

68

### 8.3.7.  Lost Profits – Collateral Sales

In this case, Siemens is seeking additional lost profits from sales of related spare parts and hardware, subscription revenue, and device royalties owed by DPS, which Siemens contends it would have sold along with its EOT products it sells that compete with [**Siemens:** "Wabtec] [**Defendants:** "Westinghouse"]'s accused TrainLink Products. These products and services sold along with the competitive products are called collateral sales.

To recover lost profits on such collateral sales, Siemens must establish two things. First, Siemens must establish it is more likely than not that Siemens would have made the collateral sales but for the infringement. Second, the additional product or service and the competitive product together must be analogous to components of a single assembly or parts of a complete machine, or, in other words, they must constitute a single functional unit or have a functional relationship.

Recovery for lost profits on collateral sales must not include items that essentially have no functional relationship to the competitive product and that have been sold with the competitive product only as a matter of convenience or business advantage.

69

### 8.4.    Reasonable Royalty

If you find that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has infringed any of the asserted claims of the patents-in-suit, the patent law provides that the amount of damages that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] should pay Siemens for infringing Siemens' patents must be enough to compensate for the infringement, and may not be less than a reasonable royalty for the use of the patented invention.

Thus, if you find that Siemens is not entitled to lost profits for any of [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringing sales, you must award Siemens a reasonable royalty in the amount that Siemens has proved it could have earned on those sales. A royalty is a payment made to a patent owner by someone else in exchange for the rights to make, use, sell, and/or import a patented product.

### 8.4.1.  Reasonable Royalty – Using the "Hypothetical Negotiation" Method

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between Siemens and [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] that took place at a time prior to when the infringement first began. Of course, we know that they did not agree to a license and royalty payment. But, in order to decide on the amount of reasonable royalty damages, you should assume that the parties did negotiate a license just before the infringement began. This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license. You should also presume that the parties had full knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation. But evidence of things that happened after the infringement first began can be considered only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation. Although evidence of the actual profits [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] made. Your role is to determine what the license would have looked like had the parties agreed to a license prior to infringement.

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors that the experts may have referenced as *Georgia Pacific* factors, in addition to any other evidence presented by the parties on the economic value of the patent:

1.      Any royalties received by the licensor for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

71

2.      The rates paid by [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] to license other patents comparable to the asserted patents.

3.      The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4.      The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5.      The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

6.      The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

7.      The duration of the asserted patents and the term of the license.

8.      The established profitability of the product made under the asserted patents; its commercial success; and its current popularity.

9.      The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10.     The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.     The extent to which [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] has made use of the invention; and any evidence that shows the value of that use.

72

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.     The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14.     The opinion testimony of qualified experts.

15.     The amount that a licensor and a licensee (such as [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

16.     Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

### 8.4.2.  Reasonable Royalty – Attribution/Apportionment

The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product, or other factors such as marketing or advertising, or [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s size or market position. In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the value attributable to the patented technology. In other words, the royalty base must be closely tied to the invention. It is not sufficient to use a royalty base that is too high and then adjust the damages downward by applying a lower royalty rate. Similarly, it is not appropriate to select a royalty base that is too low and then adjust it upward by applying a higher royalty rate. Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

### 8.4.3.  Reasonable Royalty – Entire Market Value Rule

A multi-component product may have both infringing and non-infringing components. In such products, royalties should be based not on the entire product, but instead on the "smallest salable unit" that practices the patent and has close relation to the claimed invention. Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature, damages must only be based on the portion of the value of that product attributable to the patented technology. This may involve estimating the value of a feature that may not have ever been individually sold.

The entire market value rule is a narrow exception to this general rule. In order to recover damages as a percentage of revenues or profits attributable to the entire product, Siemens must establish that it is more likely than not that the patented feature drives the demand for an entire multi-component product such that it creates the basis for customer demand or substantially creates the value of the product.

### 8.4.4.   Reasonable Royalty – Timing

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon. The parties have agreed that for the OBU Patents, this negotiation would have occurred in or around February 2006. For the EOT monitoring patents, the parties agree this negotiation would have occurred in or around December 2008. Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

### 8.4.5.   Reasonable Royalty – Use of Comparable License Agreements

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question, or for rights to similar technologies. A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between Siemens and [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] in order for you to consider it. However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between Siemens and [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"], in terms of the technologies, the parties to the license, and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

### 8.4.6.  Reasonable Royalty – Availability of Non-Infringing Substitutes

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention. An acceptable non-infringing substitute must be a product that does not infringe the patent. It must have also been, at the time of the hypothetical negotiation, both "available" and "acceptable" as I have previously explained the meaning of those terms in the context of lost profits.

9.    **Willful Infringement**

If you find that it is more likely than not that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] directly or indirectly infringed a valid asserted claim of any of the OBU or EOT monitoring patents, either literally or under the doctrine of equivalents, then you must also determine whether or not [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement was willful.

To show that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement was willful, Siemens must prove by a preponderance of the evidence that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] knew of the infringed patents and intentionally infringed them. For example, you may consider whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s behavior was malicious, wanton, deliberate, consciously wrongful, in bad faith, or as it may be described – "characteristic of a pirate." In determining whether Siemens has proven that [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s infringement was willful, you must consider all of the circumstances and assess [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s knowledge at the time the challenged conduct occurred.

To determine whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] acted willfully, consider all facts. These may include, but are not limited to:

1.    Whether or not [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] acted consistently with the standards of behavior for its industry;

2.    Whether or not [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] intentionally copied a product of Siemens that is covered by a patent-in-suit;

3.    Whether or not [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] reasonably believed it did not infringe or that the patent was invalid;

4.      Whether or not [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] made a good-faith effort to avoid infringing the patent-in-suit, for example, whether [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] attempted to design around the patent-in-suit; and

5.      Whether or not [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] tried to cover up its infringement.

[**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] argues that it did not act willfully because it relied on legal opinions that advised [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"] either (1) that the [**Siemens:** "Wabtec"] [**Defendants:** "Westinghouse"]'s products and methods did not infringe the patents-in-suit or (2) that the patents-in-suit were invalid. You must evaluate whether the opinion was of a quality that reliance on its conclusions was reasonable. You must also evaluate whether Wabtec actually relied on the opinion [**Siemens:** ", rather than, for example, obtaining the opinion merely for its potential evidentiary value in future litigation"].[9]

---

[9]   **Siemens' Position** This instruction is consistent with the Federal Circuit's recognition of a difference between seeking *and relying* on legitimate advice rather than merely obtaining legal opinions "for their potential evidentiary value on the issue of willful infringement in future litigation." *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1365 (Fed. Cir. 2006). Without this instruction, Siemens would be unduly prejudiced as the jury would be misled to presuppose that Wabtec actually relied on its legal opinions by virtue of obtaining them, which is an issue squarely disputed by Siemens, as the jury is likely unaware of other reasons that a sophisticated party may obtain such opinions if it does not seek to rely upon them. (*See*, *e.g.*, D.I. 310, Siemens' Opp'n. to MSJ of No Willful Infringement.)

**Defendants' Position:** To the extent Siemens' proposal is not an affirmative misstatement of the law, it and the preceding sentence are redundant. This redundancy will serve to only confuse the jury and suggest that the jury must make two findings on this point, rather than one (i.e., that Wabtec reasonably relied on the opinion). Siemens' citation to Applied Med. in support of its proposed addition overstates the holding of the case. The evidence in *Applied Med.* lent itself to the single ultimate conclusion that the defendant "did not rely on

(continued…)

If you determine that any infringement was willful, you may not allow that decision to affect the amount of any damages award you give for infringement.

---

(continued)

any opinions of counsel in good faith," 435 F.3d at 1365, which the instruction already requires without Siemens' addition. The language of Applied Med. also implies that Siemens' proposal is an improper instruction, a point further underscored by the fact that Siemens has not identified any model instruction or instruction from this Court including the language, nor could Defendants locate one.

**10.    Deliberations and Verdict**

### 10.1.    Introduction

I have completed my instructions on the law. I will end by explaining how you will conduct your deliberations in the jury room and about your possible verdicts.

When you start deliberating, do not talk to the jury officer, to me, or to anyone but each other about the case. If you have any questions or messages, you must write them on a piece of paper, sign them and give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. Your votes should stay secret until you are finished.

### 10.2.    Unanimous Verdict

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinions, if convinced they are erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.

Remember at all times that you are not partisans. You are judges – judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review it with you in a moment. You will take the form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form. You will then return to the Courtroom and my deputy will read aloud your verdict. Do not show the completed verdict form to anyone or share it with anyone until you are in the Courtroom.

It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. Determining what the verdict shall be is your sole and exclusive duty and responsibility.

83

### 10.3.  Duty to Deliberate

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that -- your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds. Listen carefully to what the other jurors have to say, and then decide for yourself.

### 10.4. Social Media

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cellphone, smartphone, tablet or computer, the Internet, any Internet service, any text or instant messages service, any Internet chatroom, blog or website such as Facebook, MySpace, LinkedIn, YouTube, Twitter, or Instagram to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

### 10.5.    Court Has No Opinion

Let me finish by repeating something I have said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourself based on the evidence presented.