# Exhibit B

# REDACTED

# IN ITS

# ENTIRETY

# EXHIBIT C

Trials@uspto.gov                                                     Paper No. 33
571-272-7822                                                 Entered: January 31, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION,
Petitioner,

v.

SIEMENS INDUSTRY, INC.,
Patent Owner.
_____

IPR2017-01821
Patent 7,200,471 B2
_____

Before KRISTEN L. DROESCH, MEREDITH C. PETRAVICK, and
TIMOTHY J. GOODSON, *Administrative Patent Judges*.

PETRAVICK, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*38 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2017-01821
Patent 7,200,471 B2

# I. INTRODUCTION

## A. Background

Westinghouse Air Brake Techologies Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claims 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 of U.S. Patent No. 7,200,471 B2 (Ex. 1001, "the '471 patent") pursuant to 35 U.S.C. §§ 311–319.  Paper 1 ("Pet.").  We instituted an *inter partes* review on all challenged claims and all challenged grounds, as follows:

| No. | Ground | Claims | Prior Art |
|-----|--------|--------|-----------|
| 1 | § 103(a) | 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 | Judge[1], GCOR[2], and Balukin[3] |
| 2 | § 103(a) | 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 | Burns[4], Monfalcone[5], and Balukin |

---

[1] *BNSF/UP PTS pilot advances in Northwest*, Progressive Railroading, 1996 pp. 49–53 ("Judge") (Ex. 1011).

[2] General Code of Operational Rules, 2000 ("GCOR") (Ex. 1013).

[3] US Patent No. 5,787,371; issued July 28, 1998 ("Balukin") (Ex. 1015).

[4] Burns et al., *Safety and Productivity Improvement of Railroad Operations by Advanced Train Control Systems*, Proceedings, Technical Papers Presented at the 1989 IEEE/ASME Joint railroad Conference 1989 ("Burns") (Ex. 1006).

[5] Monfalcone et al., *Safety Modeling of a Direct Traffic Control (DTC) Train Control System Using the Axiomatic Safety-Critical Assessment Process (ASCAP)*, Annual Reliability and Maintainability Symposium, 2001 Proceedings, the International Symposium on Product Quality and Integrity 2001 pp. 352–357 ("Monfalcone") (Ex. 1007).

IPR2017-01821
Patent 7,200,471 B2

Siemens Industry, Inc. ("Patent Owner") filed a Patent Owner's Response to the Petition (Paper 15, "PO Resp."), and Petitioner filed a Petitioner's Reply (Paper 21, "Pet. Reply.").

Patent Owner also filed a Motion to Exclude.  Paper 24 ("Mot."). Petitioner filed an Opposition (Paper 28, "Opp. to Mot."), and Patent Owner filed a Reply (Paper 29, "Reply to Opp.").

An oral hearing was held on November 13, 2018 and a transcript appears in the record.  Paper 32 ("Tr.").

### B. Related Proceedings

The parties indicate that the '471 patent is the subject of *Siemens Industry, Inc. v. Westinghouse Air Brake Technologies. Corp.*, Case No. 1:16-cv-00284 in the United States District Court for the District of Delaware.  Paper 5, 1; Paper 7, 2.

The '471 patent is related to U.S. Patent No. 7,092,801 B2, which was the subject of IPR2017-00981, and to U.S. Patent No. 6,978,195, which was the subject of IPR2017-01454.  Paper 5, 1; Paper 7, 2.

### C. The '471 Patent

The '471 patent is titled "Train Control System and Method of Controlling a Train or Trains" and issued on April 3, 2007.  Ex. 1001, (45), (54).  The '471 patent relates to the automatic control of trains.  *Id.* at 1:17–18.

The '471 patent discusses known systems for controlling trains.  *See id.* at 1:20–3:39, 9:62–67.  For example, the '471 patent discloses that traditional methods for controlling trains use track warrants, which are

3

IPR2017-01821
Patent 7,200,471 B2

permissions to occupy a given section of track (i.e., a block). *Id.* at 1:27–32. In the traditional method, a dispatcher issues a train warrant verbally to the train conductor or engineer. *Id.* at 1:32–40. The '471 patent discloses that the system is "subject to errors which can be disastrous" because it relies upon human beings. *Id.* at 1:49–52; *see id.* at 1:62–63. The '471 patent teaches that it was known to increase the safety of trains by "automat[ing] various aspects of train operation" and that "efforts at automation have been made." *Id.* at 1:24–27, 2:24; *see also id.* at 3:35–36. For example, the '471 patent discloses that "systems, such as the Advanced Train Control ["ATC"] System proposed by Rockwell International, will automatically apply the brakes if a track warrant is about to be exceeded." *Id.* at 2:59–62. The '471 patent discloses that ATC systems have been combined with Positive Train Stop ("PTS") systems, which will anticipate signaling and stop or slow a train. *Id.* at 3:1–9. For example, the system will stop a train automatically before it runs through a stop signal. *Id.* at 3:6–9. The '471 patent further discloses that "some of the descriptions of PTS systems the inventors hereof have seen in trade publications apparently indicate that a train will not be allowed to move until it has received a track warrant from a dispatcher (i.e., a track warrant or track authority)." *Id.* at 9:62–67.

In addition to disclosing that it was known for a dispatcher to control a train on a main line track using track warrants, the '471 patent discloses that it was known for a yardmaster to control a train in a train yard using circulation authorities, which are permissions to move the train within an area of track (such as a train yard) not controlled by a dispatcher or to an area of track that is controlled by a dispatcher. *Id.* at 9:33–49.

4

IPR2017-01821
Patent 7,200,471 B2

The '471 patent discloses "automat[ing] various aspects of train operation" can increase safety of train operations by preventing collisions caused by human error. *Id.* at 1:24–27; *see id.* at 1:53–56, 1:57–58, 2:24, 3:27–35. The '471 patent states "[i]n addition to the performance and safety issues . . . , vandalism is becoming an increasing concern of train operators" and discloses that "[o]ne form of vandalism is the unauthorized moving of trains." *Id.* at 3:40–43. "Unauthorized movement of a train, whether on a main line, in a train yard, or on some other section of track, can cause much damage even if a stop signal is not violated." *Id.* at 3:51–52.

The '471 patent purports to solve the problem of "safe operation of a railroad while mitigating the effects of vandalism" by "not allow[ing] the train to move at all, whether the train is on the main line or in a train yard, until an appropriate authority is received." *Id.* at 4:7–12.

The '471 patent discloses that

vandalism concerning the unauthorized movement of trains is a serious problem. The present invention mitigates this problem by ensuring that the train has permission to move on the segment of track on which it is located before it can be moved at all. By way of comparison, while some of the descriptions of PTS systems the inventors hereof have seen in trade publications apparently indicate that a train will not be allowed to move until it has received a track warrant from a dispatcher (i.e., a track warrant or track authority), it appears that such systems will not prevent a vandal (or negligent engineer/conductor) from moving a train in a train yard after the train has received the track warrant but before the train has received a circulation authority to move the train to the section of main line track for which the dispatcher has issued the track warrant. Such unauthorized movement of the train can obviously cause much damage. In contrast, some embodiments of the system 100 will not allow a train that has received a track warrant to move until it has received a circulation authority to

5

IPR2017-01821
Patent 7,200,471 B2

> move to the section of main line track corresponding to the
> track warrant.  Alternatively, some embodiments will accept an
> authority that includes both a block of main line track and an
> area of non-main line track.  (In such systems, either a single
> entity controls both main line track and non-main line track, or
> the dispatcher and yardmaster communicate with each other so
> that such an authority may be issued.)

*Id.* at 9:58–10:15.

### D. Illustrative Claim

Of the challenged claims, only claims 1, 6, 11, and 19 are independent.  Claim 1 recites a system, and claim 6 recites a corresponding method.  Claims 2 and 4 depend from claim 1, and claims 7 and 9 depend from claim 6.  Likewise, claim 19 recites a system, and claim 11 recites a corresponding method.  Claim 12 depends from claim 11, and claim 20 depends from claim 19.  Claims 1 and 19 are illustrative and reproduced below.

> 1.  A system for controlling the movement of a train from a
> section of track not on a main line to a section of main line
> track, the system comprising:
>
>> a control module;
>>
>> a positioning system connected to the control module;
>> and
>>
>> a receiver connected to the control module;
>>
>> wherein the control module is configured to perform the
>> steps of:
>>
>>> preventing the train from being moved until a
>>> circulation authority to move within the section
>>> of track not on the main line has been received,

IPR2017-01821
Patent 7,200,471 B2

the section of track not on the main line being a section of track in which the train is located;

allowing the train to move within the section of track not on the main line provided that the circulation authority has been received;

preventing the train from entering the section of main line track until a movement authority to move a train within the section of main line track has been received; and

allowing the train to move from the section of track not on the main line to the section of main line track provided that the movement authority has been received.

19. A system for controlling a train, the system comprising:

a control module;

a positioning system attached to the control module; and

a receiver attached to the control module; wherein the control module is configured to perform the steps of:

receiving a movement authority to move a train within a section of main line track;

receiving a message including a signal from a device located along a wayside, the message including a signal from the device, the signal indicating that movement of the train into the section of main line track is permitted; and

preventing the train from being moved into the section main line track until both the movement authority and the signal from the device are received.

IPR2017-01821
Patent 7,200,471 B2

## II. ANALYSIS

### A. Claim Construction

Under the version of our rules applicable to this *inter partes* review,[6] the Board interprets claim terms in an unexpired patent according to the broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b) (2016); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation approach).  Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning, as they would be understood by one of ordinary skill in the art at the time of the invention.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

For the purposes of this Decision, we determine that only the terms below need explicit claim constructions in order to resolve the issues before us.  *See, e.g.*, *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'") (quotation omitted).

### *"circulation authority"*

The claims, for example clam 1, recite a "circulation authority."  Ex. 1001, 12:45–46.  In our Decision on Institution, we construed "circulation

---

[6] The claim construction standard for *inter partes* reviews has changed for proceedings in which the petition was filed on or after November 13, 2018.  *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Nov. 13, 2018) (to be codified at 37 C.F.R. pt. 42).

IPR2017-01821
Patent 7,200,471 B2

authority" as "an authority that permits a train or locomotive to move within an area of track (such as a train yard) not controlled by a dispatcher, or from an area of track not controlled by a dispatcher."  Dec. on Inst. 9 (citing Ex. 1001, 9:41–44).  We based our construction upon a statement from the following passage of the '471 patent:

> In contrast to main line track, movement of trains in a train yard is typically under the control of a yardmaster.  The yardmaster is responsible for the movement of trains in a train yard, including movement of trains within the train yard (e.g., movement of a train from a resting place to a fuel depot or repair facility) or from the yard to the main line track.  The term "circulation authority" has sometimes been used, and will be used herein, *to refer to an authority that permits a train or locomotive to move within an area of track (such as a train yard) not controlled by a dispatcher, or from an area of track not controlled by a dispatcher to an area of track that is controlled by a dispatcher.*  The circulation authority may be a simple permission for the train to move, or may provide start and end locations (e.g., the end location may correspond to the start location of the track warrant and the start location may correspond to the current location of the train/locomotive).

Ex. 1001, 9:33–49 (emphasis added).  Based on this passage, Patent Owner argues that our construction should have included the phrase "to an area of track that is controlled by a dispatcher" at the end.  PO Resp. 12–13. According to Patent Owner, the addition of the phrase is significant because otherwise the definition implies that a circulation authority could authorize train movement onto track controlled by a dispatcher, such as a mainline track.  *Id.* at 13.  Patent Owner contends that "the specification is clear that a circulation authority can only provide authority for a train to move *to*, not *into*, a section of train controller by a dispatcher."  *Id.*

IPR2017-01821
Patent 7,200,471 B2

Petitioner disagrees that the addition of the phrase is significant because no matter how construed, circulation authorities were known in the prior art. *See* Pet. Reply 4–6. Petitioner also contends that an authority that permits a train to move *into* a section of main line track necessarily includes permission for the portion of the train that has not yet entered main line track to move along the non-main line track. *Id.*

We are persuaded by Patent Owner that our construction should have included the omitted phrase and revise our construction to be "an authority that permits a train or locomotive to move within an area of track (such as a train yard) not controlled by a dispatcher, or from an area of track not controlled by a dispatcher to an area of track that is controlled by a dispatcher," as set forth in the above passage of the '471 patent. Ex. 1001, 9:33–49.

Although not explicitly argued by Patent Owner with respect to its claim construction (*see* PO Resp. 12–13), Patent Owner's arguments with respect to the prior art imply that the same entity cannot be both the dispatcher that issues the track warrant and the entity, such as the yardmaster, that issues the circulation authority. *See e.g.*, PO Resp. 17–18, 23–25. For example, with respect to GCOR, Patent Owner argues, "*GCOR* does not describe any movement authority that could fairly be characterized as a circulation authority, or indeed any authorities at all issued by anyone other than a dispatcher or a control operator (under the director of a dispatcher)." *Id.* at 18. In other words, Patent Owner argues that by definition someone other than a dispatcher or someone under the control of a dispatcher who issues a track warrant must issue the circulation authority.

IPR2017-01821
Patent 7,200,471 B2

Petitioner disagrees and argues that "the '471 Patent is clear that both 'track warrants' and 'circulation authorities' are kinds of authorities that can be issued by a dispatcher." Pet. Reply 3 (citing Ex. 1001, 9:54–57, 10:13–16).

Patent Owner's implicit argument is not persuasive because it is not consistent with our revised construction or the '471 patent. Our revised construction is silent as to what entity issues the circulation authority and does not preclude the same entity from issuing the track warrant and the circulation authority. In our construction, the phrases "not controlled by a dispatcher" and "controlled by a dispatcher" each characterize an area of track. This is consistent with the '471 patent. The '471 patent uses the phrase "controlled by a dispatcher" to describe track on the main line (*see* Ex. 1001, 9:39–44) and the phrase "not controlled by a dispatcher" to describe areas of track not on the mainline, for example, track in a yard (*see id.* at 1:42–44 (describing yards, sidings, and secondary track), 9:39–44, 10:12–15). Further, the '471 patent explicitly describes the dispatcher and the yardmaster may be the same entity. The '471 patent states,

> The entities issuing the circulation authorities and track warrants may be a human being or a computer. The entity issuing a track warrant may be separate from or the same as the entity issuing a circulation authority . . .

>  In such systems, either a single entity controls both main line track and non-main line track, or the dispatcher and yardmaster communicate with each other so that such an authority may be issued.

*Id.* at 9:54–57, 10:12–15. Patent Owner acknowledges that:

> The specification of the '471 Patent discloses that in an alternate embodiment, both track warrants and circulation authorities could be issued by the same entity, whether a human

> being or a computer (*e.g.*, a single computer system running
> both a dispatcher program and a yardmaster program). . . . But
> even that alternate embodiment doesn't avoid the fact that two
> different authorities relating to two different types of track (*e.g.*,
> main line and a yard) must be received before a train not on the
> main line track is permitted to move."

PO Resp. 28–29 n.10 (citing Ex. 1001, 9:55–57; Ex. 2009 ¶ 39).

Additionally, Patent Owner's declarant Mr. John Loud's testimony indicates that the same entity, wearing both the "hats" of the dispatcher and the yardmaster, could issue both track warrants and circulation authorities. Ex. 2009 ¶ 39.

We, thus, are not persuaded that our revised construction of circulation authority precludes the same entity from issuing the track warrant and the circulation authority.

## B. Obviousness

Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). The ultimate determination of obviousness under § 103 is a question of law based on underlying factual findings. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) (citing *Graham v. John Deere Co*., 383 U.S. 1, 17–18 (1996)). These underlying factual considerations consist of: (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) "secondary considerations" of non-obviousness

IPR2017-01821
Patent 7,200,471 B2

such as "commercial success, long felt but unsolved needs, failure of others, etc."[7]  *KSR*, 550 U.S. at 406 (quoting *Graham*, 338 U.S. at 17–18).

*Level of Ordinary Skill in the Art*

In the Petition, Petitioner contends that:

> [A] POSA as of July 2, 2002 would have had at least a bachelor's of science degree in electrical engineering, mechanical engineering, aeronautics and astronautics, or a related engineering field, and would also have had at least three (3) years of experience with transportation control and safety systems. . . . Such a POSA would have had knowledge of transportation communication systems, movement control schemes, and on-board computers, and would have understood how to search available literature for relevant publications.

Pet. 10 (citing Ex. 1002 ¶¶ 46–48).  Patent Owner disagrees with Petitioner's definition of the level of ordinary skill in the art because it does not require any background related to train operations or control systems.  PO Resp. 14.

Patent Owner contends:

> [A] POSITA for purposes of the '471 Patent would have had (i) an undergraduate engineering degree or the equivalent thereof and at least three years of experience in train operations or train control systems, (ii) knowledge of train control systems, train safety systems that include wayside systems, and train communications systems, and (iii) an understating of how to search available literature for relevant publications.

*Id.* (citing Ex. 2009 ¶ 60).  Patent Owner argues that train control experience is necessary because the '471 patent relates to control function concerning movement of a train and authorities governing the movement.  PO Resp. 14. Petitioner does not dispute this in its Reply.  *See generally* Pet. Reply.

---

[7] The record contains no evidence of secondary considerations.

IPR2017-01821
Patent 7,200,471 B2

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equipment Co., Inc. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Both Petitioner and Patent Owner's definitions include an undergraduate engineering degree or the equivalent and both include experience related to transportation control and safety systems. The difference between Petitioner's and Patent Owner's definitions is whether the transportation control and safety systems relate specifically to train control and safety systems. Patent Owner's argument that the level of ordinary skill in the art would include experience with train control and safety systems is persuasive. The '471 patent is directed to "automatic control of trains" and solves safety problems with train operations and movements. Ex. 1001, 1:16–4:5.

*Weight of Dr. Pullen's Testimony*

Patent Owner argues that we should give the testimony of Petitioner's declarant Dr. Pullen's testimony little or no weight because "he does not have relevant experience is train operations or train control systems that would qualify him as a POSITA." PO Resp. 15. Petitioner disagrees. Pet. Reply 6–7.

Patent Owner's argument is not persuasive. Dr. Pullen holds several degrees in Aeronautics, a field of study that involves control systems: an undergraduate degree he received in 1989, a Masters degree he received in

14

IPR2017-01821
Patent 7,200,471 B2

1990, and a Ph.D. he received in 1996. Ex. 1003, 1. Dr. Pullen's declaration indicates that he has "twenty years of experience in the field of transportation safety and control systems, with the last three years specifically focused on train safety and control systems. Ex. 1002 ¶ 7; *see also id.* ¶¶ 8–17 (describing education and experience related to control systems). Dr. Pullen's lack of experience specific to trains before the last three years may detract from the weight to be given his testimony on certain matters, but we are not persuaded to give Dr. Pullen's testimony little or no weight.

### Ground 1—Judge, GCOR, and Balukin

Petitioner contends that claims 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 are unpatentable over a combination of Judge, GCOR, and Balukin. *See* Pet. 16–41; Pet. Reply 10–18. Patent Owner disagrees. PO Resp. 21–44.

### Overview of Judge

Judge is an article, titled "BNSF/UP PTS [P]ilot [A]dvances in Northwest," in the May 1996 issue of Progressive Railroading. Ex. 1011, 49. The article describes a Positive Train Separation ("PTS") system that for safety "is designed to eliminate train collisions." *Id.* at 49. The article states that the system "does not replace any of the movement authority controls in place today. Train movement will still be authorized by signals, track warrants and other safety systems now in use. The PTS system merely enforces these rules." *Id.*

The PTS system has a server segment, a communications segment, and a locomotive segment. *Id.* at 50. The system includes a Location Determination System, which has a global positioning system receiver, to verify where the train is and what track it is on. *Id.* at 52. The server

IPR2017-01821
Patent 7,200,471 B2

observes all train movement authorities granted by the [Computer Aided Dispatching] system and by the dispatcher, and transmits a PTS enforceable authority ("PTSEA") to a computer on the locomotive. *Id.* The server checks the PTSEA before sending to ensure that it does not conflict with any other rules it is monitoring. *Id.* "Without a PTSEA, a PTS train cannot be moved." *Id.*

### Overview of GCOR

GCOR is a general code of operating rules, which govern the operation of railroads. *Id.* GCOR discloses rules for main track authorization, yard limits, movement on sidings, and entering a main track. *Id.* at 48, 52, 58, 85. GCOR discloses that "[b]efore initiating movement on a main track, a crew member must: [r]ecieve a track warrant." *Id.* at 48. GCOR discloses that "the control operator must authorize the train to enter the track" (*id.* at 85) and "[w]here yard limits are in effect . . . all movements must receive permission from the control operator to enter the main track or to cross over from one main track to another" (*id.* at 52).

### Overview of Balukin

Balukin is titled "Apparatus to Enable Controlling a Throttle Controlling from a Remote Host" and issued on July 28, 1998. Ex. 1015, [45], [54]. Balukin discloses a system for controlling the throttle, dynamic brake, and reverser from a remote host. *Id.* at 1:11–13. Balukin discloses that "[t]he remote host may be in a small unit which could be carried by a person, so that in a switchyard, a person on foot can control the locomotive," or "be in a tower for control of trains in a switchyard." *Id.* at 5:31–38.

16

IPR2017-01821
Patent 7,200,471 B2

*Analysis—Independent Claims 1 and 6*

Petitioner contends that independent claims 1 and 6 are unpatentable over Judge, GCOR, and Balukin.  Pet. 16–32, 35–36.  Petitioner relies upon the declaration of Dr. Pullen for support.  Ex. 1002.  Claims 1 and 6 both recite:

> preventing the train from being moved until a circulation authority to move within the section of track not on the main line has been received, the section of track not on the main line being a section of track in which the train is located.

Ex. 1001, 12:45–49, 13:7–11.  Petitioner relies upon a combination of GCOR and Judge to teach this step.  Pet. 27–29, 35.  In particular, Petitioner cites to GCOR's disclosure of requiring permission to enter a main track and Judge's disclosure of an on-train computer that receives movement authorities.  *Id.* at 35–36 (citing Ex. 1013, 52; Ex. 1011, 50).

GCOR discloses, "[w]here yard limits are in effect, all movements must receive permission from the control operator *to enter the main track* or to cross over from one main track to another as follows . . . A track permit is issued."  Ex. 1013, 52 (emphasis added); *see also id.* at 85 (discussing track permits to enter the main track).  "Yard Limits are . . . restrictions placed on a section of main track that is in close proximity to a yard."  Ex. 2009 ¶ 90(A) (testimony of Mr. Loud).  GCOR's disclosure suggests that trains enter the main track from yards and, thus, must move from the yard to the main track before entering the main track.  *See* Pet. 27; Ex. 1002 ¶ 104 (testimony of Dr. Pullen).  Patent Owner's declarant Mr. Loud testifies:

> The yardmaster's issued authority relates exclusively to movements involving the yard. Building a consist of locomotives, refueling locomotives, and adding a consist of locomotives to cars to make up a train are all yard-type

17

IPR2017-01821
Patent 7,200,471 B2

> movements. *When it is time to release an assembled train, the yardmaster must authorize a movement from somewhere in the yard to the entrance to the main line track, because he/she is responsible for all movements in the yard.* But just because a yardmaster authorizes this movement ***to*** the main line track does not make the yardmaster's authorization a track warrant. Indeed, the yardmaster is unable to authorize movement ***onto*** the main line track.

Ex. 2009 ¶ 35 (emphasis added). Mr. Loud also testifies that: "And, because a movement from the yard onto the main line track includes movement in the yard, it requires a circulation authority. . . . The yardmaster can only authorize the yard portion of the movement." Ex. 1018, 43:21–44:1; *see also id.* at 9:8–10:1, 11:1–9. Similarly, the '471 patent indicates that circulation authorities to move from a yard to a mainline track were known. The '471 patent states:

> The yardmaster is responsible for movement of trains in a train yard, including . . . *from the yard to the main line track*. The term 'circulation authority' has *sometimes been used* . . . to refer to an authority that permits a train or locomotive to move within an area of track (such as a train yard) . . . to an area of track that is controlled by a dispatcher.

Ex. 1001, 9:34–39 (emphasis added); *see also* Tr. 43:14–24; *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1329–30 (Fed. Cir. 2018) ("A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness.") (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988)). Given this, we determine that Petitioner's analysis and the evidence of record sufficiently shows that receiving a circulation authority to move from a section of track not on the main line on which the train is located to the block was known prior to the '471 patent.

IPR2017-01821
Patent 7,200,471 B2

Judge discloses PTS systems that enforce movement authority controls and that "[w]ithout a PTSEA, a PTSA train cannot be moved." *Id.* Ex. 1011, 49–50.  Dr. Pullen testifies:  "At least as early as 1983, PTC systems such as ARES were capable of receiving movement authorities from dispatcher and conditioning train movement on the reception of those authorities, whether the train was on the main line, on a siding, or located in a yard."  Ex. 1002 ¶ 32 (citing Ex. 1006, 33; Ex. 1005, 26–27).  Similarly, the '471 patent, itself, discloses known systems that "automate various aspects of train operation."  Ex. 1001, 1:24–27; *see also id.* at 2:19–35 (describing prior art systems); Ex. 1002 ¶ 32 (describing prior art systems that "were capable of receiving movement authorities from dispatchers and conditioning train movement on the reception of those authorities, whether the train was on the main line, on a siding, or located in a yard").  Balukin also discloses a known automated system that allows a remote host to control the throttle, dynamic brake and reverser handles on a train. *See* Ex. 1015, 2:37–40, 5:31–38.

Judge teaches, "[t]he PTS mission is to increase railroad operational safety."  Ex. 1011, 52; *see also id.* at 49 (PTS "is designed to eliminate train collisions.");  Ex. 1012[8], 1:40–50 (disclosing that it is desirable to prevent unauthorized operation of a locomotive by unauthorized personnel, like joy riders).  Likewise, the '471 patent teaches that known efforts to automate train operation were motivated by safety concerns (e.g., preventing collisions due to unauthorized movements).  *See* Ex. 1001, 1:20–3:39.  Likewise, Dr. Pullen's testimony that one of ordinary skill in the art would

---

[8] US Patent No. 6,044,673 issued April 4, 2000 ("Jefferson") (Ex. 1012).

IPR2017-01821
Patent 7,200,471 B2

have been motivated to combine GCOR and Judge by safety concerns.  Ex.
1002 ¶¶ 102, 111.

Given this, we determine that Petitioner's analysis and the evidence
sufficiently shows it would have been obvious to prevent movement of the
train until receipt of a circulation authority to move within the section of
track not on the main line, where the section of track not on the main line is
a section of track in which the train is located in order to increase safety.

In reaching our determination, we have taken into account Patent
Owner's arguments, but find Patent Owner's arguments unpersuasive.
Patent Owner argues that Dr. Pullen "admitted on cross-examination that
*GCOR* does not disclose any 'circulation authority.'"  PO Resp. 23 (citing
Ex. 2006, 64:3–65:10).  We acknowledge that Dr. Pullen testifies that
"there's no point where [GCOR] clearly refers to movement that I can find
that represents authority to get to the point where you're about to enter the
[track] that you would define as circulation authority that I can find now."
*See* Ex. 2006, 64:3–65:10.  Dr. Pullen, however, also testifies that GCOR
"definitely covers the point of entering the main line, on to the main line
track."  *See id.*  As discussed above, GCOR's disclosure of entering the main
line track from a yard suggests that the train must move from the yard to the
main track.  The other evidence of record, discussed above, including the
disclosure in the '471 patent itself, sufficiently demonstrates that receiving a
circulation authority to move from a section of track not on the main line on
which the train is located to the block was known prior to the '471 patent.

Patent Owner also argues that all of Petitioner's citations to GCOR
refer to authorities issued by a dispatcher or a control operator acting under
the direction of the dispatcher and, thus, GCOR does not disclose a

IPR2017-01821
Patent 7,200,471 B2

circulation authority.  PO Resp. 22–29.  According to Patent Owner, a yardmaster must issue a circulation authority and not a dispatcher or a control operator acting under the direction of the dispatcher.  *Id.*  Patent Owner's argument is unpersuasive because it is not commensurate with the scope of the claims.  As discussed above, the claims do not preclude the same entity (e.g., a dispatcher or control operator) from issuing both a track warrant and a circulation authority.  The '471 patent, itself, indicates that same entity or different entities may control the main line tracks and non-main line tracks.  Ex. 1001, 9:12–15.

*Analysis—Dependent Claims 2, 4, 7, and 9*

Claims 2 and 4 depend from claim 1, and claims 7 and 9 depend from claim 6.  We find persuasive Petitioner's contentions that Judge teaches the additional limitations of claims 2 and 7 (Pet. 32, 36 (citing Ex. 1011, 52)) and that the combination of Judge and GCOR teaches the additional limitations of claims 4 and 9 (Pet. 32–36).  Patent Owner makes the same arguments made with respect to independent claims 1 and 6.  PO Resp. 44–45.  For the same reasons as discussed above, Patent Owner's arguments are unpersuasive.

We determine that Petitioner shows by a preponderance of the evidence that claims 2, 4, 7, and 9 are unpatentable over GCOR, Judge, and Balukin.

*Analysis—Independent Claims 11 and 19*

Petitioner contends that independent claims 11 and 19 are unpatentable over Judge, GCOR, and Balukin.  Pet. 36–41.  Petitioner relies upon the declaration of Dr. Pullen for support.  Ex. 1002.  Claim 11 recites:

21

IPR2017-01821
Patent 7,200,471 B2

> preventing the train from being moved into the section [of]
> main line track until both the movement authority and the
> signal from the device are received.

Ex. 1001, 13:43–45.  Claim 19 recites a similar limitation.  *Id.* at 14:11–13.

Petitioner relies upon a combination of GCOR and Judge as teaching this

step.  Pet. 39.

Judge's system includes an onboard computer (i.e., a control module)

that receives movement authorities from a dispatching system and

automatically enforces the movement authorities.  Ex. 1011, 49–50.  A

differential global positioning system connects to the train to track the

location of the train.  *Id.* at 50–52.  The train has a data radio (i.e., a receiver)

that communicates with a server.  *Id.* at 50.  Judge's system prevents a train

from moving without movement authority or PTSEA.  Ex. 1011, 50.  Judge

states: "Without a PTSEA, a PTS train cannot be moved."  *Id.*

GCOR discloses, "[b]efore initiating movement on a main track, a

crew member must . . . [r]eceive a track warrant."  Ex. 1013, 48.  "The

control operator must authorize the train to enter the track."  *Id.* at 85.  The

'471 patent, itself, discloses that systems that prevent a train from being

moved until a track warrant is received were known.  *See* Ex. 1001, 1:28–45,

9:21–9:29.  The '471 patent states "some of the descriptions of PTS systems

the inventors hereof have seen in trade publications apparently indicate that

a train will not be allowed to move until it has received a track warrant from

a dispatcher (i.e., a track warrant or track authority)."  *Id.* at 9:63–67.

GCOR also discloses that wayside devices transmit signals to the

train.  Ex. 1013, 124–125.  GCOR states:  "When absolute block is

established in advance of a train, the train must not pass a signal indicating

Stop, Stop and Proceed . . . unless verbally authorized by the train

IPR2017-01821
Patent 7,200,471 B2

dispatcher." *Id.* at 94.  Similarly, the '471 patent discloses that it was known to control trains using wayside signals to indicate authority to occupy a block or to proceed to the next block.  *See* Ex. 1001, 3:9–23.  The '471 patent states: "PTS will stop the train before actually going through a stop signal." *Id.* at 3:8–9.

Judge discloses that PTS systems were known to enforce the movement authorities.  Ex. 1011, 49.  Judge states: "This means that the system does not replace any of the movement authority controls in place today.  Train movement will still be authorized by signals, track warrants and other systems now in use." *Id.*  Judge also suggests that it was known to control trains based on more than one movement authority.  *Id.* at 50 ("[T]he server is designed to observe all train movement authorities granted by . . . the dispatcher.  It then transmits these authorities to the computer on board the PTS-equipped locomotives.").  Similarly, the '471 patent, itself, discloses that systems that "automate various aspects of train operation" were known.  Ex. 1001, 1:24–27; *see also id.* at 2:19–35 (describing prior art systems); Ex. 1002 ¶ 32 (describing prior art systems that "were capable of receiving movement authorities from dispatchers and conditioning train movement on the reception of those authorities, whether the train was on the main line, on a siding, or located in a yard").  Balukin also discloses that automated systems that allows for a remote host to control the throttle, dynamic brake and reverser handles on a train were known.  *See* Ex. 1015, 2:37–40, 5:31–38.

Judge teaches, "[t]he PTS mission is to increase railroad operational safety."  Ex. 1011, 52; *see also id.* at 49 (explaining that PTS "is designed to eliminate train collisions"); Ex. 1012, 1:40–50 (disclosing that it is desirable

IPR2017-01821
Patent 7,200,471 B2

to prevent unauthorized operation of a locomotive by unauthorized personnel, like joy riders).  Likewise, the '471 patent teaches that known efforts to automate train operation were motivated by safety concerns (e.g., preventing collisions due to unauthorized movements).  *See* Ex. 1001, 1:19–3:35.

Given this, we determine that Petitioner's analysis and the evidence of record sufficiently shows it would have been obvious to prevent movement of the train until receipt of a circulation authority to move within the section of track not on the main line, where the section of track not on the main line is a section of track in which the train is located in order to increase safety.

In reaching our determination, we have taken into account Patent Owner's arguments, but find Patent Owner's argument unpersuasive.  First, Patent Owner argues that the Petition fails to show how the combination of Judge, GCOR, and Balukin teaches receiving a signal from a wayside device that indicates permission to move the train into the section of main line track.  PO Resp. 34–35.  However, Petitioner points out that GCOR discloses:  "When absolute block is established in advance of a train, the train must not pass a signal indicating Stop, Stop and Proceed . . . unless verbally authorized by the train dispatcher."  Ex. 1013, 94.  Further, the '471 patent discloses that it was known to control trains using wayside signals to indicate authority to occupy a block or to proceed to the next block.  *See* Ex. 1001, 3:4–8.

### Analysis–Dependent Claims 12 and 20

Claim 12 depends from claim 11, and claim 20 depends from claim 19.  The additional limitations of claims 12 and 20 require preventing the train from being moved until a circulation authority is received.  Ex. 1001,

IPR2017-01821
Patent 7,200,471 B2

13:46–49, 14:14–18.  We find persuasive Petitioner's contentions that Judge, GCOR, and Balukin teaches the additional limitations of claim 12 and 20. Pet. 40 (citing Ex. 1013, 52, 90, 93, 94, 126; Ex. 1011, 50; Ex. 1015, 2:37–40, 5:31–38; Ex. 1002 ¶¶ 69, 108, 110).  Patent Owner makes the same arguments as those made with respect to independent claims 11 and 19.  PO Resp. 44–45.

 We determine that Petitioner shows by a preponderance of the evidence that claims 12 and 20 are unpatentable over GCOR, Judge, and Balukin.

*Arguments Concerning Motivation to Combine*
*Judge, GCOR, and Balukin*

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine the teachings of GCOR, Judge, and Balukin in order to increase railroad safety.  Pet. 20–24.

We agree.  Ample evidence in the record and the '471 patent's discussion of prior art techniques and knowledge demonstrate that it would have been desirable to prevent unauthorized movement of a train to avoid collisions and increase safety.  Judge discloses that "[t]he PTS mission is to increase railroad operational safety" (Ex. 1011, 52) and that PTS "is designed to eliminate train collisions" (*id.* at 49).  Jefferson teaches that it is desirable to prevent unauthorized operation of a locomotive by unauthorized personnel, like joy riders.  Ex. 1012, 1:40–50.  The '471 patent, itself, discloses that it was known in the prior art to automate train control to increase safety, to reduce human error, and to prevent collisions.  *See* Ex. 1001, 1:20–4:3.

25

IPR2017-01821
Patent 7,200,471 B2

Given this, we determine that Petitioner's analysis and the evidence of record sufficiently shows a POSITA would have been motivated to combine the teachings of Judge, GCOR, and Balukin to increase safety.  *See* Ex. 1002 ¶¶ 96–112.

In reaching our determination, we have taken into account Patent Owner's arguments.  Patent Owner argues that Petitioner's combination of prior art is based on improper hindsight and that Petitioner provides no sufficient rationale for combining the prior art to prevent the train movement until receipt of both the track warrant and the circulation authority.  PO Resp. 36–42.

We recognize that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper."  *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).  As discussed above, the record contains ample evidence that a POSITA would have desired to prevent unauthorized movement of a train to avoid collisions and increase safety.  Given this evidence, we are not persuaded that Petitioner's combination of prior art is based on improper hindsight and that safety is not a sufficient rationale for combining the prior art to prevent the train movement until receipt of both the track warrant and the circulation authority.

Further, Patent Owner argues that Petitioner's rationale for combining the teachings of the references is insufficient because none of Judge, GCOR, and Balukin recognize the vandalism problem disclosed in the '471 patent.

IPR2017-01821
Patent 7,200,471 B2

PO Resp. 42–43.  This argument is unpersuasive because the obviousness inquiry does not look only to the problem the patentee was trying to solve. *See Outdry Techs. Corp. v. Geox S.p.A.*, 859 F.3d 1364, 1371 (Fed. Cir. 2017) ("The motivation supported by the record and found by the Board need not be the same motivation articulated in the patent for making the claimed combination."); *In re Dillon*, 919 F.2d 688, 693 (Fed. Cir. 1990) (en banc) (holding that the motivation to combine the prior art references need not be identical to that of Applicants).  Rather, any need or problem known in the field of endeavor at the time of the invention and addressed by the prior art can provide a reason for combining the elements in the manner claimed.  *KSR*, 550 U.S. at 402; *Outdry Techs.*, 859 F.3d at 1370–71; *see also In re Kemps*, 97 F.3d 1427, 1430 (Fed. Cir. 1996).

For the reasons discussed above, we determine that Petitioner demonstrates by a preponderance of the evidence that claims 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 are unpatentable over Judge, GCOR, and Balukin.

### Ground 2—Burns, Monfalcone, and Balukin

Petitioner contends that claims 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 are unpatentable over a combination of Burns, Monfalcone, and Balukin.  *See* Pet. 52–69; Pet. Reply 18–23.  Patent Owner disagrees.  PO Resp. 46–64.

### Overview of Burns

Burns is a paper titled "Safety and Productivity Improvement of Railroad Operations by Advanced Train Control Systems."  Ex. 1006, 33. Burns discloses an advanced train control system ("ATCS") that uses an on-board computer or Train Control Computer ("TCC") to control the train.  *Id.* at 34.  "The TCC is also the safety device which enforces movement and

27

IPR2017-01821
Patent 7,200,471 B2

speed authority limits by applying train brakes when it predicts that the train will otherwise exceed its authorized limits." *Id.*

Burns discloses that the "ATCS improves safety of train operations by expanding communication of critical information, adding safety enhancing features, and continuously monitoring for the occurrence of specified hazards." *Id.* at 37. Burns discloses that:

> Movement authorities separate and protect trains in unsignaled portions of the railroad, by commanding movements between designated points over particular track segments, into and out of sidings, through speed restrictions and past work crews, after waiting for opposing traffic. Movement authorities protect track forces in all territories. ATCS provides extensive new capabilities for authority generation, checking, distribution, and enforcement, which yield operating safety enhancements.

*Id.* After an authority is generated, it is checked against current authorities, approved, and then sent by the dispatcher via a Data Network to the locomotive cab. *Id.* "Once acknowledged, the authority is monitored by the TCC, which will apply brakes if it predicts that the train will soon violate the authority limits." *Id.*

*Overview of Monfalcone*

Monfalcone is a paper titled "Safety Modeling of a Direct Traffic Control (DTC) Train Control System Using the Axiomatic Safety-Critical Assessment Process (ASCAP)." Ex. 1007, 352. Monfalcone describes "a simulation-based approach for performing safety analysis in terms of a given train control technology" that "models train movement within a corridor in terms of the physical entities contained and the behavior of the dispatcher and train crews required for train movement." *Id.* The model provides "the data necessary to quantitatively predict safety for a given corridor. *Id.*

28

IPR2017-01821
Patent 7,200,471 B2

In the model, "train crew agents request authorization to move a train and this train movement authority is granted or denied by the dispatcher agent." *Id.* at 353.  Train crews request entry into blocks, and the dispatcher grants authority for them to do so once it determines that it is safe.  *Id.* at 354.  The train can only continue into the next block if granted permission by the dispatcher.  *Id.*  Monfalcone states:

> At the start of the simulation, trains are queued at the yards and possibly at spurs to allow for track entry.  Trains are allowed to leave the yard only when the dispatcher grants authority, since the limits of block authority often exceed the visual range of the train crew.  Any subsequent train movement through block boundaries or out of sidings is also conditioned upon the dispatcher granting authority to the requesting train crew(s).

*Id.* at 354.

### Analysis—Independent Claims 1 and 6

Petitioner contends that claims 1 and 6 are unpatentable over Burns, Monfalcone, and Balukin.  Pet. 42–59, 63–64.  Petitioner relies upon the declaration of Dr. Pullen for support.  Ex. 1002.  In particular, Petitioner relies upon a combination of Burns, Monfalcone, and Balukin to teach preventing the train from being moved until a circulation authority to move within the section of track not on the main line has been received, as required by claims 1 and 6 (Ex. 1001, 12:45–49, 13:7–11).  Pet. 55–57, 63.

Monfalcone teaches that a train must request and receive authority from a dispatcher to enter the main line from a yard.  Ex. 1007, 353, 355, 356.  Monfalcone's disclosure suggests that trains enter the main track from yards and, thus, must move from the yard to the main track before entering.  *See* Pet. 57; Ex. 1002 ¶ 104 (testimony of Dr. Pullen).  Based on this

disclosure from Monfalcone, and further for the reasons discussed above in connection with the ground based on Judge, GCOR, and Balukin (*see supra*), we find persuasive Petitioner's contentions that receiving a circulation authority to move from a section of track not on the main line on which the train is located to the block was known prior to the '471 patent. These contentions are supported by the testimony of Mr. Loud and the '471 patent's discussion of what was known in the prior art. *See* Ex. 2009 ¶ 35; Ex. 1018, 43:21–44:1; Ex. 1001, 9:34–39; *see also* Tr. 43:14–24. Given this, we determine that Petitioner's analysis and the evidence of record sufficiently shows that receiving a circulation authority to move from a section of track not on the main line on which the train is located to the block was known prior to the '471 patent.

Burns discloses its ATCS is a safety device, which enforces movement and speed authority limits by applying train brakes when it predicts that the train will otherwise exceed its authorized limits. Ex. 1006, 34, 37. Dr. Pullen testifies: "At least as early as 1983, PTC systems such as ARES were capable of receiving movement authorities from dispatcher and conditioning train movement on the reception of those authorities, whether the train was on the main line, on a siding, or located in a yard." Ex. 1002 ¶ 32 (citing Ex. 1006, 33; Ex. 1005, 26–27). Mr. Loud testifies, "because a movement from the yard onto the main line track includes movement in the yard, it requires a circulation authority." Ex. 1018, 43:21–44:1.

Burns teaches that the ATCS system improves safety by automatic enforcement of movement authority. Ex. 1006, 33; *see also* Ex. 1012, 1:40–50 (disclosing that it is desirable to prevent unauthorized operation of a locomotive by unauthorized personnel, like joy riders). Likewise, the '471

IPR2017-01821
Patent 7,200,471 B2

patent teaches that known efforts to automate train operation were motivated by safety concerns (e.g., preventing collisions due to unauthorized movements). *See* Ex. 1001, 1:25–27.  Monfalcone is also concerned with safety and avoiding collision.  Ex. 1007, 352, 356.

    Given this, we determine that Petitioner's analysis and the evidence of record sufficiently shows it would have been obvious to prevent the train from being moved until both the track warrant and the circulation authority have been received when controlling the movement of a train from the yard onto or to a section of main line track.

    In reaching our determination, we have taken into account Patent Owner's arguments, but find Patent Owner's arguments unpersuasive.  First, Patent Owner asserts that neither Burns nor Manfalcone teaches a circulation authority because circulation authority refers "to an authority that permits a train or locomotive to move within an area of track (such as a train yard) not controlled by a dispatcher, or from an area of track not controlled by a dispatcher" (Ex. 1001, 9:40–44).  PO Resp. 47–53.  Patent Owner asserts that both Burns and Monfalcone teach the dispatcher controlling the main lines and the non-main lines.  *Id.*  Patent Owner's argument is unpersuasive because it is not commensurate with the scope of the claims.  As discussed above, the claims do not preclude the same entity (e.g., a dispatcher or control operator) from issuing both a track warrant and a circulation authority.  Monfalcone teaches a simulation in which dispatching agents interact to grant movement authorities.  Ex. 1007, 353 ("dispatcher agents," "collection of agents").  Monfalcone teaches that trains are only allowed to leave the yard when granted permission.  *Id.* at 354.  The '471 patent discloses that it was known that permission to move in a train yard was

IPR2017-01821
Patent 7,200,471 B2

given by a yardmaster.  Ex. 1001, 9:33–34.  Further, the '471 patent indicates that same entity or different entities may control the main line tracks and non-main line tracks.  Ex. 1001, 9:12–15.

We determine that Petitioner shows by a preponderance of the evidence that claims 1 and 6 are unpatentable over Burns, Monfalcone, and Balukin.

*Analysis—Dependent Claims 2, 4, 7, and 9*

Claims 2 and 4 depend from claim 1, and claims 7 and 9 depend from claim 6.  We find persuasive Petitioner's contentions that Burns teaches the additional limitations of claims 2 and 7 (Pet. 59 (citing Ex. 1006, 34)) and that the combination of Burns and Monfalcone teaches the additional limitations of claims 4 and 9 (Pet. 59–62, 64).  Patent Owner makes the same arguments as those made with respect to independent claims 1 and 6. PO Resp. 63–64.

We determine that Petitioner shows by a preponderance of the evidence that claims 2, 4, 7, ad 9 are unpatentable over Burns, Monfalcone, and Balukin.

*Analysis—Independent Claims 11 and 19*

Petitioner contends that claims 11 and 19 are unpatentable over Burns, Monfalcone, and Balukin.  Pet. 64–69.  Petitioner relies upon the declaration of Dr. Pullen for support.  Ex. 1002.  In particular, Petitioner argues that the combination of Burns, Monfalcone, and Balukin teaches preventing the train from moving into the section of main line track until both the movement authority and the signal from the wayside device are received, as required by claims 11 and 19.  Ex. 1001, 13:43–45, 14:11–13.

IPR2017-01821
Patent 7,200,471 B2

Burns discloses an ATCS that enforces movement authorities by
applying train brakes when it predicts that the train will exceed its authority.
Ex. 1006, 33–34, 37; *see also* Ex. 1001, 2:60–62. Burns teaches that
movement authorities include commands from dispatchers to move
"between designated points over particular track segments, into and out of
sidings, . . . ." Ex. 1006, 37. A command to move between designated
points over particular track segments is a track warrant. *See* Ex. 1001, 9:18–
28 ("A track warrant is essentially a permission for a train to occupy and
move on a section of main line track. The track warranty has start and end
points . . . ."). Monfalcone similarly discloses conditioning movement along
main line blocks and out of yards or sidings on receiving authority from a
dispatcher. Ex. 1007, 354. The '471 patent, itself, discloses that systems
that prevent a train from being moved until a track warrant is received were
known. *See* Ex. 1001, 1:28–45, 9:21–9:29. The '471 patent states "some of
the descriptions of PTS systems the inventors hereof have seen in trade
publications apparently indicate that a train will not be allowed to move until
it has received a track warrant from a dispatcher (i.e., a track warrant or
track authority)." *Id.* at 9:63–67. Burns and Monfalcone, thus, teach that
preventing movement until an authority, such as a track warrant or
circulation authority, is received was known prior to the '471 patent.

Burns discloses controlling train movements with a Wayside Interface
Unit ("WIU"). Ex. 1006, 34, Fig. 2. "WIUs give ATCS the capability to
monitor switch and signal status of interlockings, and optionally, track
occupancy indicators." *Id.* at 36. "The WIU messages information whether
or not a movement authority covering the segment of track monitored by the
WIU is proper." Ex. 1002 ¶ 82. Monfalcone also suggests that trains

IPR2017-01821
Patent 7,200,471 B2

encounter objects, such as signals indicating entry into a block. Ex. 1007, 355–356. Further, the '471 patent, itself, discloses that it was known for ATC systems to control trains using wayside signals to indicate authority to occupy a block or to proceed to the next block. *See* Ex. 1001, 2:15–17.

Similar to Burns, Balukin discloses that an automated system that allows a remote host to control the throttle, dynamic brake, and reverser handles on a train were known. *See* Ex. 1015, 2:37–40, 5:31–38. The '471 patent, itself, discloses that systems that "automate various aspects of train operation" were known. Ex. 1001, 1:24–27; *see also id.* at 2:19–35 (describing prior art systems); Ex. 1002 ¶ 32 (describing prior art systems that "were capable of receiving movement authorities from dispatchers and conditioning train movement on the reception of those authorities, whether the train was on the main line, on a siding, or located in a yard").

Burns teaches that the ATCS system improves safety by automatic enforcement of movement authority. Ex. 1006, 33; *see also* Ex. 1012, 1:40–50 (disclosing that it is desirable to prevent unauthorized operation of a locomotive by unauthorized personnel, like joy riders). Likewise, the '471 patent teaches that known efforts to automate train operation were motivated by safety concerns (e.g., preventing collisions due to unauthorized movements). *See* Ex. 1001, 1:22–27. Monfalcone is also concerned with safety and avoiding collision. Ex. 1007, 352, 356.

We are persuaded by Petitioner that it would have been obvious to one of ordinary skill in the art, given the disclosures of Burns, Monfalcone, and Balukin, to increase safety by preventing the train from being moved without receiving movement authority and permission from a wayside signal. *See* Ex. 1002 ¶¶ 113–128. We determine that Petitioner shows by a

IPR2017-01821
Patent 7,200,471 B2

preponderance of the evidence that claims 11 and 19 are unpatentable over Burns, Monfalcone, and Balukin.

In reaching our determination, we have taken into account Patent Owner's arguments, but find Patent Owner's argument unpersuasive. Patent Owner broadly argues that none of references address "a system that receives and coordinates authorities/signals from separate sources and determines a train's permission to move based upon such multiple sources." PO Resp. 56. Patent Owner's argument focuses individually on Burns, Monfalcone, and Balukin. One cannot establish nonobviousness by attacking the references individually when a challenge is predicated upon a combination of prior art disclosures. *See In re Merck & Co., Inc.*, 800 F.2d at 1097. Petitioner challenged claims 11 and 19 of the '471 patent based upon a combination of Burns, Monfalcone, and Balukin. As discussed above and on this record, we determine that Petitioner's analysis and evidence sufficiently shows that claims 11 and 19 would have been obvious over the combination of Burns, Monfalcone, and Balukin.

On this record, we determine that Petitioner shows by a preponderance of the evidence that claims 11 and 19 are unpatentable over Burns, Monfalcone, and Balukin.

*Analysis–Dependent Claims 12 and 20*

Claim 12 depends from claim 11, and claim 20 depends from claim 19. The additional limitations of claims 12 and 20 require preventing the train from being moved until a circulation authority is received. Ex. 1001, 13:46–49, 14:14–18. We find persuasive Petitioner's contentions that Burns, Monfalcone, and Balukin teaches the additional limitations of claims 12 and 20. Pet. 68 (citing Ex. 1006, 34, 37; Ex. 1007, 353, 355, 356; Ex.

IPR2017-01821
Patent 7,200,471 B2

1015, 2:37–40, 5:32–38; Ex. 1002 ¶¶ 83, 119, 120, 123–124).  Patent Owner makes the same arguments made with respect to independent claims 11 and 19.  PO Resp. 63–64.

We determine that Petitioner shows by a preponderance of the evidence that claims 12 and 20 are unpatentable over Burns, Monfalcone, and Balukin.

*Argument Concerning Motivation to Combine,*

*Burns, Monfalcone, and Balukin*

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine the teachings of Burns, Monfalcone, and Balukin in order to increase railroad safety.  Pet. 48–52.

Ample evidence in the record and the '471 patent's discussion of the prior art demonstrate that it would have been desirable to prevent unauthorized movement of a train to avoid collisions and increase safety. Burns teaches that the ATCS system improves safety by automatic enforcement of movement authority.  Ex. 1006, 33; *see also* Ex. 1012, 1:40– 50 (disclosing that it is desirable to prevent unauthorized operation of a locomotive by unauthorized personnel, like joy riders).  Likewise, the '471 patent teaches that known efforts to automate train operation were motivated by safety concerns (e.g., preventing collisions due to unauthorized movements).  *See* Ex. 1001, 1:22–27.  Monfalcone is also concerned with safety and avoiding collision.  Ex. 1007, 352, 356.  The '471 patent, itself, discloses that it was known in the prior art to automate train control to increase safety, to reduce human error, and to prevent collisions.  *See* Ex. 1001, 1:20–4:3.

IPR2017-01821
Patent 7,200,471 B2

Given this, we determine that Petitioner's analysis and the evidence of record sufficiently shows a POSITA would have been motivated to combine the teachings of Burns, Monfalcone, and Balukin to prevent the train from being moved without receiving movement authority and permission from a wayside signal in order to avoid collisions and increase safety. *See* Ex. 1002 ¶¶ 129–130.

In reaching our determination, we have taken into account Patent Owner's arguments. Patent Owner argues that Petitioner provides no sufficient rationale for combining the prior art to prevent the train from being moved without receiving movement authority and permission from a wayside signal and that Petitioner's combination is based on improper hindsight. PO Resp. 57–63.

We recognize that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d at 1395. As discussed above, the record contains ample evidence that a POSITA would have desired to prevent unauthorized movement of a train to avoid collisions and increase safety. Given this evidence, we are not persuaded that the Petitioner's combination of prior art is based on improper hindsight and that safety is not a sufficient rationale for combining the prior art to prevent the train movement until receipt of both the track warrant and the circulation authority.

IPR2017-01821
Patent 7,200,471 B2

Further, Patent Owner argues that Petitioner's rationale for combining the teachings of the prior art is insufficient because none of Burns, Monfalcone, and Balukin recognize the vandalism problem disclosed in the '471 patent.  PO Resp. 60–61.  This argument is unpersuasive because the obviousness inquiry does not look only to the problem the patentee was trying to solve.  *See Outdry Techs.*, 859 F.3d at 1371 ("The motivation supported by the record and found by the Board need not be the same motivation articulated in the patent for making the claimed combination."); *In re Dillon*, 919 F.2d at 693 (en banc) (holding that the motivation to combine the prior art references need not be identical to that of Applicants). Rather, any need or problem known in the field of endeavor at the time of the invention and addressed by the prior art can provide a reason for combining the elements in the manner claimed.  *KSR*, 550 U.S. at 402; *Outdry Techs.*, 859 F.3d at 1370–71; *see also In re Kemps*, 97 F.3d at 1430.

For the reasons discussed above, we determine that Petitioner demonstrates by a preponderance of the evidence that claims 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 are unpatentable over Burns, Monfalcone, and Balukin.

*Other Arguments*

Patent Owner argues that certain discussions concerning prior art in the '471 patent were not cited in the Petition and, therefore, may not be relied upon to support Petitioner's challenges.  *See e.g.*, PO Resp. 30, n.12. Similarly, Patent Owner argues that Jefferson was not identified as a reference relied upon for the grounds sets forth in the Petition and, thus, may not be used to support Petitioner's alleged motivations to combine the prior art references.  *See id.* at 42, n.19.  "[T]he introduction of new evidence in the course of the trial is to be expected in *inter partes* review trial

IPR2017-01821
Patent 7,200,471 B2

proceedings and, as long as the opposing party is given notice of the evidence and an opportunity to respond to it, the introduction of such evidence is perfectly permissible under the APA." *Genzyme Therapeutic Products Limited Partnership v. Biomarin Pharmaceutical Inc.*, 825 F. 3d 1360, 1366 (Fed. Cir. 2016). Patent Owner does not allege that it did not have notice and opportunity to respond to its own admission made in the '471 patent concerning the prior art or the relied upon portions of Jefferson. *See e.g.*, PO Resp. 30, n.12, 42, n.19.

Further, upon reviewing an *inter partes* review decision by the Board, the U.S. Court of Appeals for the Federal Circuit has found that statements in the specification are "probative on how one with ordinary skill in the art at the time of filing of the involved patent would have read and understood the disclosure of the prior art." *Paice v. Ford Motor*, 881 F.3d 894, 901 (Fed. Cir. 2018) (citing *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness."); *In re Baxter Travenol Labs*, 952 F.2d 388, 390 (Fed. Cir. 1991) (holding extrinsic evidence, including *admissions*, may be used to explain what a reference discloses in a reexamination proceeding)).

### III. MOTION TO EXCLUDE

Patent Owner moves to exclude Exhibit 1002, which is the declaration of Dr. Pullen. *See* Mot. Patent Owner urges the exclusion of Dr. Pullen's testimony pursuant to Federal Rule of Evidence 702 on the basis that he has insufficient experience specific to train control. *Id.* at 4–9; Reply to Opp. 1–5. Relatedly, Patent Owner argues that Dr. Pullen's testimony regarding

issues to be considered from the perspective of an ordinarily skilled artisan is speculative and therefore inadmissible under Federal Rules of Evidence 402 and 403. Mot. 9–11

Petitioner opposes the motion, arguing that Dr. Pullen has extensive experience in transportation control systems generally, of which train control is a subset, and in recent years has experience specific to train control. Opp. to Mot. 1–7. Petitioner also points to testimony given in another proceeding by Patent Owner's expert, Mr. Loud, explaining that he was qualified to testify as an expert in a trial involving personal watercraft controllers by virtue of his engineering background and his experience with railroad control systems. Pet. 7 (citing Ex. 1019, 42:4–23).

We are not persuaded that Dr. Pullen's testimony should be excluded. Dr. Pullen holds several degrees in Aeronautics, a field of study that involves control systems: an undergraduate degree he received in 1989, a Masters degree he received in 1990, and a Ph.D. he received in 1996. Ex. 1003, 1. Dr. Pullen's declaration indicates that he has "twenty years of experience in the field of transportation safety and control systems, with the last three years specifically focused on train safety and control systems. Ex. 1002 ¶ 7; *see also id.* ¶¶ 8–17 (describing education and experience related to control systems). Thus, at the time of the claimed invention in the '471 patent (*see* Ex. 1001, (62), indicating a priority date of Jul 2, 2002), Dr. Pullen had more than the requisite academic training but not the "at least three years of experience related to train control" required by the definition of POSITA we have adopted above.

Nevertheless, complete overlap between a witness's technical qualifications and the field of the invention is not necessary for the witness's

IPR2017-01821
Patent 7,200,471 B2

testimony to be admissible under Federal Rule of Evidence 702.  For example, the Federal Circuit has upheld a district court's admission under Rule 702 of the testimony of a witness who lacked experience in the design of the patented invention, but had experience with materials selected for use in the invention.  *See SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1372–73 (Fed. Cir. 2010).  Dr. Pullen has extensive experience and expertise related to control systems, and some experience in more recent years related to train control.  Ex. 1002 ¶¶ 7–17; Ex. 1003.  Dr. Pullen's lack of experience specific to trains before 2011 may detract from the weight to be given his testimony on certain matters, but it does not render the entirety of his testimony inadmissible under Rules 702, 402, or 403.

To support its motion, Patent Owner relies heavily on *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356 (Fed. Cir. 2008).  *See* Mot. 5–7, 9; Reply to Opp. 4.  There, the Federal Circuit reviewed the district court's denial of a motion to exclude a patent lawyer having no relevant technical expertise from testifying in a jury trial.  *Sundance*, 550 F.3d at 1361–62.  The Federal Circuit held that because the patent attorney "was never offered as a technical expert, and in fact was not qualified as a technical expert, it was an abuse of discretion for the district court to permit him to testify as an expert on the issues of noninfringement or invalidity."  *Id.* at 1362.  The Federal Circuit further explained:

> The court, in its role as gatekeeper, must exclude expert testimony that is not reliable and specialized, and which invades the province of the jury to find facts and that of the court to make ultimate legal conclusions.  Allowing a patent law expert without any technical expertise to testify on the issues of infringement and validity amounts to nothing more than advocacy from the witness stand.

IPR2017-01821
Patent 7,200,471 B2

*Id.* at 1364–65. Here, Dr. Pullen is offered as a technical expert and he has substantial technical expertise related to the field of the '471 patent. Moreover, in this proceeding, fact-finding and legal determinations are carried out by the same panel of administrative patent judges, which eliminates the concern of invading the jury's province. These distinctions make *Sundance* inapposite as a basis for excluding Dr. Pullen's testimony.

For the foregoing reasons, we deny Patent Owner's motion to exclude Exhibit 1002.

## IV. CONCLUSION

We determine that Petitioner demonstrates by a preponderance of the evidence that claims 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 are unpatentable under 35 U.S.C. § 103(a) over a combination of GCOR, Judge, and Balukin and over a combination of Burns, Monfalcone, and Balukin.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 4, 6, 7, 9, 11, 12, 19, and 20 of U.S. Patent No. 7,200,471 B2 have been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Exhibit 1002 is denied; and

FURTHER ORDERED that parties to the proceeding seeking judicial review of this Final Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-01821
Patent 7,200,471 B2

PETITIONER:

Jason A. Engel
Alan L. Barry
Benjamin E. Weed
Katherine L. Hoffee
Roberto Capriotti
Ragae Ghabrial
K&L GATES LLP
jason.engel.ptab@klgates.com
alan.barry@klgates.com
benjamin.weed.ptab@klgates.com
katy.hoffee.ptab@klgates.com
roberto.capriotti@klgates.com
ragae.ghabrial@klgates.com

PATENT OWNER:

Jeffrey D. Sanok
Mark M. Supko
Vincent J. Galluzzo
Scott L. Bittman
CROWELL & MORING LLP
jsanok@crowell.com
msupko@crowell.com
vgalluzzo@crowell.com
sbittman@crowell.com

EXHIBIT D

Trials@uspto.gov
571-272-7822

Paper 44
Entered: January 29, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION,
Petitioner,

v.

SIEMENS MOBILITY, INC.,
Patent Owner.
_____

Case IPR2017-00981
Patent 7,092,801 B2
_____

Before KRISTEN L. DROESCH, MEREDITH C. PETRAVICK, and
TIMOTHY J. GOODSON, *Administrative Patent Judges.*

GOODSON, *Administrative Patent Judge.*

DECISION
Denying Patent Owner's Request for Rehearing
*37 C.F.R. § 42.71*

IPR2017-00981
Patent 7,092,801 B2

## I.    INTRODUCTION

Patent Owner filed a Request for Rehearing (Paper 43, "Req. Reh'g") of our Final Decision (Paper 42, "Dec."). In that Decision, we concluded that Petitioner established by a preponderance of the evidence that claims 1, 6, 9, 10, 15, 18, and 19 of U.S. Patent No. 7,092,801 B2 ("the '801 patent") are unpatentable. *See* Dec. 37. Patent Owner requests rehearing, arguing that we misapprehended or overlooked certain evidence or arguments. *See* Req. Reh'g 1. For the reasons set forth below, Patent Owner's request for rehearing is *denied*.

## II.    LEGAL STANDARD

In a request for rehearing, "[t]he burden of showing a decision should be modified lies with the party challenging the decision." 37 C.F.R. § 42.71(d). Further, "[t]he request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply." *Id.*

## III.    ARGUMENTS RELATING TO NICKLES-LED GROUND

Patent Owner argues that we misapprehended Nickles in finding that it discloses using train weight and track grade to prevent speed restrictions. Req. Reh'g 10–12. This argument does not identify disclosure in Nickles that we overlooked or misapprehended, and instead simply reiterates arguments that we already discussed and found unpersuasive in the Decision. *See* Dec. 13–16.

Patent Owner further argues that we misapprehended evidence in finding that Nickles teaches the subject matter of claim 19. Req. Reh'g 12–13. Patent Owner does not cite any paper in which its arguments concerning claim 19 were presented previously. *See id.*; 37 C.F.R. § 42.71(d). Indeed,

2

IPR2017-00981
Patent 7,092,801 B2

we noted in the Final Decision that Patent Owner did not present any argument for claim 19 separate from its argument for claim 1.  Dec. 31; *see also id.* at 11 n.8.  Accordingly, Patent Owner waived its arguments concerning claim 19.  *See LG Elecs., Inc. v. Conversant Wireless Licensing S.A.R.L.*, Case No. 18-1185, slip op. at 10–11 (Fed. Cir. Jan. 25, 2019) (citing *In re Nuvasive, Inc.*, 841 F.3d 966, 974 (Fed. Cir. 2016)).

IV.    ARGUMENTS RELATING TO RSAC-LED GROUNDS

Patent Owner argues that we overlooked Dr. Pullen's testimony that he did not analyze whether a skilled artisan would have combined disparate systems described in RSAC.  Req. Reh'g 3–6.  According to Patent Owner, that Petitioner did not present testimony from Dr. Pullen regarding motivation to combine different teachings within RSAC means that Petitioner's obviousness case is deficient.  *Id.* at 4–5.  We disagree that expert testimony on motivation to combine is indispensable to support a determination of obviousness.  The Federal Circuit has explained that "expert testimony is not required when the references and the invention are easily understandable."  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1242 (Fed. Cir. 2010); *see also Belden v. Berk-Tek LLC*, 805 F.3d 1064, 1079 (Fed. Cir. 2015) ("No rule requires a Petition to be accompanied by any declaration. . . .").

Moreover, we pointed out in our Decision that "combining RSAC's descriptions of different systems is not essential to Petitioner's challenge" because RSAC's descriptions of the PTS system are sufficient to teach each limitation of claim 1.  Dec. 30.  Recent Federal Circuit precedent indicates that a motivation to combine is unnecessary when a single reference teaches each element of a challenged claim.  *See Realtime Data, LLC v. Iancu*, __

3

IPR2017-00981
Patent 7,092,801 B2

F.3d __, 2019 WL 149835, at *4 (Fed. Cir. 2019).

Finally, Patent Owner argues that we overlooked evidence in finding that RSAC's description of PTS teaches using track grade and train weight to determine when a train is in danger of violating a speed restriction and applying the brakes to prevent a violation. Req. Reh'g 6–10. Similar to the arguments relating to the Nickles-led ground, these arguments amount to mere disagreement with the findings in our Decision. We discussed Patent Owner's arguments regarding this limitation in the Decision, and the Request does not apprise us of evidence or arguments that we missed or misunderstood in reaching those findings. *See* Dec. 25–28. Accordingly, Patent Owner's arguments that we erred in our findings are better addressed through appeal.

V.    ORDER

Accordingly, it is

ORDERED that Patent Owner's Request for Rehearing is *denied*.

4

IPR2017-00981
Patent 7,092,801 B2

For PETITIONER:

Jason A. Engel
Alan L. Barry
Roberto Capriotti
Benjamin E. Weed
Ragae Ghabrial
Katherine L. Hoffee
K&L GATES LLP
Jason.engel.ptab@klgates.com
Al.barry.ptab@klgates.com
Roberto.capriotti@klgates.com
Benjamin.weed.ptab@klgates.com
Ragae.ghabrial@klgates.com
Katy.hoffee.ptab@klgates.com


For PATENT OWNER:

Jeffrey D Sanok
Mark M. Supko
Vincent J. Galluzzo
Jacob Z. Zambrzycki
CROWELL & MORING LLP
jsanok@crowell.com
muspko@crowell.com
vgalluzzo@crowell.com
jzambrzycki@crowell.com